**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RICHARD LOWERY, | |
| *Plaintiff*, | |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| LILLIAN MILLS, in her official capacity as Dean of the McCombs School of Business at the University of Texas at Austin; ETHAN BURRIS, in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin; and SHERIDAN TITMAN, in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin, | Case No. |
| *Defendants*. | |

INTRODUCTION

The First Amendment protects the right of citizens to criticize government

officials, including administrators at Texas' flagship state university for their use of

public funds for ideological indoctrination, and their hostility to viewpoint diversity

and academic freedom. It also protects the right of public university professors to

engage their colleagues and administrators in debate and discussion concerning

1

academic matters, including what should be taught and the school's ideological direction and balance. Richard Lowery, a professor at the University of Texas at Austin (UT), has used social media and online opinion articles to publicly criticize university officials' actions, and ask elected state-government officials to intervene. He has also used such tools to participate in the sort of academic campus discourse that faculty traditionally pursue.

UT's officials responded with a campaign to silence Lowery by threatening his job, pay, institute affiliation, research opportunities, academic freedom, and labeling his behavior as inviting violence or lacking in civility. They also allowed, or at least did not retract, a UT employee's request that police surveil Lowery's speech, because he might contact politicians or other influential people.

Lowery got the message. Fearing further retribution, he began self-censoring, including by throttling his social media use and altering the topics of his speeches in academic settings. That harm is ongoing.

Lowery seeks to vindicate his right of free expression and asks this Court to enjoin, and declare unconstitutional, Defendants' actions to chill his expression and retaliate against him for engaging in protected speech.

JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case presents questions of federal law.

2.  Venue lies in this Court because all defendants reside in this judicial district, and the events giving rise to these claims occurred and are occurring here. 28 U.S.C. §§ 1391(b)(1) and (b)(2).

PARTIES

3. Plaintiff Lowery is an Associate Professor of Finance at the McCombs School of Business at UT. Prof. Lowery also serves as an Associate Director at the Salem Center for Policy, an academic institute that is part of the McCombs School.

4. Defendant Lillian Mills is the Dean of the McCombs School. She is sued in her official capacity. Dean Mills has the power to control or influence the conditions of Lowery's employment at UT.

5. Defendant Ethan Burris is the Senior Associate Dean for Academic Affairs of the McCombs School. He is sued in his official capacity. Associate Dean Burris has the power to control or influence the conditions of Lowery's employment at UT.

6. Defendant Sheridan Titman is the Chair of the McCombs School's Department of Finance. He is sued in his official capacity. Chair Titman has the power to control or influence the conditions of Lowery's employment at UT.

STATEMENT OF FACTS

*Professor Lowery's public commentary on university affairs*

7. Lowery has a well-established history of speaking on controversial public affairs topics. His published commentary has appeared in newspapers and online publications such as *The Hill*, the *Texas Tribune*, the *Houston Chronicle*, the *Ft. Worth Star-Telegram*, the *Washington Times*, and *The College Fix*.

8. Professor Lowery dissents from the political and academic views that are held by the majority of his peers and superiors at UT, often publicly, and sometimes uses pointed terminology to get his points across. He also does not shy from making his opinions known to elected officials in Texas, including those who oversee funding for UT.

9. In recent years, Lowery has repeatedly criticized UT's senior officials ("UT's Administration"), including President Jay Hartzell, and their approaches to issues such as critical-race theory indoctrination, affirmative action, academic freedom, competence-based performance measures, and the future of capitalism.

10. He has in particular complained about the UT Administration's use of diversity, equity, and inclusion (DEI) requirements to filter out competent academics who dissent from the DEI ideology prevailing on campus.

11. For example, on December 21, 2021, Professor Lowery published a column in the online periodical, *The College Fix,* challenging UT's recent $100,000 GoKar program for subsidizing the teaching of critical race theory to young children. Richard Lowery, *At UT-Austin, teaching white 4-year-olds that they're*

4

*racist is funded by taxpayer dollars,* THE COLLEGE FIX (Dec. 1, 2021) http://bit.ly/3RptYwV. Lowery called the GoKar program a "grave misuse of state funds for public purposes." He also criticized UT's use of DEI grants as the "diversion of state resources to political advocacy through bureaucratic means…" and the lack of oversight by elected leaders.

12.      Similarly, in June 2022, Lowery published a pointed criticism of race-based affirmative action in admissions at UT in the *Washington Times*. Richard Lowery, *Perpetuating racism: Why universities insist on 'affirmative action,* THE WASHINGTON TIMES (June 28, 2022), http://bit.ly/3kKNBDl. He opined that racist admission policies were operationalized through university DEI offices and the placement of critical race theorists in positions of power, posing several questions to his readers, such as: "Why are [university presidents] more scared of racist faculty than of their state government, which should be monitoring them to make sure they are focused on excellence and equal treatment of students?" Lowery encouraged Texans to seek answers from their state representatives.

*Lowery criticizes the UT Administration's hijacking of the Liberty Institute*

13.      Lowery has a longstanding commitment to increasing viewpoint diversity on the UT campus, both through his work with the Salem Center and through his speech on and off campus.

14.      Carlos Carvalho is another professor of business at the McCombs School and is also the Executive Director of the Salem Center for Public Policy, where he collaborates with Lowery on evidence-based approaches to policy issues,

5

including market-based approaches that consider trade-offs. Their work does not utilize critical race theory or other principles based on DEI ideology.

15.     Lowery is a Senior Scholar at the Salem Center and reports to Carvalho. Lowery receives additional pay due to his affiliation with the Salem Center, as well as prestige and access to research opportunities.

16.     In 2021, Lowery and Carvalho decided to pursue funding for a new "Liberty Institute" at UT, to provide a place for the study of classical-liberal, pro-free market viewpoints on a campus, as a counterweight to the dominant critical race theory and DEI-based ideology that was metastasizing from its origins in the humanities into more evidence-based disciplines such as business, economics, and STEM disciplines.

17.     Their goal was for the Liberty Institute to remain independent within UT, without having to answer to the general faculty within existing schools, so as to avoid becoming subject to the ideological bias inherent in most academic hiring decisions at UT, where DEI filtering mechanisms are applied, which result in the removal of candidates who dissent from DEI ideology and critical race theory.

18.     The two enlisted the support of UT President Hartzell and private donors.

19.     The Texas legislature's 2022-23 state budget allocated $6 million in funding for the Liberty Institute, which also garnered support from private donors.

20.     But the enabling legislation was somewhat vague, which allowed President Hartzell and his allies in the UT Administration to hijack the project,

6

remove its independence, re-direct its funding to existing personnel and programs, and change its title to "Civitas."

21.    On June 8, 2022, Lowery was quoted in the *Texas Tribune,* criticizing President Hartzell and another member of the UT Administration: "The President of UT, in coordination with one of his chief deputies, Richard Flores, chose to completely default on the plan agreed to for bringing needed intellectual diversity to campus and push back against the persistent attacks on free inquiry and academic freedom at UT-Austin." Kate McGee, *Professors behind conservative-backed "Liberty Institute" say UT has strayed from plan,* THE TEXAS TRIBUNE (June 8, 2022), http://bit.ly/409vZ3W.

22.    On July 1, 2022, Lowery again expressed his opinions about the hijacking of the Liberty Institute, criticizing the role of UT President Hartzell and Richard Flores, who is an advocate of critical race theory and DEI-ideology. Richard Lowery, *How UT-Austin Administrators Destroyed an Intellectual Diversity Initiative,* MARTIN CENTER FOR ACADEMIC RENEWAL (July 1, 2022), http://bit.ly/3kMhO4S. ("During this time, UT's president put a critical race theorist in charge of developing the Liberty Institute"). Lowery concluded his opinion article with a call for outside intervention to help establish viewpoint diversity: "[W]ith the current administration at UT, nothing will be possible without far more direct state intervention."

23.    Later in July 2022, Professor Lowery appeared on The Center for the Study of Partisanship and Ideology's (CSPI) podcast to join its President, Richard

Hanania, to talk about the Liberty Institute controversy. CSPI Podcast, *Lessons from the Frontlines of the University Wars | Richard Lowery & Richard Hanania* (last visited January 26. 2023), https://youtu.be/F9JB3a3viGU. Hanania is also a visiting scholar at the Salem Center.

24.     During the podcast, Lowery criticized UT's Administrators, including President Hartzell. Lowery repeatedly opined that part of Hartzell's job was lying to Republican office holders in Texas in order to minimize viewpoint-diversity problems at UT. Lowery also repeatedly criticized what he termed fake conservatives on campus, who he said have assisted establishment leftists in derailing viewpoint-diversity efforts at UT. He was also generally critical of UT's use of DEI-ideology to filter merit-based candidates for academic and administrative posts.

25.     Lowery has used his Twitter account with the handle @RichardLoweryTX to express his views on the UT Administration and other issues by authoring tweets, and sometimes by re-tweeting or replying to posts by other users. Initially, all of Lowery's posts were publicly available to be viewed by any other Twitter user.

26.     He has sometimes tagged elected officials or social-media personalities in his tweets, which makes his postings visible to those officials on Twitter.

27.     Further information about the functionality of tweeting, re-tweeting, and replying, can be found at TWITTER, *New user FAQ* (last visited Jan. 31, 2023), https://help.twitter.com/en/resources/new-user-faq.

28.     On August 18, 2022, Lowery tweeted about an article regarding new DEI-ideology based job performance reviews in the University of California system, tagging Texas Governor Greg Abbott's Twitter account, and also Lieutenant Governor Dan Patrick's Twitter account. He pointedly asked why those elected officials had put Texas on the same path, a reference to the UT Administration's expanding use of DEI filtering criteria at UT.



9

*Professor Lowery's pointed critiques of the Global Sustainability Leadership
Institute*

29.     The McCombs School hosts a Global Sustainability Leadership
Institute ("GSLI" or "Sustainability Institute"), which promotes Environment
Sustainability and Governance ("ESG") based viewpoints that are consistent with
the predominant DEI-ideology at UT and are often at odds with free-market
principles and Lowery's views.

30.     Per its director, Meeta Kothare, GSLI's goal is to create leaders "who
will create a regenerative, inclusive world in their own lifetime."

31.     Richard Lowery believes that the Sustainability Institute is designed
to train activists to use corporations to promote DEI-based ideology. He believes
that ESG serves a similar purpose: to hijack corporations to propagate ideological
goals. He also believes that the Sustainability Institute promotes a worldview and
academic approach that is at least partially antithetical to his own free-market
philosophy and academic approach, and is also hostile to the academic values,
approaches, and studies emphasized by the Salem Center.

32.     Lowery has criticized the Sustainability Institute and its events using
his Twitter account.

33.     On April 11, 2022, Lowery tweeted a photo of a Sustainability Institute flyer touting the institute's "Global Sustainability Minor." Lowery commented that the minor was promoting "left-wing activism" and criticized the perceived hypocrisy of its supporters, stating, "These people are shameless and awful."



34.     On August 22, 2022, Lowery tweeted a photo of a display promoting a Sustainability Institute event called, "Impact Chat: ESG under Attack." Lowery criticized the featuring of two ESG proponents, and compared the panel's lack of balance with his own efforts to include dissenting views at Salem Center events.



*"We need to do something about Richard"*

35.     Lowery's repeated criticisms of the UT Administration, their DEI initiatives, and the Sustainability Institute drew the attention of Defendants, who decided to pressure Lowery and his friend and ally, Carlos Carvalho, into censoring Lowery's speech.

36.     In a late July or early August 2022 conversation, Defendant Titman told Carvalho, "We need to do something about Richard." He added that President

Hartzell and Dean Mills were upset about Lowery's political advocacy, and wanted to know if "we can ask him to tone it down?"

37.     Carvalho understood this as an implicit threat, but he refused to do anything. Carvalho explained to Defendant Titman that Lowery has a First Amendment right to express himself.

38.     Defendants decided to ratchet up the pressure. In mid-August 2022, Defendants Mills and Burris met with Carvalho to discuss the Salem Center. The first part of their meeting was routine, but after about an hour, the tone shifted when Mills and Burris changed the subject to Lowery's speech.

39.     Mills and Burris claimed that Lowery was "crossing the line" in his criticism of school officials, to the point where the UT legal department was allegedly concerned about his speech. When Carvalho asked them for examples of such speech, Dean Mills pointed to Lowery's podcast interview with Richard Hanania about the Liberty Institute controversy. Mills advised Carvalho to "work with Richard [Lowery]" about his speech.

40.     When Carvalho declined to pressure Lowery to modify his speech, the deans' approach shifted to suggestions that Lowery was impeding Carvalho's ability to do his job, and that Lowery's association with Carvalho and the Salem Center was "problematic." The deans insisted that something should be done about Lowery, Associate Dean Burris telling Carvalho, "You have the power to have him not be attached to the center," a reference to the fact that Burris and Carvalho must both annually review Lowery's contract with the Salem Center.

41.     When Carvalho again resisted calls to discipline Lowery over his
speech, Dean Mills threatened to remove Carvalho from his Executive Director post,
telling him, "I don't need to remind you that you serve at my pleasure," and stated
that she did not care that Carvalho was the one who primarily raised money for the
center.

42.     In another meeting, in late August 2022, in Associate Dean Burris's
office, Burris asked for Carvalho's opinion about their previous conversation.
Carvalho stated that he had felt threatened, to which Burris responded by
attempting to recharacterize the conversation, stating, "No, I wouldn't interpret it
that way, he's [Lowery] hurting you." Burris did not retract any of his prior threats.

43.     In another meeting in Burris's office, on or about October 17, 2022,
Burris stressed to Carvalho the importance of "civility" while also reminding
Carvalho that Burris is the one who must approve Lowery's compensation and
ultimately oversees the Salem Center. Although he had just renewed Lowery's
annual appointment, Burris told Carvalho that he might not approve Lowery's
appointment to the center in the future because of his speech.

44.     Carvalho understood that Titman, Mills, and Burris all wanted him to
pressure Lowery to temper his political and academic speech, and to convey to him
that his relationship with the Salem Center was in danger if he did not do so. He
relayed Titman, Mills, and Burris's threats to Lowery, as they requested and
expected that he would.

14

*The Sustainability Institute seeks to suppress dangerous ideas*

45.     On August 22, 2022, GSLI's Managing Director, Meeta Kothare, an anti-free market activist, emailed Lowery's tweet criticizing the institute's ESG event to Dean Mills and GSLI's Executive Director, Jeffrey Hales. The email's subject line was, "Lowery's tweets have started again" suggesting that Kothare, Mills, and Hales had previously discussed Lowery's tweets.

46.     Addressing Dean Mills in the email, Kothare added, "Lil . . . I'm becoming very concerned about the safety of our events at this rate. The tweets start as soon as any poster about us goes up somewhere in the building." Betraying that her true objection to Lowery's tweet was not safety, she added, "Thankfully, this time he has not tagged some politician."

47.     Kothare then forwarded the email she had sent to Mills and Hales about Lowery to another finance professor, Laura Starks, asking, "Do our finance colleagues know about this? Should Sheridan [Titman] be told? This is an ongoing story. At what point will he [Lowery] stir up real trouble?"

48.     Starks, in turn, forwarded the email chain to defendant Titman. "Please see issue below. Given the political mood in the country today, this is not acceptable and is potentially quite dangerous."

49.     Titman responded, "We should have a discussion of what is appropriate on twitter – we want to encourage intellectual discourse, but I don't think rude comments are acceptable."

50. In another email, Kothare complained to Titman that Lowery had criticized her institute's sustainability minor and sometimes tagged elected officials.

51. Defendant Titman responded to Kothare's censorship demands by forwarding Lowery the original email Kothare sent to Dean Mills, omitting the header so that Lowery could not see the sender. He could tell only that Mills was the recipient, as that email opened by addressing "Lil."

52. Along with the forwarded email, Titman wrote Lowery, "You don't seem to be making friends. It is probably in your interest to come up with a class for the Spring that is likely to be popular . . . In any event, the appropriate response is to jointly sponsor a panel discussion on ESG."

53. Lowery responded, "I consider this a threat. I can certainly criticize events."

54. As a result of Titman's threats, as well as those of Mills and Burris, Lowery set his Twitter account to "private," meaning that only his followers could see his tweets, replies, and re-tweets, not the general public. Setting his account to "private" also reduces the reach of any commentary Lowery posted on Twitter or might in the future post on Twitter.

55. He also stopped tweeting altogether as of late August 2022, although he has not deleted his account and would like to resume tweeting, re-tweeting, replying to other posts, and otherwise commenting on matters as before.

*The Sustainability Institute asks UT police to surveil Lowery's speech*

56.     Two days after Kothare lobbied to have UT Administrators censor Lowery, another Sustainability Institute employee, Madison Gove, emailed UT police officer Joseph Bishop, referencing a conversation that they had about Lowery.

57.     Gove wrote "His name is Richard Lowery . . . [a]s mentioned, we are more worried about the people he reaches than him. Some of his supporters are authors, podcasters, and politicians. . . . Unfortunately, he switched his account to private mode today, so I cannot give you anything other than what I have. Perhaps you all can see more. The link is https://twitter.com/RichardLoweryTX."

58.     Gove also provided Officer Bishop with screenshots of Lowery's tweets, which she had gathered before he had set his account to private.

59.     Kothare and other UT administrators were copied on Gove's email to the UT police requesting surveillance of Lowery's speech. There is no indication that any UT administrator withdrew the request for police surveillance.

*The impact of Defendants' threats on Lowery's speech*

60.     Due to Defendants' threats to punish him for his political commentary and criticism of the UT Administration, Professor Lowery does not believe he is free to continue expressing his views openly.

61.     Lowery reasonably fears that if he continues to offer public commentary that is critical of the UT Administration and its policies, Defendants will not renew his appointment to the Salem Center, costing him the $20,000

17

annual stipend that comes with that position, and possibly take other adverse actions.

62.     Lowery also fears that if he continues to speak publicly, Defendants will remove his supervisory role at the Policy Research Lab, and the opportunities to publish academic research that the Policy Research Lab generates for Lowery.

63.     The loss of research opportunities would be professionally devastating, since Lowery's primary research has been curtailed by the significant efforts he expends on the Salem Center's behalf.

64.     Having recently discovered Gove's email to the UT police, Lowery is further concerned that Defendants will attempt to label Lowery as lacking civility, being dangerous, violent, or in need of police surveillance, especially if he publicly criticizes the UT Administration or contacts elected officials.

65.     Lowery further fears that Defendants will find various additional pretexts for punishing him for his speech, because they are embarrassed and irritated by his criticisms and the fact that he is informing elected officials about events at UT, that cast the UT Administration in a negative light.

66.     Lowery would continue speaking his mind about political and academic matters, including criticizing the UT Administration, DEI policies, the Sustainability Institute and the hijacking of the Liberty Institute. But he refrains from doing so because he believes Defendants will make good on their threats, including ending his affiliation with the Salem Center, cutting his pay, accusing

18

him of incivility, equating his opinions with inciting violence, and placing him under police surveillance.

67.     On account of Defendants' threats, Lowery has locked his Twitter account, significantly reducing his audience, and making his speech on that platform generally unavailable to the public. He has also stopped using Twitter entirely and has curtailed his public speech critical of the UT Administration because of Defendants' threats.

68.     For example, Lowery served on the organizing committee for a recent Stanford University conference exploring freedom of speech on campus and had planned to use his appearance at that conference to criticize the UT Administration's handling of the Liberty Institute affair and the hostility of UT's environment for free speech. But fearing retaliation by Defendants, who had already threatened him over similar speech, Lowery instead spoke about free speech issues at private universities.

69.     Similarly, he asked that an October 2022 symposium in Washington, D.C., called "Reversing Ideological Capture of Universities," that he had participated in, and helped organize, not be made public.

70.     In addition, to teaching and conducting research, Lowery believes that part of his job as a UT academic is to comment on university affairs, including UT's policies, UT Administrator's actions, spending priorities, academic freedom, tolerance for viewpoint diversity, even when those topics do not directly relate to his teaching or published research.

71.     Lowery has observed that other UT faculty are able to comment freely in support of DEI initiatives without getting threatened by UT Administrators. Sometimes their speech is even subsidized and encouraged by UT. For example, the UT Provost's Office offers grants to support projects on campus that promote DEI.

72.     A description of the Provost's grant program to promote DEI ideology can be found at University of Texas, *New Grants Empower Campus Community to Lead Diversity, Equity and Inclusion Projects* (last visited February 5, 2023), http://bit.ly/3XeXwi4.

COUNT ONE
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
CHILLING OF FREE SPEECH BY STATE ACTORS

73.     Professor Lowery realleges and incorporates paragraphs 1 through 72.

74.     Lowery's public criticism of the UT Administration, its DEI policies, its hijacking of the Liberty Institute; as well as his criticism of the Sustainability Institute, its minor, and its ESG panel, all constitute protected speech on matters of public concern. And to the extent that Lowery speaks about academic affairs on campus, his doing so is part and parcel of his traditional role as a university professor.

75.     Lowery has a legally protected right to voice his criticisms of the UT Administration on the Sustainability Institute to elected officials in Texas state government, including petitioning them for a redress of his grievances with regard to spending of public funds for ideological indoctrination at UT.

76.     The UT Administration may not prohibit Lowery from speaking to elected officials in Texas state government through the use of Twitter or other social media platforms, even if that embarrasses the UT administration.

77.     When speaking on matters of public concern, Lowery has a right to present his opinions in the way that he chooses, including in ways that others, including the majority of UT faculty, might find disagreeable or offensive.

78.     In addition, or in the alternative, Lowery also has a right to engage in the speech at issue in this case as part of his right to academic freedom and as a participant in the dialogue about university affairs.

79.     Defendants' threats to reduce Lowery's pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, label him, request that his speech be placed under police surveillance, or otherwise discipline him are designed to silence Lowery's criticisms or change the content of this speech to make it less critical, disagreeable, or offensive.

80.     In addition, or in the alternative, Defendants' threats also prospectively chill his right to academic freedom.

81.     Lowery has an intention to engage in future public criticism of the UT Administration, its DEI policies, its handling of the Liberty Institute, and its misuse of public funds for ideological purposes; as well as criticizing the Sustainability Institute and its activities; and the general lack of viewpoint

diversity on the UT campus. He also has an intention to speak to elected officials in Texas state government about these issues via social media and other means.

82.     Lowery's intended conduct would reasonably subject him to further threats and the implementation of previous threats by Defendants.

83.     The risk of future threats and the implementation of previous threats is substantial.

84.     By chilling Professor Lowery's freedom of speech, Defendants, under color of law, violated and continue to violate Richard Lowery's free speech rights under the First and Fourteenth Amendment to the United States Constitution. Accordingly, Defendants injured Professor Lowery in violation of 42 U.S.C. § 1983, and Lowery is entitled to declaratory and preliminary and permanent injunctive relief against the Defendants' misconduct; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT TWO
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
RETALIATION FOR PROTECTED SPEECH AS A CITIZEN AND ACADEMIC

85.     Professor Lowery realleges and incorporates paragraphs 1 through 72.

86.      Lowery's public criticism of the UT Administration, its DEI policies, its hijacking of the Liberty Institute, and its perceived misuse of public funds; as well as his criticism of the Sustainability Institute, its minor, and its ESG panel, all constitute protected speech by a citizen, especially when Lowery spoke in published opinion articles, on social media, or to elected officials.

22

87.     In addition, or in the alternative, part of Lowery's job as an academic at UT is to critique ideas, policies, hiring, administrative decisions, the allocation of resources, and the general intellectual climate. Doing so allows Lowery to participate in the life of the mind and academic dialogue in a way that is also afforded to his leftwing peers, who do not share his conservative worldview. To the extent that Lowery's speech at issue in this case constituted speech within his job responsibilities, it was speech protected by the right to academic freedom.

88.     Defendants, individually, and in concert with each other acted to retaliate against Lowery for his protected speech because it was embarrassing to them and others in the UT administration and also because they feared the possibility of elected officials scrutinizing their behavior.

89.     Defendants also retaliated against Lowery because they found his commentary offensive and thought that it offended other, more favored faculty at UT, whose worldview was more aligned with the majority of UT-faculty and the UT Administration's DEI ideology.

90.     Defendants retaliated against Lowery for his protected speech by threatening to reduce Lowery's pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, labeling him, requesting that his speech be placed under police surveillance, or otherwise disciplining him.

91.     Defendants' threats were such that a reasonable person in Lowery's position would refrain from speaking in the ways at issue in this case.

92.     In addition, and in the alternative, to the extent the speech at issue in this case was speech that was part of Lowery's job responsibilities and protected by academic freedom, Defendants' threats against Lowery effectively removed an important part of his job duties by restricting his right to critique ideas, policies, hiring, administrative decisions, the allocation of resources, the general intellectual climate at UT, and to otherwise participate in the life of the mind and academic dialogue on terms equal to his peers on the faculty.

93.     In addition, and in the alternative, the removal of these rights and job responsibilities amounted to an adverse employment action and a serious burden on the right to academic freedom.

94.     By retaliating against Richard Lowery for his protected speech, Defendants, under color of law, violated and continue to violate Richard Lowery's free speech rights under the First and Fourteenth Amendments to the United States Constitution. Accordingly, Defendants injured Professor Lowery in violation of 42 U.S.C. § 1983, and Lowery is entitled to declaratory and preliminary and permanent injunctive relief against the Defendants' retaliatory misconduct; and attorney fees and expenses under 42 U.S.C. § 1988.

### Prayer for Relief

WHEREFORE, Plaintiff Richard Lowery requests that judgment be entered in his favor and against the Defendants as follows:

A.  Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation

with them who receive actual notice of the injunction, from threatening Lowery for protected speech, or from implementing those threats, including reducing his pay, removing his job responsibilities, removing his affiliation with the Salem Center, reducing his access to research opportunities, reducing his academic freedom, labeling his criticism as violent or uncivil, asking any police agency to surveil Lowery's speech, engage in any other adverse employment action, or employment action designed to dissuade a reasonable person in Lowery's position from engaging in protected speech;

B. Declaratory relief consistent with the injunction, to the effect that Lowery's public speech criticizing the UT Administration, its DEI policies, its hijacking of the Liberty Institute, and its perceived misuse of public funds; as well as his criticism of the GSLI, its minor, and its ESG panel; and including the fact that he directed some of his public speech at elected officials, all constitute protected speech; and that Defendants threats against Lowery amounted to unconstitutional state action designed to chill Lowery's protected speech and retaliate against him for having engaged in protected speech;

C. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Any other relief this Court may grant in its discretion.

Respectfully submitted,

   *s/Stephanie M. Brown*
Stephanie M. Brown
State Bar No. 24126339
Endel Kolde
(admission to be sought)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-1664
Fax: (202) 301-3399
sbrown@ifs.org
dkolde@ifs.org

*Attorneys for Richard Lowery*

Dated: February 8, 2023

   *s/Michael E. Lovins*
Michael E. Lovins
State Bar No. 24032555
LOVINS | TROSCLAIR, PLLC
1301 S. Cap. Of Texas
Building A Suite 136
Austin, Texas 78746
Tel: 512.535.1649
Fax: 214.972.1047
michael@lovinslaw.com

26