(Slip Opinion)          OCTOBER TERM, 2022          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## 303 CREATIVE LLC ET AL. *v.* ELENIS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 21–476.  Argued December 5, 2022—Decided June 30, 2023

Lorie Smith wants to expand her graphic design business, 303 Creative LLC, to include services for couples seeking wedding websites. But Ms. Smith worries that Colorado will use the Colorado Anti-Discrimination Act to compel her—in violation of the First Amendment—to create websites celebrating marriages she does not endorse. To clarify her rights, Ms. Smith filed a lawsuit seeking an injunction to prevent the State from forcing her to create websites celebrating marriages that defy her belief that marriage should be reserved to unions between one man and one woman.

CADA prohibits all "public accommodations" from denying "the full and equal enjoyment" of its goods and services to any customer based on his race, creed, disability, sexual orientation, or other statutorily enumerated trait. Colo. Rev. Stat. §24–34–601(2)(a). The law defines "public accommodation" broadly to include almost every public-facing business in the State. §24–34–601(1). Either state officials or private citizens may bring actions to enforce the law. §§24–34–306, 24–34–602(1). And a variety of penalties can follow any violation.

Before the district court, Ms. Smith and the State stipulated to a number of facts: Ms. Smith is "willing to work with all people regardless of classifications such as race, creed, sexual orientation, and gender" and "will gladly create custom graphics and websites" for clients of any sexual orientation; she will not produce content that "contradicts biblical truth" regardless of who orders it; Ms. Smith's belief that marriage is a union between one man and one woman is a sincerely held conviction; Ms. Smith provides design services that are "expressive" and her "original, customized" creations "contribut[e]" to the overall message" her business conveys "through the websites" it creates; the wedding websites she plans to create "will be expressive in nature,"

2                303 CREATIVE LLC *v.* ELENIS

Syllabus

will be "customized and tailored" through close collaboration with individual couples, and will "express Ms. Smith's and 303 Creative's message celebrating and promoting" her view of marriage; viewers of Ms. Smith's websites "will know that the websites are her original artwork;" and "[t]here are numerous companies in the State of Colorado and across the nation that offer custom website design services."

Ultimately, the district court held that Ms. Smith was not entitled to the injunction she sought, and the Tenth Circuit affirmed.

*Held*: The First Amendment prohibits Colorado from forcing a website designer to create expressive designs speaking messages with which the designer disagrees. Pp. 6–26.

(a) The framers designed the Free Speech Clause of the First Amendment to protect the "freedom to think as you will and to speak as you think." *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 660–661 (internal quotation marks omitted). The freedom to speak is among our inalienable rights. The freedom of thought and speech is "indispensable to the discovery and spread of political truth." *Whitney* v. *California*, 274 U. S. 357, 375 (Brandeis, J., concurring). For these reasons, "[i]f there is any fixed star in our constitutional constellation," *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642, it is the principle that the government may not interfere with "an uninhibited marketplace of ideas," *McCullen* v. *Coakley*, 573 U. S. 464, 476 (internal quotation marks omitted).

This Court has previously faced cases where governments have sought to test these foundational principles. In *Barnette*, the Court held that the State of West Virginia's efforts to compel schoolchildren to salute the Nation's flag and recite the Pledge of Allegiance "invad[ed] the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control." 319 U. S., at 642. State authorities had "transcend[ed] constitutional limitations on their powers." 319 U. S., at 642. In *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, the Court held that Massachusetts's public accommodations statute could not be used to force veterans organizing a parade in Boston to include a group of gay, lesbian, and bisexual individuals because the parade was protected speech, and requiring the veterans to include voices they wished to exclude would impermissibly require them to "alter the expressive content of their parade." *Id.,* at 572–573. And in *Boy Scouts of America* v. *Dale*, when the Boy Scouts sought to exclude assistant scoutmaster James Dale from membership after learning he was gay, the Court held the Boy Scouts to be "an expressive association" entitled to First Amendment protection. 530 U. S., at 656. The Court found that forcing the Scouts to include Mr. Dale would undoubtedly "interfere with [its] choice not to propound a point of view contrary to its beliefs." *Id.,*

at 654.

These cases illustrate that the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply "misguided," *Hurley*, 515 U. S., at 574, and likely to cause "anguish" or "incalculable grief," *Snyder* v. *Phelps*, 562 U. S. 443, 456. Generally, too, the government may not compel a person to speak its own preferred messages. See *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 505. Pp. 6–9.

(b) Applying these principles to the parties' stipulated facts, the Court agrees with the Tenth Circuit that the wedding websites Ms. Smith seeks to create qualify as pure speech protected by the First Amendment under this Court's precedents. Ms. Smith's websites will express and communicate ideas—namely, those that "celebrate and promote the couple's wedding and unique love story" and those that "celebrat[e] and promot[e]" what Ms. Smith understands to be a marriage. Speech conveyed over the internet, like all other manner of speech, qualifies for the First Amendment's protections. And the Court agrees with the Tenth Circuit that the wedding websites Ms. Smith seeks to create involve *her* speech, a conclusion supported by the parties' stipulations, including that Ms. Smith intends to produce a final story for each couple using her own words and original artwork. While Ms. Smith's speech may combine with the couple's in a final product, an individual "does not forfeit constitutional protection simply by combining multifarious voices" in a single communication. *Hurley*, 515 U. S., at 569.

Ms. Smith seeks to engage in protected First Amendment speech; Colorado seeks to compel speech she does not wish to provide. As the Tenth Circuit observed, if Ms. Smith offers wedding websites celebrating marriages she endorses, the State intends to compel her to create custom websites celebrating other marriages she does not. 6 F. 4th 1160, 1178. Colorado seeks to compel this speech in order to "excis[e] certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 633, 642. Indeed, the Tenth Circuit recognized that the coercive "[e]liminati[on]" of dissenting ideas about marriage constitutes Colorado's "very purpose" in seeking to apply its law to Ms. Smith. 6 F. 4th, at 1178. But while the Tenth Circuit thought that Colorado could compel speech from Ms. Smith consistent with the Constitution, this Court's First Amendment precedents teach otherwise. In *Hurley, Dale,* and *Barnette,* the Court found that governments impermissibly compelled speech in violation of the First Amendment when they tried to force speakers to accept a message with which they disagreed. Here, Colorado seeks to put Ms. Smith to a similar choice. If she wishes to speak, she must either speak

4                303 CREATIVE LLC *v.* ELENIS

Syllabus

as the State demands or face sanctions for expressing her own beliefs, sanctions that may include compulsory participation in "remedial . . . training," filing periodic compliance reports, and paying monetary fines. That is an impermissible abridgement of the First Amendment's right to speak freely. *Hurley*, 515 U. S., at 574.

Under Colorado's logic, the government may compel anyone who speaks for pay on a given topic to accept all commissions on that same topic—no matter the message—if the topic somehow implicates a customer's statutorily protected trait. 6 F. 4th, at 1199 (Tymkovich, C. J., dissenting). Taken seriously, that principle would allow the government to force all manner of artists, speechwriters, and others whose services involve speech to speak what they do not believe on pain of penalty. The Court's precedents recognize the First Amendment tolerates none of that. To be sure, public accommodations laws play a vital role in realizing the civil rights of all Americans, and governments in this country have a "compelling interest" in eliminating discrimination in places of public accommodation. *Roberts* v. *United States Jaycees*, 468 U. S. 609, 628. This Court has recognized that public accommodations laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 250 (internal quotation marks omitted). Over time, governments in this country have expanded public accommodations laws in notable ways. Statutes like Colorado's grow from nondiscrimination rules the common law sometimes imposed on common carriers and places of traditional public accommodation like hotels and restaurants. *Dale*, 530 U. S., at 656–657. Often, these enterprises exercised something like monopoly power or hosted or transported others or their belongings. See, *e.g.*, *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 437. Importantly, States have also expanded their laws to prohibit more forms of discrimination. Today, for example, approximately half the States have laws like Colorado's that expressly prohibit discrimination on the basis of sexual orientation. The Court has recognized this is "unexceptional." *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___. States may "protect gay persons, just as [they] can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public. And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment." *Ibid.* At the same time, this Court has also long recognized that no public accommodations law is immune from the demands of the Constitution. In particular, this Court has held, public accommodations statutes can sweep too broadly when deployed to compel speech. See, *e.g., Hurley*, 515 U. S., at 571,

578; *Dale*, 530 U. S., at 659.  As in those cases, when Colorado's public accommodations law and the Constitution collide, there can be no question which must prevail.  U. S. Const. Art. VI, §2.

As the Tenth Circuit saw it, Colorado has a compelling interest in ensuring "equal access to publicly available goods and services," and no option short of coercing speech from Ms. Smith can satisfy that interest because she plans to offer "unique services" that are, "by definition, unavailable elsewhere."  6 F. 4th, at 1179–1180 (internal quotation marks omitted).  In some sense, of course, her voice is unique; so is everyone's.  But that hardly means a State may coopt an individual's voice for its own purposes.  The speaker in *Hurley* had an "enviable" outlet for speech, and the Boy Scouts in *Dale* offered an arguably unique experience, but in both cases this Court held that the State could not use its public accommodations statute to deny a speaker the right "to choose the content of his own message."  *Hurley*, 515 U. S., at 573; see *Dale*, 530 U. S., at 650–656.  A rule otherwise would conscript any unique voice to disseminate the government's preferred messages in violation of the First Amendment.  Pp. 9–15.

(c) Colorado now seems to acknowledge that the First Amendment *does* prohibit it from coercing Ms. Smith to create websites expressing any message with which she disagrees.  Alternatively, Colorado contends, Ms. Smith must simply provide the same commercial product to all, which she can do by repurposing websites celebrating marriages she does endorse for marriages she does not.  Colorado's theory rests on a belief that this case does not implicate pure speech, but rather the sale of an ordinary commercial product, and that any burden on Ms. Smith's speech is purely "incidental."  On the State's telling, then, speech more or less vanishes from the picture—and, with it, any need for First Amendment scrutiny.  Colorado's alternative theory, however, does not sit easily with its stipulation that Ms. Smith does *not* seek to sell an ordinary commercial good but intends to create "customized and tailored" expressive speech for each couple "to celebrate and promote the couple's wedding and unique love story."  Colorado seeks to compel just the sort of speech that it tacitly concedes lies beyond its reach.

The State stresses that Ms. Smith offers her speech for pay and does so through 303 Creative LLC, a company in which she is "the sole member-owner."  But many of the world's great works of literature and art were created with an expectation of compensation.  And speakers do not shed their First Amendment protections by employing the corporate form to disseminate their speech.  Colorado urges the Court to look at the reason Ms. Smith refuses to offer the speech it seeks to compel, and it claims that the reason is that she objects to the "protected characteristics" of certain customers.  But the parties' stipula-

6                  303 CREATIVE LLC *v.* ELENIS

Syllabus

tions state, to the contrary, that Ms. Smith will gladly conduct business with those having protected characteristics so long as the custom graphics and websites she is asked to create do not violate her beliefs. Ms. Smith stresses that she does not create expressions that defy any of her beliefs for any customer, whether that involves encouraging violence, demeaning another person, or promoting views inconsistent with her religious commitments.

The First Amendment's protections belong to all, not just to speakers whose motives the government finds worthy. In this case, Colorado seeks to force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance. In the past, other States in *Barnette*, *Hurley*, and *Dale* have similarly tested the First Amendment's boundaries by seeking to compel speech they thought vital at the time. But abiding the Constitution's commitment to the freedom of speech means all will encounter ideas that are "misguided, or even hurtful." *Hurley*, 515 U. S., at 574. Consistent with the First Amendment, the Nation's answer is tolerance, not coercion. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands. Colorado cannot deny that promise consistent with the First Amendment. Pp. 15–19, 24–25.

6 F. 4th 1160, reversed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

Cite as: 600 U. S. ____ (2023)        1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 21–476

303 CREATIVE LLC, ET AL., PETITIONERS *v.*
AUBREY ELENIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 30, 2023]

JUSTICE GORSUCH delivered the opinion of the Court.

Like many States, Colorado has a law forbidding businesses from engaging in discrimination when they sell goods and services to the public. Laws along these lines have done much to secure the civil rights of all Americans. But in this particular case Colorado does not just seek to ensure the sale of goods or services on equal terms. It seeks to use its law to compel an individual to create speech she does not believe. The question we face is whether that course violates the Free Speech Clause of the First Amendment.

## I

### A

Through her business, 303 Creative LLC, Lorie Smith offers website and graphic design, marketing advice, and social media management services. Recently, she decided to expand her offerings to include services for couples seeking websites for their weddings. As she envisions it, her websites will provide couples with text, graphic arts, and videos to "celebrate" and "conve[y]" the "details" of their "unique love story." App. to Pet. for Cert. 182a, 187a, 198a. The

websites will discuss how the couple met, explain their backgrounds, families, and future plans, and provide information about their upcoming wedding. All of the text and graphics on these websites will be "original," "customized," and "tailored" creations. *Id.*, at 187a. The websites will be "expressive in nature," designed "to communicate a particular message." *Id.*, at 181a. Viewers will know, too, "that the websites are [Ms. Smith's] original artwork," for the name of the company she owns and operates by herself will be displayed on every one. *Id.*, at 187a.

While Ms. Smith has laid the groundwork for her new venture, she has yet to carry out her plans. She worries that, if she does so, Colorado will force her to express views with which she disagrees. Ms. Smith provides her website and graphic services to customers regardless of their race, creed, sex, or sexual orientation. *Id.*, at 184a. But she has never created expressions that contradict her own views for anyone—whether that means generating works that encourage violence, demean another person, or defy her religious beliefs by, say, promoting atheism. See *ibid.*; see also Tr. of Oral Arg. 19–20. Ms. Smith does not wish to do otherwise now, but she worries Colorado has different plans. Specifically, she worries that, if she enters the wedding website business, the State will force her to convey messages inconsistent with her belief that marriage should be reserved to unions between one man and one woman. App. to Pet. for Cert. 177a–190a. Ms. Smith acknowledges that her views about marriage may not be popular in all quarters. But, she asserts, the First Amendment's Free Speech Clause protects her from being compelled to speak what she does not believe. The Constitution, she insists, protects her right to differ.

## B

To clarify her rights, Ms. Smith filed a lawsuit in federal

Opinion of the Court

district court. In that suit, she sought an injunction to prevent the State from forcing her to create wedding websites celebrating marriages that defy her beliefs. App. 303–305. To secure relief, Ms. Smith first had to establish her standing to sue. That required her to show "a credible threat" existed that Colorado would, in fact, seek to compel speech from her that she did not wish to produce. *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 159 (2014).

Toward that end, Ms. Smith began by directing the court to the Colorado Anti-Discrimination Act (CADA). That law defines a "public accommodation" broadly to include almost every public-facing business in the State. Colo. Rev. Stat. §24–34–601(1) (2022). In what some call its "Accommodation Clause," the law prohibits a public accommodation from denying "the full and equal enjoyment" of its goods and services to any customer based on his race, creed, disability, sexual orientation, or other statutorily enumerated trait. §24–34–601(2)(a). Either state officials or private citizens may bring actions to enforce the law. §§24–34–306, 24–34–602(1). And a variety of penalties can follow. Courts can order fines up to $500 per violation. §24–34–602(1)(a). The Colorado Commission on Civil Rights can issue cease-and-desist orders, §24–34–306(9), and require violators to take various other "affirmative action[s]." §24–34–605; §24–34–306(9). In the past, these have included participation in mandatory educational programs and the submission of ongoing compliance reports to state officials. See *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (slip op., at 8).[1]

––––––––––

[1] In addition to the Accommodation Clause, CADA contains a "Communication Clause" that prohibits a public accommodation from "publish[ing] . . . any written . . . communication" indicating that a person will be denied "the full and equal enjoyment" of services or that he will be "unwelcome, objectionable, unacceptable, or undesirable" based on a pro-

Opinion of the Court

  In her lawsuit, Ms. Smith alleged that, if she enters the wedding website business to celebrate marriages she does endorse, she faces a credible threat that Colorado will seek to use CADA to compel her to create websites celebrating marriages she does not endorse.  6 F. 4th 1160, 1173–1174 (CA10 2021).  As evidence, Ms. Smith pointed to Colorado's record of past enforcement actions under CADA, including one that worked its way to this Court five years ago.  See *Masterpiece Cakeshop*, 584 U. S., at ___ (slip op., at 9); see also App. 25–155 (discussing Colorado's other past enforcement actions).

  To facilitate the district court's resolution of the merits of her case, Ms. Smith and the State stipulated to a number of facts:

- Ms. Smith is "willing to work with all people regardless of classifications such as race, creed, sexual orientation, and gender," and she "will gladly create custom graphics and websites" for clients of any sexual orientation.  App. to Pet. for Cert. 184a.

- She will not produce content that "contradicts biblical truth" regardless of who orders it.  *Ibid.*

- Her belief that marriage is a union between one man and one woman is a sincerely held religious conviction.  *Id.*, at 179a.

- All of the graphic and website design services Ms. Smith provides are "expressive."  *Id.*, at 181a.

- The websites and graphics Ms. Smith designs are "original, customized" creations that "contribut[e] to the overall messages" her business conveys "through the websites" it creates.  *Id.*, at 181a–182a.

——————

tected classification.  Colo. Rev. Stat. §24–34–601(2)(a) (2022).  The Communication Clause, Ms. Smith notes, prohibits any speech inconsistent with the Accommodation Clause.  Because Colorado concedes that its authority to apply the Communication Clause to Ms. Smith stands or falls with its authority to apply the Accommodation Clause, see Brief for Respondents 44–45, we focus our attention on the Accommodation Clause.

Opinion of the Court

- Just like the other services she provides, the wedding websites Ms. Smith plans to create "will be expressive in nature." *Id.*, at 187a.
- Those wedding websites will be "customized and tailored" through close collaboration with individual couples, and they will "express Ms. Smith's and 303 Creative's message celebrating and promoting" her view of marriage. *Id.*, at 186a–187a.
- Viewers of Ms. Smith's websites "will know that the websites are [Ms. Smith's and 303 Creative's] original artwork." *Id.*, at 187a.
- To the extent Ms. Smith may not be able to provide certain services to a potential customer, "[t]here are numerous companies in the State of Colorado and across the nation that offer custom website design services." *Id.*, at 190a.

C

Ultimately, the district court ruled against Ms. Smith. 405 F. Supp. 3d 907, 912 (Colo. 2019).  So did the Tenth Circuit.  6 F. 4th, at 1168.  For its part, the Tenth Circuit held that Ms. Smith had standing to sue.  In that court's judgment, she had established a credible threat that, if she follows through on her plans to offer wedding website services, Colorado will invoke CADA to force her to create speech she does not believe or endorse.  *Id.*, at 1172–1175.  The court pointed to the fact that "Colorado has a history of past enforcement against nearly identical conduct—*i.e.*, *Masterpiece Cakeshop*"; that anyone in the State may file a complaint against Ms. Smith and initiate "a potentially burdensome administrative hearing" process; and that "Colorado [has] decline[d] to disavow future enforcement" proceedings against her.  *Id.*, at 1174.  Before us, no party challenges these conclusions.

Turning to the merits, however, the Tenth Circuit held that Ms. Smith was not entitled to the injunction she

Opinion of the Court

sought.  The court acknowledged that Ms. Smith's planned wedding websites qualify as "pure speech" protected by the First Amendment.  *Id.*, at 1176.  As a result, the court reasoned, Colorado had to satisfy "strict scrutiny" before compelling speech from her that she did not wish to create.  *Id.*, at 1178.  Under that standard, the court continued, the State had to show both that forcing Ms. Smith to create speech would serve a compelling governmental interest and that no less restrictive alternative exists to secure that interest.  *Ibid.*  Ultimately, a divided panel concluded that the State had carried these burdens.  As the majority saw it, Colorado has a compelling interest in ensuring "equal access to publicly available goods and services," and no option short of coercing speech from Ms. Smith can satisfy that interest because she plans to offer "unique services" that are, "by definition, unavailable elsewhere."  *Id.*, at 1179–1180 (internal quotation marks omitted).

Chief Judge Tymkovich dissented.  He observed that "ensuring access to a *particular* person's" voice, expression, or artistic talent has never qualified as "a compelling state interest" under this Court's precedents.  *Id.*, at 1203.  Nor, he submitted, should courts depart from those precedents now.  "Taken to its logical end," Chief Judge Tymkovich warned, his colleagues' approach would permit the government to "regulate the messages communicated by *all* artists"—a result he called "unprecedented."  *Id.*, at 1204.

We granted certiorari to review the Tenth Circuit's disposition.  595 U. S. ___ (2022).

## II

The framers designed the Free Speech Clause of the First Amendment to protect the "freedom to think as you will and to speak as you think."  *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 660–661 (2000) (internal quotation marks omitted).  They did so because they saw the freedom of speech "both as an end and as a means."  *Whitney* v. *California*,

Opinion of the Court

274 U. S. 357, 375 (1927) (Brandeis, J., concurring); see also 12 The Papers of James Madison 193–194 (C. Hobson & R. Rutland eds. 1979). An end because the freedom to think and speak is among our inalienable human rights. See, *e.g.*, 4 Annals of Cong. 934 (1794) (Rep. Madison). A means because the freedom of thought and speech is "indispensable to the discovery and spread of political truth." *Whitney*, 274 U. S., at 375 (Brandeis, J., concurring). By allowing all views to flourish, the framers understood, we may test and improve our own thinking both as individuals and as a Nation. For all these reasons, "[i]f there is any fixed star in our constitutional constellation," *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943), it is the principle that the government may not interfere with "an uninhibited marketplace of ideas," *McCullen* v. *Coakley*, 573 U. S. 464, 476 (2014) (internal quotation marks omitted).

From time to time, governments in this country have sought to test these foundational principles. In *Barnette*, for example, the Court faced an effort by the State of West Virginia to force schoolchildren to salute the Nation's flag and recite the Pledge of Allegiance. If the students refused, the State threatened to expel them and fine or jail their parents. Some families objected on the ground that the State sought to compel their children to express views at odds with their faith as Jehovah's Witnesses. When the dispute arrived here, this Court offered a firm response. In seeking to compel students to salute the flag and recite a pledge, the Court held, state authorities had "transcend[ed] constitutional limitations on their powers." 319 U. S., at 642. Their dictates "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control." *Ibid.*

A similar story unfolded in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995). There, veterans organizing a St. Patrick's Day parade in Boston refused to include a group of gay, lesbian,

Opinion of the Court

and bisexual individuals in their event. The group argued that Massachusetts's public accommodations statute entitled it to participate in the parade as a matter of law. *Id.*, at 560–561. Lower courts agreed. *Id.*, at 561–566. But this Court reversed. *Id.*, at 581. Whatever state law may demand, this Court explained, the parade was constitutionally protected speech and requiring the veterans to include voices they wished to exclude would impermissibly require them to "alter the expressive content of their parade." *Id.*, at 572–573. The veterans' choice of what to say (and not say) might have been unpopular, but they had a First Amendment right to present their message undiluted by views they did not share.

Then there is *Boy Scouts of America* v. *Dale.* In that case, the Boy Scouts excluded James Dale, an assistant scoutmaster, from membership after learning he was gay. Mr. Dale argued that New Jersey's public accommodations law required the Scouts to reinstate him. 530 U. S., at 644–645. The New Jersey Supreme Court sided with Mr. Dale, *id.*, at 646–647, but again this Court reversed, *id.*, at 661. The decision to exclude Mr. Dale may not have implicated pure speech, but this Court held that the Boy Scouts "is an expressive association" entitled to First Amendment protection. *Id.*, at 656. And, the Court found, forcing the Scouts to include Mr. Dale would "interfere with [its] choice not to propound a point of view contrary to its beliefs." *Id.*, at 654.

As these cases illustrate, the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply "misguided," *Hurley*, 515 U. S., at 574, and likely to cause "anguish" or "incalculable grief," *Snyder* v. *Phelps*, 562 U. S. 443, 456 (2011). Equally, the First Amendment protects acts of expressive association. See, *e.g.*, *Dale*, 530 U. S., at 647–656; *Hurley*, 515 U. S., at 568–570, 579. Generally, too, the government may not compel a person to speak its own preferred messages. See

Opinion of the Court

*Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 505–506 (1969); see also, *e.g.*, *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 256 (1974); *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977); *National Institute of Family and Life Advocates* v. *Becerra*, 585 U. S. ___, ___ (2018) (*NIFLA*) (slip op., at 8).  Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include.  See *Hurley,* 515 U. S., at 568–570, 576; see also *Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.*, 547 U. S. 47, 63–64 (2006) (*FAIR*) (discussing cases).  All that offends the First Amendment just the same.

### III

Applying these principles to this case, we align ourselves with much of the Tenth Circuit's analysis.  The Tenth Circuit held that the wedding websites Ms. Smith seeks to create qualify as "pure speech" under this Court's precedents. 6 F. 4th, at 1176.  We agree.  It is a conclusion that flows directly from the parties' stipulations.  They have stipulated that Ms. Smith's websites promise to contain "images, words, symbols, and other modes of expression."  App. to Pet. for Cert. 181a.  They have stipulated that every website will be her "original, customized" creation.  *Id.*, at 181a–182a.  And they have stipulated that Ms. Smith will create these websites to communicate ideas—namely, to "celebrate and promote the couple's wedding and unique love story" and to "celebrat[e] and promot[e]" what Ms. Smith understands to be a true marriage.  *Id.*, at 186a–187a.

A hundred years ago, Ms. Smith might have furnished her services using pen and paper.  Those services are no less protected speech today because they are conveyed with a "voice that resonates farther than it could from any soapbox."  *Reno* v. *American Civil Liberties Union*, 521 U. S. 844,

Opinion of the Court

870 (1997). All manner of speech—from "pictures, films, paintings, drawings, and engravings," to "oral utterance and the printed word"—qualify for the First Amendment's protections; no less can hold true when it comes to speech like Ms. Smith's conveyed over the Internet. *Kaplan* v. *California*, 413 U. S. 115, 119–120 (1973); see also *Shurtleff* v. *Boston*, 596 U. S. ___, ___–___ (2022) (slip op., at 7–8) (flags); *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 790 (2011) (video games); *Hurley*, 515 U. S., at 568–570 (parades); *Ward* v. *Rock Against Racism*, 491 U. S. 781, 790 (1989) (music); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 501–502 (1952) (movies).

We further agree with the Tenth Circuit that the wedding websites Ms. Smith seeks to create involve *her* speech. 6 F. 4th, at 1181, and n. 5. Again, the parties' stipulations lead the way to that conclusion. See App. to Pet. for Cert. 181a, 187a. As the parties have described it, Ms. Smith intends to "ve[t]" each prospective project to determine whether it is one she is willing to endorse. *Id.*, at 185a. She will consult with clients to discuss "their unique stories as source material." *Id.*, at 186a. And she will produce a final story for each couple using her own words and her own "original artwork." *Id.*, at 182a–183a. Of course, Ms. Smith's speech may combine with the couple's in the final product. But for purposes of the First Amendment that changes nothing. An individual "does not forfeit constitutional protection simply by combining multifarious voices" in a single communication. *Hurley*, 515 U. S., at 569.

As surely as Ms. Smith seeks to engage in protected First Amendment speech, Colorado seeks to compel speech Ms. Smith does not wish to provide. As the Tenth Circuit observed, if Ms. Smith offers wedding websites celebrating marriages she endorses, the State intends to "forc[e her] to create custom websites" celebrating other marriages she does not. 6 F. 4th, at 1178. Colorado seeks to compel this speech in order to "excis[e] certain ideas or viewpoints from

the public dialogue." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 633, 642 (1994). Indeed, the Tenth Circuit recognized that the coercive "[e]liminati[on]" of dissenting "ideas" about marriage constitutes Colorado's "very purpose" in seeking to apply its law to Ms. Smith. 6 F. 4th, at 1178.

We part ways with the Tenth Circuit only when it comes to the legal conclusions that follow. While that court thought Colorado could compel speech from Ms. Smith consistent with the Constitution, our First Amendment precedents laid out above teach otherwise. In *Hurley*, the Court found that Massachusetts impermissibly compelled speech in violation of the First Amendment when it sought to force parade organizers to accept participants who would "affec[t] the[ir] message." 515 U. S., at 572. In *Dale*, the Court held that New Jersey intruded on the Boy Scouts' First Amendment rights when it tried to require the group to "propound a point of view contrary to its beliefs" by directing its membership choices. 530 U. S., at 654. And in *Barnette*, this Court found impermissible coercion when West Virginia required schoolchildren to recite a pledge that contravened their convictions on threat of punishment or expulsion. 319 U. S., at 626–629. Here, Colorado seeks to put Ms. Smith to a similar choice: If she wishes to speak, she must either speak as the State demands or face sanctions for expressing her own beliefs, sanctions that may include compulsory participation in "remedial . . . training," filing periodic compliance reports as officials deem necessary, and paying monetary fines. App. 120; *supra*, at 3. Under our precedents, that "is enough," more than enough, to represent an impermissible abridgment of the First Amendment's right to speak freely. *Hurley*, 515 U. S., at 574.

Consider what a contrary approach would mean. Under Colorado's logic, the government may compel anyone who speaks for pay on a given topic to accept all commissions on that same topic—no matter the underlying message—if the

Opinion of the Court

topic somehow implicates a customer's statutorily protected trait.   6 F. 4th, at 1198 (Tymkovich, C. J., dissenting). Taken seriously, that principle would allow the government to force all manner of artists, speechwriters, and others whose services involve speech to speak what they do not believe on pain of penalty.  The government could require "an unwilling Muslim movie director to make a film with a Zionist message," or "an atheist muralist to accept a commission celebrating Evangelical zeal," so long as they would make films or murals for other members of the public with different messages.  *Id.*, at 1199.  Equally, the government could force a male website designer married to another man to design websites for an organization that advocates against same-sex marriage.  See Brief for Petitioners 26–27.  Countless other creative professionals, too, could be forced to choose between remaining silent, producing speech that violates their beliefs, or speaking their minds and incurring sanctions for doing so.  See, *e.g.*, Brief for Creative Professionals et al. as *Amici Curiae* 5–10; Brief for First Amendment Scholars as *Amici Curiae* 19–22.  As our precedents recognize, the First Amendment tolerates none of that.

In saying this much, we do not question the vital role public accommodations laws play in realizing the civil rights of all Americans.   This Court has recognized that governments in this country have a "compelling interest" in eliminating discrimination in places of public accommodation. *Roberts* v. *United States Jaycees*, 468 U. S. 609, 628 (1984); see also *Hurley*, 515 U. S., at 571–572.  This Court has recognized, too, that public accommodations laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments."   *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 250 (1964) (internal quotation marks omitted); see also, *e.g.*, *Katzenbach* v. *McClung*, 379 U. S. 294 (1964); *Newman* v.

Opinion of the Court

*Piggie Park Enterprises, Inc.*, 390 U. S. 400 (1968) (*per curiam*).

Over time, governments in this country have expanded public accommodations laws in notable ways too.  Statutes like Colorado's grow from nondiscrimination rules the common law sometimes imposed on common carriers and places of traditional public accommodation like hotels and restaurants.  *Dale*, 530 U. S., at 656–657.  Often, these enterprises exercised something like monopoly power or hosted or transported others or their belongings much like bailees.  See, *e.g., Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 437 (1889); *Primrose* v. *Western Union Telegraph Co.*, 154 U. S. 1, 14 (1894).  Over time, some States, Colorado included, have expanded the reach of these nondiscrimination rules to cover virtually every place of business engaged in any sales to the public.  Compare 1885 Colo. Sess. Laws pp. 132–133 (a short list of entities originally bound by the State's public accommodations law) with Colo. Rev. Stat. §24–34–601(1) (currently defining a public accommodation to include "any place of business engaged in any sales to the public").

Importantly, States have also expanded their laws to prohibit more forms of discrimination.  Today, for example, approximately half the States have laws like Colorado's that expressly prohibit discrimination on the basis of sexual orientation.[2]  And, as we have recognized, this is entirely "unexceptional."  *Masterpiece Cakeshop*, 584 U. S., at ___ (slip

--------

[2] Besides Colorado, this includes Cal. Civ. Code Ann. §51 (West 2020); Conn. Gen. Stat. §46a–81d (2021); Del. Code Ann., Tit. 6, §4504 (2019); Haw. Rev. Stat. §489–3 (Cum. Supp. 2021); Ill. Comp. Stat., ch. 775, §5/1–102 (West 2021); Iowa Code §216.7 (2022); Me. Rev. Stat. Ann., Tit. 5, §4591 (2013); Md. State Govt. Code Ann. §20–304 (2021); Mass. Gen. Laws, ch. 272, §98 (2021); Mich. Comp. Laws Ann. §37.2302 (West 2013); Minn. Stat. §363A.11 (2022); Nev. Rev. Stat. §651.070 (2017); N. H. Rev. Stat. Ann. §354–A:17 (2022); N. J. Stat. Ann. §10:5–12 (West 2013); N. M. Stat. Ann. §28–1–7 (2022); N. Y. Exec. Law Ann. §291(2)

op., at 10). States may "protect gay persons, just as [they] can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public. And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment." *Ibid.*; see also *Hurley*, 515 U. S., at 571–572; 6 F. 4th, at 1203 (Tymkovich, C. J., dissenting). Consistent with all of this, Ms. Smith herself recognizes that Colorado and other States are generally free to apply their public accommodations laws, including their provisions protecting gay persons, to a vast array of businesses. Reply Brief 15; see Tr. of Oral Arg. 45–46.

At the same time, this Court has also recognized that no public accommodations law is immune from the demands of the Constitution. In particular, this Court has held, public accommodations statutes can sweep too broadly when deployed to compel speech. In *Hurley*, the Court commented favorably on Massachusetts' public accommodations law, but made plain it could not be "applied to expressive activity" to compel speech. 515 U. S., at 571, 578. In *Dale*, the Court observed that New Jersey's public accommodations law had many lawful applications but held that it could "not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." 530 U. S., at 659. And, once more, what was true in those cases must hold true here. When a state public accommodations law and the Constitution collide, there can be no question which must prevail. U. S. Const., Art. VI, cl. 2.

Nor is it any answer, as the Tenth Circuit seemed to suppose, that Ms. Smith's services are "unique." 6 F. 4th, at

--------

(West 2019); Ore. Rev. Stat. §659A.403 (2021); R. I. Gen. Laws §11–24–2 (2002); Vt. Stat. Ann., Tit. 9, §4502(a) (2020); Va. Code Ann. §2.2–3904 (2022); Wash. Rev. Code §49.60.215 (2022); Wis. Stat. §106.52 (2019–2020). See also Brief for Local Governments et al. as *Amici Curiae* 5 (noting that many local governments have enacted similar rules).

Opinion of the Court

1180.  In some sense, of course, her voice is unique; so is everyone's.  But that hardly means a State may coopt an individual's voice for its own purposes.  In *Hurley*, the veterans had an "enviable" outlet for speech; after all, their parade was a notable and singular event.  515 U. S., at 560, 577–578.  In *Dale*, the Boy Scouts offered what some might consider a unique experience.  530 U. S., at 649–650.  But in both cases this Court held that the State could not use its public accommodations statute to deny speakers the right "to choose the content of [their] own message[s]."  *Hurley*, 515 U. S., at 573; see *Dale*, 530 U. S., at 650–656.  Were the rule otherwise, the better the artist, the finer the writer, the more unique his talent, the more easily his voice could be conscripted to disseminate the government's preferred messages.  That would not respect the First Amendment; more nearly, it would spell its demise.

IV

Before us, Colorado appears to distance itself from the Tenth Circuit's reasoning.  Now, the State seems to acknowledge that the First Amendment *does* forbid it from coercing Ms. Smith to create websites endorsing same-sex marriage or expressing any other message with which she disagrees.  See Brief for Respondents 12 (disclaiming any interest in "interfer[ing] with [Ms. Smith's] choice to offer only websites of [her] own design"); see also Brief for United States as *Amicus Curiae* 19 (conceding that "constitutional concerns" would arise if Colorado "require[d] petitione[r] to design a website" that she "would not create or convey for any client").  Instead, Colorado devotes most of its efforts to advancing an alternative theory for affirmance.

The State's alternative theory runs this way.  To comply with Colorado law, the State says, all Ms. Smith must do is repurpose websites she will create to celebrate marriages she *does* endorse for marriages she does *not*.  She sells a product to some, the State reasons, so she must sell the

16           303 CREATIVE LLC *v.* ELENIS

Opinion of the Court

same product to all. Brief for Respondents 15, 20. At bottom, Colorado's theory rests on a belief that the Tenth Circuit erred at the outset when it said this case implicates pure speech. *Id.,* at 19. Instead, Colorado says, this case involves only the sale of an ordinary commercial product and any burden on Ms. Smith's speech is purely "incidental." *Id.,* at 18, 25–28; see Tr. of Oral Arg. 65, 97–98. On the State's telling, then, speech more or less vanishes from the picture—and, with it, any need for First Amendment scrutiny. In places, the dissent seems to advance the same line of argument. *Post,* at 29 (opinion of SOTOMAYOR, J.).

This alternative theory, however, is difficult to square with the parties' stipulations. As we have seen, the State has stipulated that Ms. Smith does *not* seek to sell an ordinary commercial good but intends to create "customized and tailored" speech for each couple. App. to Pet. for Cert. 181a, 187a. The State has stipulated that "[e]ach website 303 Creative designs and creates is an original, customized creation for each client." *Id.,* at 181a. The State has stipulated, too, that Ms. Smith's wedding websites "will be expressive in nature, using text, graphics, and in some cases videos to celebrate and promote the couple's wedding and unique love story." *Id.,* at 187a. As the case comes to us, then, Colorado seeks to compel just the sort of speech that it tacitly concedes lies beyond the reach of its powers.

Of course, as the State emphasizes, Ms. Smith offers her speech for pay and does so through 303 Creative LLC, a company in which she is "the sole member-owner." *Id.,* at 181a; see also *post,* at 33 (opinion of SOTOMAYOR, J.) (emphasizing Ms. Smith's "commercial" activity). But none of that makes a difference. Does anyone think a speechwriter loses his First Amendment right to choose for whom he works if he accepts money in return? Or that a visual artist who accepts commissions from the public does the same? Many of the world's great works of literature and art were

created with an expectation of compensation. Nor, this Court has held, do speakers shed their First Amendment protections by employing the corporate form to disseminate their speech. This fact underlies our cases involving everything from movie producers to book publishers to newspapers. See, *e.g., Joseph Burstyn, Inc.*, 343 U. S., at 497–503; *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 114–116 (1991); *Grosjean* v. *American Press Co.*, 297 U. S. 233, 240–241, 249 (1936).

Colorado next urges us to focus on the *reason* Ms. Smith refuses to offer the speech it seeks to compel. She refuses, the State insists, because she objects to the "protected characteristics" of certain customers. Brief for Respondents 16; see also *post*, at 26–27, 31–32 (opinion of SOTOMAYOR, J.) (reciting the same argument). But once more, the parties' stipulations speak differently. The parties agree that Ms. Smith "will gladly create custom graphics and websites for gay, lesbian, or bisexual clients or for organizations run by gay, lesbian, or bisexual persons so long as the custom graphics and websites" do not violate her beliefs. App. to Pet. for Cert. 184a. That is a condition, the parties acknowledge, Ms. Smith applies to "all customers." *Ibid.* Ms. Smith stresses, too, that she has not and will not create expressions that defy any of her beliefs for any customer, whether that involves encouraging violence, demeaning another person, or promoting views inconsistent with her religious commitments. See Tr. of Oral Arg. 18–20. Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive. See *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 468–469 (2007) (opinion of ROBERTS, C. J.) (observing that "a speaker's motivation is entirely irrelevant" (internal quotation marks omitted)); *National Socialist Party of America* v. *Skokie*, 432 U. S. 43, 43–44

Opinion of the Court

(1977) (*per curiam*) (upholding free-speech rights of partic-
ipants in a Nazi parade); *Snyder*, 562 U. S., at 456–457
(same for protestors of a soldier's funeral).[3]

Failing all else, Colorado suggests that this Court's deci-
sion in *FAIR* supports affirmance. See also *post*, at 25–26
(opinion of SOTOMAYOR, J.) (making the same argument).
In *FAIR*, a group of schools challenged a law requiring
them, as a condition of accepting federal funds, to permit
military recruiters space on campus on equal terms with
other potential employers. 547 U. S., at 51–52, 58. The
only expressive activity required of the law schools, the
Court found, involved the posting of logistical notices along
these lines: "'The U. S. Army recruiter will meet interested
students in Room 123 at 11 a.m.'" *Id.*, at 61–62. And, the
Court reasoned, compelled speech of this sort was "inci-
dental" and a "far cry" from the speech at issue in our "lead-
ing First Amendment precedents [that] have established
the principle that freedom of speech prohibits the govern-
ment from telling people what they must say." *Ibid.*; see
also *NIFLA*, 585 U. S., at ___ (slip op., at 8).

It is a far cry from this case too. To be sure, our cases
have held that the government may sometimes "requir[e]

───────────

   [3]The dissent labels the distinction between status and message "amus-
ing" and "embarrassing." *Post*, at 32. But in doing so, the dissent ignores
a fundamental feature of the Free Speech Clause. While it does *not* pro-
tect status-based discrimination unrelated to expression, generally it
*does* protect a speaker's right to control her own message—even when we
may disapprove of the speaker's motive or the message itself. The dis-
sent's derision is no answer to any of this. It ignores, too, the fact that
Colorado *itself* has, in other contexts, distinguished status-based dis-
crimination (forbidden) from the right of a speaker to control his own
message (protected). See App. 131, 137, 140, 143–144, 149, 152, 154.
(Truth be told, even the dissent acknowledges "th[is] distinction" else-
where in its opinion. *Post*, at 31, n. 11.) Nor is the distinction unusual
in societies committed both to nondiscrimination rules and free expres-
sion. See, *e.g.*, *Lee* v. *Ashers Baking Co. Ltd.*, [2018] UKSC 49, p. 14 ("The
less favourable treatment was afforded to the message not to the man.").
Does the dissent really find all that amusing and embarrassing?

the dissemination of purely factual and uncontroversial information," particularly in the context of "commercial advertising." *Hurley*, 515 U. S., at 573 (internal quotation marks omitted); see also *NIFLA*, 585 U. S., at ___ (slip op., at 8); *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795–796 (1988). But this case involves nothing like that. Here, Colorado does not seek to impose an incidental burden on speech. It seeks to force an individual to "utter what is not in [her] mind" about a question of political and religious significance. *Barnette*, 319 U. S., at 634. And that, *FAIR* reaffirmed, is something the First Amendment does not tolerate. No government, *FAIR* recognized, may affect a "speaker's message" by "forc[ing]" her to "accommodate" other views, 547 U. S., at 63; no government may "'alter'" the "'expressive content'" of her message, *id.*, at 63–64 (alteration omitted); and no government may "interfer[e] with" her "desired message," *id.*, at 64.

### V

It is difficult to read the dissent and conclude we are looking at the same case. Much of it focuses on the evolution of public accommodations laws, *post*, at 7–13, and the strides gay Americans have made towards securing equal justice under law, *post*, at 14–17. And, no doubt, there is much to applaud here. But none of this answers the question we face today: Can a State force someone who provides her own expressive services to abandon her conscience and speak *its* preferred message instead?

When the dissent finally gets around to that question—more than halfway into its opinion—it reimagines the facts of this case from top to bottom. The dissent claims that Colorado wishes to regulate Ms. Smith's "conduct," not her speech. *Post*, at 24–29. Forget Colorado's stipulation that Ms. Smith's activities are "expressive," App. to Pet. for Cert. 181a, and the Tenth Circuit's conclusion that the State

Opinion of the Court

seeks to compel "pure speech," 6 F. 4th, at 1176. The dissent chides us for deciding a pre-enforcement challenge. *Post*, at 23. But it ignores the Tenth Circuit's finding that Ms. Smith faces a credible threat of sanctions unless she conforms her views to the State's. 6 F. 4th, at 1172–1175. The dissent suggests (over and over again) that any burden on speech here is "incidental." *Post*, at 24, 26–30, 32–33. All despite the Tenth Circuit's finding that Colorado intends to force Ms. Smith to convey a message she does not believe with the "very purpose" of "[e]liminating . . . ideas" that differ from its own. 6 F. 4th, at 1178.[4]

Nor does the dissent's reimagination end there. It claims that, "for the first time in its history," the Court "grants a business open to the public" a "right to refuse to serve members of a protected class." *Post*, at 1; see also *id.*, at 26, n. 10, 35. Never mind that we do no such thing and Colorado *itself* has stipulated Ms. Smith will (as CADA requires) "work with all people regardless of . . . sexual orientation." App. to Pet. for Cert. 184a. Never mind, too, that it is the dissent that would have this Court do something truly novel by allowing a government to coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own.

There is still more. The dissent asserts that we "sweep under the rug petitioners' challenge to CADA's Communication Clause." *Post*, at 26. This despite the fact the parties and the Tenth Circuit recognized that Ms. Smith's Communication Clause challenge hinges on her Accommodation Clause challenge. (So much so that Colorado devoted less than two pages at the tail end of its brief to the Communication Clause and the Tenth Circuit afforded it just three

--------

[4] Perplexingly, too, the dissent suggests that, by recounting the Tenth Circuit's conclusion on this score, we "misunderstan[d] this case" and "invo[ke] . . . Orwellian thought policing." *Post*, at 34, n. 14.

Cite as: 600 U. S. ____ (2023)          21

Opinion of the Court

paragraphs in its free-speech analysis. See Brief for Respondents 44–45; 6 F. 4th, at 1182–1183.)[5]  The dissent even suggests that our decision today is akin to endorsing a "separate but equal" regime that would allow law firms to refuse women admission into partnership, restaurants to deny service to Black Americans, or businesses seeking employees to post something like a "White Applicants Only" sign. *Post*, at 1, 16–21, 26, 28–29, 32, and n. 13, 37. Pure fiction all.

In some places, the dissent gets so turned around about the facts that it opens fire on its own position. For instance: While stressing that a Colorado company cannot refuse "the full and equal enjoyment of [its] services" based on a customer's protected status, *post*, at 27, the dissent assures us that a company selling creative services "to the public" *does* have a right "to decide what messages to include or not to include," *post*, at 28. But if that is true, what are we even debating?

Instead of addressing the parties' stipulations about the case actually before us, the dissent spends much of its time adrift on a sea of hypotheticals about photographers, stationers, and others, asking if they too provide expressive services covered by the First Amendment. *Post*, at 27–29, 31–32, 37. But those cases are not *this* case. Doubtless, determining what qualifies as expressive activity protected

—————

[5] Why does the dissent try to refocus this case around the Communication Clause? Perhaps because the moment one acknowledges the parties' stipulations—and the fact Colorado seeks to use its Accommodation Clause to compel speech in order to ensure conformity to its own views on a topic of major significance—the First Amendment implications become obvious. As does the fact that our case is nothing like a typical application of a public accommodations law requiring an ordinary, nonexpressive business to serve all customers or consider all applicants. Our decision today does not concern—much less endorse—anything like the "'straight couples only'" notices the dissent conjures out of thin air. *Post*, at 26, n. 10. Nor do the parties discuss anything of the sort in their stipulations.

Opinion of the Court

by the First Amendment can sometimes raise difficult questions. But this case presents no complication of that kind. The parties have *stipulated* that Ms. Smith seeks to engage in expressive activity. And the Tenth Circuit has recognized her services involve "pure speech." See *supra*, at 6, 9. Nothing the dissent says can alter this—nor can it displace the First Amendment protections that follow.

The dissent's treatment of precedent parallels its handling of the facts. Take its remarkable suggestion that a government forcing an individual to create speech on weighty issues with which she disagrees—all, as the Tenth Circuit found, with the goal of "[e]liminating" views it does not share, 6 F. 4th, at 1178—only "incidental[ly]" burdens First Amendment liberties. *Post*, at 26–35. Far from embracing a notion like that, our cases have rejected it time after time—including in the context of public accommodations laws. See Parts II–IV, *supra*; *FAIR*, 547 U. S., at 61–64 (no government may affect a "speaker's own message" by "forc[ing]" her to "accommodate" views she does not hold); *Hurley*, 515 U. S., at 563, 566 (using a public accommodations law to compel parade organizers to include speech they did not believe was no mere "'incidental'" infringement on First Amendment rights); *Dale*, 530 U. S., at 659 (employing a public accommodations law to require the Boy Scouts to alter their admissions policies had more than "an incidental effect on protected speech").[6]

_____

[6] The dissent observes that public accommodations laws may sometimes touch on speech incidentally as they work to ensure ordinary, non-expressive goods and services are sold on equal terms. Cf. *post*, at 24–27 (citing *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552 (2011); *Rumsfeld* v. *FAIR*, 547 U. S. 47 (2006); *United States* v. *O'Brien*, 391 U. S. 367 (1968)). But as *Hurley* observed, there is nothing "incidental" about an infringement on speech when a public accommodations law is applied "peculiar[ly]" to compel expressive activity. *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 572 (1995).

Opinion of the Court

When it finally gets around to discussing these controlling precedents, the dissent offers a wholly unpersuasive attempt to distinguish them. The First Amendment protections furnished in *Barnette*, *Hurley*, and *Dale*, the dissent declares, were limited to schoolchildren and "nonprofit[s]," and it is "dispiriting" to think they might also apply to Ms. Smith's "commercial" activity. *Post*, at 32–35. But our precedents endorse nothing like the limits the dissent would project on them. Instead, as we have seen, the First Amendment extends to all persons engaged in expressive conduct, including those who seek profit (such as speechwriters, artists, and website designers). See *supra*, at 16–17. If anything is truly dispiriting here, it is the dissent's failure to take seriously this Court's enduring commitment to protecting the speech rights of all comers, no matter how controversial—or even repugnant—many may find the message at hand.

Finally, the dissent comes out and says what it really means: Once Ms. Smith offers some speech, Colorado "would require [her] to create and sell speech, notwithstanding [her] sincere objection to doing so"—and the dissent would force her to comply with that demand. *Post*, at 29–30. Even as it does so, however, the dissent refuses to acknowledge where its reasoning leads. In a world like that, as Chief Judge Tymkovich highlighted, governments could force "an unwilling Muslim movie director to make a

_____

The dissent notes that our case law has not sustained every First Amendment objection to an antidiscrimination rule, as with a law firm that sought to exclude women from partnership. *Post*, at 19–21 (citing *Hishon* v. *King & Spalding*, 467 U. S. 69 (1984); *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984)). But the dissent disregards *Dale*'s holding that context matters and that very different considerations come into play when a law is used to force individuals to toe the government's preferred line when speaking (or associating to express themselves) on matters of significance. *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 648–653 (2000).

Opinion of the Court

film with a Zionist message," they could compel "an atheist muralist to accept a commission celebrating Evangelical zeal," and they could require a gay website designer to create websites for a group advocating against same-sex marriage, so long as these speakers would accept commissions from the public with different messages. 6 F. 4th, at 1199 (dissenting opinion). Perhaps the dissent finds these possibilities untroubling because it trusts state governments to coerce only "enlightened" speech. But if that is the calculation, it is a dangerous one indeed.[7]

The dissent is right about one thing—"[w]hat a difference" time can make. See *post*, at 2 (internal quotation marks omitted). Eighty years ago in *Barnette*, this Court affirmed that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." 319 U. S., at 642. The Court did so despite the fact that the speech rights it defended were deeply unpopular; at the time, the world was at war and many thought respect for the flag and the pledge "essential for the welfare of the state." *Id.*, at 662–663 (Frankfurter, J., dissenting); see also *id.*, at 636, 640 (majority opinion). Fifty years ago, this Court protected the right of Nazis to march through a town home to many Holocaust survivors and along the way espouse ideas antithetical to those for

───────────

[7] Perhaps the dissent finds these possibilities untroubling for another reason. It asserts that CADA does not apply to "[m]any filmmakers, visual artists, and writers" because they do not "hold out" their services to the public. *Post*, at 27. But the dissent cites nothing to support its claim and instead, once more, fights the facts. As we have seen, Colorado's law today applies to "*any* place of business engaged in *any* sales to the public." Colo. Rev. Stat. §24–34–601(1) (emphasis added); see also Part III, *supra*. And the dissent can hardly dispute that many artists and writers accept commissions from the public. Brief for Creative Professionals et al. as *Amici Curiae* 5–21. Certainly, Colorado does not advance anything like the dissent's argument; it calls any exemption to its law for "artists" and others who provide "custom" services "unworkable." Brief for Respondents 28–31 (internal quotation marks omitted).

Opinion of the Court

which this Nation stands. See *Skokie*, 432 U. S., at 43–44; *supra*, at 17–18. Five years ago, in a case the dissenters highlight at the outset of their opinion, the Court stressed that "it is not . . . the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop*, 584 U. S., at ___ (slip op., at 16). And just days ago, Members of today's dissent joined in holding that the First Amendment restricts how States may prosecute stalkers despite the "harm[ful]," "low-value," and "upsetting" nature of their speech. *Counterman* v. *Colorado*, 600 U. S. ___, ___ (2023) (slip op., at 6); *id.*, at ___ (SOTOMAYOR, J., concurring in part and concurring in judgment) (slip op., at 5).

Today, however, the dissent abandons what this Court's cases have recognized time and time again: A commitment to speech for only *some* messages and *some* persons is no commitment at all. By approving a government's effort to "[e]liminat[e]" disfavored "ideas," 6 F. 4th, at 1178, today's dissent is emblematic of an unfortunate tendency by some to defend First Amendment values only when they find the speaker's message sympathetic. But "[i]f liberty means anything at all, it means the right to tell people what they do not want to hear." 6 F. 4th, at 1190 (Tymkovich, C. J., dissenting) (quoting G. Orwell).

\*

In this case, Colorado seeks to force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance. In the past, other States in *Barnette*, *Hurley*, and *Dale* have similarly tested the First Amendment's boundaries by seeking to compel speech they thought vital at the time. But, as this Court has long held, the opportunity to think for ourselves and to express those thoughts freely is among our most cherished liberties and part of what keeps our Republic strong. Of course, abiding the Constitution's commitment to the freedom of speech means all of us will encounter ideas

26 303 CREATIVE LLC *v.* ELENIS

Opinion of the Court

we consider "unattractive," *post*, at 38 (opinion of
SOTOMAYOR, J.), "misguided, or even hurtful," *Hurley*, 515
U. S., at 574.  But tolerance, not coercion, is our Nation's
answer.  The First Amendment envisions the United States
as a rich and complex place where all persons are free to
think and speak as they wish, not as the government de-
mands.  Because Colorado seeks to deny that promise, the
judgment is

*Reversed.*

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–476

_____

## 303 CREATIVE LLC, ET AL., PETITIONERS *v.* AUBREY ELENIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 30, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Five years ago, this Court recognized the "general rule" that religious and philosophical objections to gay marriage "do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (slip op., at 9). The Court also recognized the "serious stigma" that would result if "purveyors of goods and services who object to gay marriages for moral and religious reasons" were "allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages.'" *Id.*, at ___ (slip op., at 12).

Today, the Court, for the first time in its history, grants a business open to the public a constitutional right to refuse to serve members of a protected class. Specifically, the Court holds that the First Amendment exempts a website-design company from a state law that prohibits the company from denying wedding websites to same-sex couples if the company chooses to sell those websites to the public. The Court also holds that the company has a right to post a notice that says, "'no [wedding websites] will be sold if they will be used for gay marriages.'" *Ibid.*

"What a difference five years makes." *Carson* v. *Makin*, 596 U. S. \_\_\_, \_\_\_ (2022) (SOTOMAYOR, J., dissenting) (slip op., at 5). And not just at the Court. Around the country, there has been a backlash to the movement for liberty and equality for gender and sexual minorities. New forms of inclusion have been met with reactionary exclusion. This is heartbreaking. Sadly, it is also familiar. When the civil rights and women's rights movements sought equality in public life, some public establishments refused. Some even claimed, based on sincere religious beliefs, constitutional rights to discriminate. The brave Justices who once sat on this Court decisively rejected those claims.

Now the Court faces a similar test. A business open to the public seeks to deny gay and lesbian customers the full and equal enjoyment of its services based on the owner's religious belief that same-sex marriages are "false." The business argues, and a majority of the Court agrees, that because the business offers services that are customized and expressive, the Free Speech Clause of the First Amendment shields the business from a generally applicable law that prohibits discrimination in the sale of publicly available goods and services. That is wrong. Profoundly wrong. As I will explain, the law in question targets conduct, not speech, for regulation, and the *act* of discrimination has never constituted protected expression under the First Amendment. Our Constitution contains no right to refuse service to a disfavored group. I dissent.

I

A

A "public accommodations law" is a law that guarantees to every person the full and equal enjoyment of places of public accommodation without unjust discrimination. The American people, through their elected representatives, have enacted such laws at all levels of government: The federal Civil Rights Act of 1964 and the Americans with

SOTOMAYOR, J., dissenting

Disabilities Act of 1990 prohibit discrimination by places of public accommodation on the basis of race, color, religion, national origin, or disability.[1]   All but five States have analogous laws that prohibit discrimination on the basis of these and other traits, such as age, sex, sexual orientation, and gender identity.[2]   And numerous local laws offer similar protections.

The people of Colorado have adopted the Colorado Anti-Discrimination Act (CADA), which provides:

> "It is a discriminatory practice and unlawful for a
> person, directly or indirectly, to refuse, withhold from,

––––––––––

[1] See 42 U. S. C. §2000a *et seq.* (Title II of Civil Rights Act of 1964); 42 U. S. C. §12181 *et seq.* (Title III of Americans with Disabilities Act of 1990).

[2] See Alaska Stat. §18.80.230 (2023); Ariz. Rev. Stat. Ann. §41–1442 (2017); Ark. Code Ann. §16–123–107 (Supp. 2021); Cal. Civ. Code Ann. §51 (West 2020); Colo. Rev. Stat. §24–34–601 (2022); Conn. Gen. Stat. §§46a–64, 46a–81d (Cum. Supp. 2023); Del. Code Ann., Tit. 6, §4504 (Cum. Supp. 2022); Fla. Stat. §§413.08, 760.08 (2022); Haw. Rev. Stat. §489–3 (Cum. Supp. 2021); Idaho Code Ann. §67–5909 (2020); Ill. Comp. Stat., ch. 775, §5/1–102 (West Supp. 2021); Ind. Code §22–9–1–2 (2022); Iowa Code §216.7 (2023); Kan. Stat. Ann. §44–1001 (2021); Ky. Rev. Stat. Ann. §§344.120, 344.145 (West 2018); La. Rev. Stat. Ann. §51:2247 (West Cum. Supp. 2023); Me. Rev. Stat. Ann., Tit. 5, §4591 (Cum. Supp. 2023); Md. State Govt. Code Ann. §20–304 (2021); Mass. Gen. Laws, ch. 272, §98 (2020); Mich. Comp. Laws §§37.1102, 37.2302 (1981), as amended, 2023 Mich. Pub. Acts no. 6 (*sine die*); Minn. Stat. §363A.11 (2022); Mo. Rev. Stat. §213.065 (Cum. Supp. 2021); Mont. Code Ann. §49–2–304 (2021); Neb. Rev. Stat. §20–134 (2022); Nev. Rev. Stat. §651.070 (2017); N. H. Rev. Stat. Ann. §354–A:17 (2022); N. J. Stat. Ann. §10:5–12 (West Cum. Supp. 2023); N. M. Stat. Ann. §28–1–7 (2022); N. Y. Civ. Rights Law Ann. §40 (West 2019); N. D. Cent. Code Ann. §14–02.4–14 (2017); Ohio Rev. Code Ann. §4112.02 (Lexis Supp. 2023); Okla. Stat., Tit. 25, §1402 (2011); Ore. Rev. Stat. §659A.403 (2021); Pa. Stat. Ann., Tit. 43, §953 (Purdon 2020); R. I. Gen. Laws §11–24–2 (2002); S. C. Code Ann. §45–9–10 (2016); S. D. Codified Laws §20–13–23 (2016); Tenn. Code Ann. §4–21–501 (2021); Utah Code §13–7–3 (2022); Vt. Stat. Ann., Tit. 9, §4502 (2020); Va. Code Ann. §2.2–3904 (2022); Wash. Rev. Code §49.60.215 (2022); W. Va. Code Ann. §5–11–2 (Lexis 2022); Wis. Stat. §106.52 (2019–2020); Wyo. Stat. Ann. §6–9–101 (2021).

SOTOMAYOR, J., dissenting

or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. §24–34–601(2)(a).

This provision, known as the Act's "Accommodation Clause," applies to any business engaged in sales "to the public." §24–34–601(1). The Accommodation Clause does not apply to any "church, synagogue, mosque, or other place that is principally used for religious purposes." *Ibid.*

In addition, CADA contains what is referred to as the Act's "Communication Clause," which makes it unlawful to advertise that services "will be refused, withheld from, or denied," or that an individual is "unwelcome" at a place of public accommodation, based on the same protected traits. §24–34–601(2)(a). In other words, just as a business open to the public may not refuse to serve customers based on race, religion, or sexual orientation, so too the business may not hang a sign that says, "No Blacks, No Muslims, No Gays."

A public accommodations law has two core purposes. First, the law ensures "*equal access* to publicly available goods and services." *Roberts* v. *United States Jaycees*, 468 U. S. 609, 624 (1984) (emphasis added). For social groups that face discrimination, such access is vital. All the more so if the group is small in number or if discrimination against the group is widespread. Equal access is mutually beneficial: Protected persons receive "equally effective and meaningful opportunity to benefit from all aspects of life in America," 135 Cong. Rec. 8506 (1989) (remarks of Sen. Harkin) (Americans with Disabilities Act), and "society," in return, receives "the benefits of wide participation in political, economic, and cultural life." *Roberts*, 468 U. S., at 625.

Second, a public accommodations law ensures *equal dignity* in the common market. Indeed, that is the law's "fundamental object": "to vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'" *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 250 (1964) (quoting S. Rep. No. 872, 88th Cong., 2d Sess., 16 (1964)). This purpose does not depend on whether goods or services are otherwise available. "'Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his [social identity]. It is equally the inability to explain to a child that regardless of education, civility, courtesy, and morality he will be denied the right to enjoy equal treatment.'" 379 U. S., at 292 (Goldberg, J., concurring). When a young Jewish girl and her parents come across a business with a sign out front that says, "'No dogs or Jews allowed,'"[3] the fact that another business might serve her family does not redress that "stigmatizing injury," *Roberts*, 468 U. S., at 625. Or, put another way, "the hardship Jackie Robinson suffered when on the road" with his baseball team "was not an inability to find *some hotel* that would have him; it was the indignity of not being allowed to stay in the *same hotel* as his white teammates." J. Oleske, The Evolution of Accommodation, 50 Harv. Civ. Rights-Civ. Lib. L. Rev. 99, 138 (2015).

To illustrate, imagine a funeral home in rural Mississippi agrees to transport and cremate the body of an elderly man who has passed away, and to host a memorial lunch. Upon learning that the man's surviving spouse is also a man, however, the funeral home refuses to deal with the family.

_____

[3] Hearings on the Nomination of Ruth Bader Ginsburg To Be Associate Justice of the Supreme Court of the United States before the Senate Committee on the Judiciary, 103d Cong., 1st Sess., 139 (1993).

SOTOMAYOR, J., dissenting

Grief stricken, and now isolated and humiliated, the family desperately searches for another funeral home that will take the body.  They eventually find one more than 70 miles away.  See First Amended Complaint in *Zawadski* v. *Brewer Funeral Services, Inc.*, No. 55CI1–17–cv–00019 (C. C. Pearl River Cty., Miss., Mar. 7, 2017), pp. 4–7.[4]  This ostracism, this otherness, is among the most distressing feelings that can be felt by our social species.  K. Williams, Ostracism, 58 Ann. Rev. Psychology 425, 432–435 (2007).

Preventing the "unique evils" caused by "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages" is a compelling state interest "of the highest order."  *Roberts*, 468 U. S., at 624, 628; see *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537, 549 (1987).  Moreover, a law that prohibits only such acts by businesses open to the public is narrowly tailored to achieve that compelling interest.  The law "responds precisely to the substantive problem which legitimately concerns the State": the harm from status-based discrimination in the public marketplace.  *Roberts*, 468 U. S., at 629 (internal quotation marks omitted).

This last aspect of a public accommodations law deserves special emphasis: The law regulates only businesses that choose to sell goods or services "to the general public," *e.g.*, Va. Code Ann. §2.2–3904, or "to the public," *e.g.*, Mich. Comp. Laws §37.2301.  Some public accommodations laws,

––––––––––

[4]The men in this story are Robert "Bob" Huskey and John "Jack" Zawadski.  Bob and Jack were a loving couple of 52 years.  They moved from California to Colorado to care for Bob's mother, then to Wisconsin to farm apples and teach special education, and then to Mississippi to retire.  Within weeks of this Court's decision in *Obergefell* v. *Hodges*, 576 U. S. 644 (2015), Bob and Jack got married.  They were 85 and 81 years old on their wedding day.  A few months later, Bob's health took a turn.  He died the following spring.  When Bob's family was forced to find an alternative funeral home more than an hour from where Bob and Jack lived, the lunch in Bob's memory had to be canceled.  Jack died the next year.

SOTOMAYOR, J., dissenting

such as the federal Civil Rights Act, list establishments that qualify, but these establishments are ones open to the public generally. See, *e.g.*, 42 U. S. C. §2000a(b) (hotels, restaurants, gas stations, movie theaters, concert halls, sports arenas, stadiums). A public accommodations law does not force anyone to start a business, or to hold out the business's goods or services to the public at large. The law also does not compel any business to sell any particular good or service. But if a business chooses to profit from the public market, which is established and maintained by the state, the state may require the business to abide by a legal norm of nondiscrimination. In particular, the state may ensure that groups historically marked for second-class status are not denied goods or services on equal terms.

The concept of a public accommodation thus embodies a simple, but powerful, social contract: A business that chooses to sell to the public assumes a duty to serve the public without unjust discrimination. J. Singer, No Right To Exclude: Public Accommodations and Private Property, 90 Nw. U. L. Rev. 1283, 1298 (1996) (Singer).

### B

The legal duty of a business open to the public to serve the public without unjust discrimination is deeply rooted in our history. The true power of this principle, however, lies in its capacity to evolve, as society comes to understand more forms of unjust discrimination and, hence, to include more persons as full and equal members of "the public."

### 1

"At common law, innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 571 (1995) (quoting *Lane* v. *Cotton*, 12 Mod. 472, 485, 88 Eng. Rep. 1458, 1465 (K. B.

1701) (Holt, C. J.)). "Public employment" meant a business "in which the owner has held himself out as ready to serve the public by exercising his trade." Singer 1307; see, *e.g.*, *Gisbourn* v. *Hurst*, 1 Salk. 249, 91 Eng. Rep. 220 (K. B. 1710). Take, for example, *Lane* v. *Cotton*, "[t]he leading English case" on the subject "cited over and over again in the nineteenth century in the United States." Singer 1304. There, Lord Chief Justice Holt explained:

> "[W]here-ever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him. . . . If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which is for the public good, and has thereby exposed and vested an interest of himself in all the King's subjects that will employ him in the way of his trade." *Lane* v. *Cotton*, 12 Mod., at 484, 88 Eng. Rep., at 1464.

That is to say, a business's duty to serve all comers derived from its choice to hold itself out as ready to serve the public. This holding-out rationale became firmly established in early American law. See 2 J. Kent, Commentaries on American Law 464–465 (1827); J. Story, Commentaries on the Law of Bailments §§495, 591 (1832); see also, *e.g.*, *Markham* v. *Brown*, 8 N. H. 523, 528 (1837); *Jencks* v. *Coleman*, 13 F. Cas. 442, 443 (No. 7,258) (CC RI 1835) (Story, J.); *Dwight* v. *Brewster*, 18 Mass. 50, 53 (1822).

The majority is therefore mistaken to suggest that public accommodations or common carriers historically assumed duties to serve all comers because they enjoyed monopolies or otherwise had market power. *Ante*, at 13. Tellingly, the majority cites no common-law case espousing the monopoly

rationale.[5]  That is because nowhere in the relevant case law "is monopoly suggested as the distinguishing characteristic."  E. Adler, Business Jurisprudence, 28 Harv. L. Rev. 135, 156 (1914) ("A distinction based on monopoly would require proof that the common carrier had some kind of a monopoly which the private carrier did not have, or that 'common' was synonymous with 'monopoly.'  The plain meaning of the cases is [instead that] the common was the public, the professional, the business carrier or other trader").[6]

### 2

After the Civil War, some States codified the common-law duty of public accommodations to serve all comers.  See M. Konvitz & T. Leskes, A Century of Civil Rights 155–157 (1961).  Early state public accommodations statutes prohibited discrimination based on race or color.  Yet the principle was at times stated more broadly: to provide "a remedy against any unjust discrimination to the citizen in all public places."  *Ferguson* v. *Gies*, 82 Mich. 358, 365, 46 N. W. 718, 720 (1890).  In 1885, Colorado adopted "'An Act to Protect All Citizens in Their Civil Rights,' which guaranteed 'full

---

[5] For example, a case on which the majority relies found that it could "shortly dispos[e]" of the question whether a steamship company was a common carrier because the company was "the owner of a general ship, carrying goods for hire . . . and perform[ing]" that service "regular[ly]."  *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 437 (1889).  No showing of market power was required.  *Ibid.*

[6] Nor does "host[ing] or transport[ing] others and their belongings," *ante*, at 13, explain the right of access.  Smiths, for instance, did not always practice their trade by holding property for others.  And even when they did, any duty of care resulting from such bailment cannot explain the duty to serve all comers, which logically must be assumed beforehand.  See *Lane* v. *Cotton*, 12 Mod. 472, 484, 88 Eng. Rep. 1458, 1464 (K. B. 1701) (Holt, C. J.).  That duty instead came from somewhere else, and the weight of authority indicates that it came from a business's act of holding itself out to the public as ready to serve anyone who would hire it.  Singer 1304–1330; 3 W. Blackstone, Commentaries on the Laws of England 164 (1768); J. Story, Commentaries on the Law of Bailments §§495, 591 (1837); 1 T. Parsons, Law of Contracts 639, 643, 649 (1853).

and equal enjoyment' of certain public facilities to 'all citizens,' 'regardless of race, color or previous condition of servitude.'" *Masterpiece Cakeshop*, 584 U. S., at ___–___ (slip op., at 4–5) (quoting 1885 Colo. Sess. Laws p. 132). "A decade later, the [State] expanded the requirement to apply to 'all other places of public accommodation.'" 584 U. S., at ___ (slip op., at 5) (quoting 1895 Colo. Sess. Laws ch. 61, p. 139). Congress, too, passed the Civil Rights Act of 1875, which established "[t]hat all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement . . . applicable alike to citizens of every race and color, regardless of any previous condition of servitude." Act of Mar. 1, 1875, §1, 18 Stat. 336.

This Court, however, struck down the federal Civil Rights Act of 1875 as unconstitutional. *Civil Rights Cases*, 109 U. S. 3, 25 (1883). Southern States repealed public accommodations statutes and replaced them with Jim Crow laws. And state courts construed any remaining right of access in ways that furthered *de jure* and *de facto* racial segregation.[7] Full and equal enjoyment came to mean "separate but equal" enjoyment. The result of this backsliding was "the replacement of a general right of access with a general right to exclude . . . in order to promote a racial caste system." Singer 1295.

─────────

[7] Compare, *e.g.*, *Chesapeake, O. & S. R. Co.* v. *Wells*, 85 Tenn. 613, 615, 4 S. W. 5 (1887) (rejecting Ida B. Wells's claim that she was denied "'accommodations equal in all respects,'" when she tried to enter a train car "set apart for white ladies and their gentlemen" on account of tobacco smoke in her car, and was forcibly removed), with *Memphis & C. R. Co.* v. *Benson*, 85 Tenn. 627, 632, 4 S. W. 5, 7 (1887) (accepting that a white man would be permitted to ride standing in the ladies' car on account of tobacco smoke in his car).

In time, the civil rights movement of the mid-20th century again demanded racial equality in public places. In 1963, two decades after then–Howard University law student Pauli Murray organized sit-ins at cafeterias in Washington, D. C., a diverse group of students and faculty from Tougaloo College sat at Woolworth's lunch counter in Jackson, Mississippi. For doing so, they were violently attacked by a white mob. See A. Moody, Coming of Age in Mississippi 235–240 (1992). Around the country, similar acts of protest against racial injustice, some big and some small, sought "to create such a crisis and foster such a tension" that the country would be "forced to confront the issue." M. King, Letter from a Birmingham Jail, Apr. 16, 1963. That year, Congress once more set out to eradicate "discrimination . . . in places of accommodation and public facilities," *Heart of Atlanta Motel*, 379 U. S., at 246, notwithstanding this Court's previous declaration of a federal public accommodations law to be unconstitutional.

Congress believed, rightly, that discrimination in places of public accommodation—"the injustice of being arbitrarily denied equal access to those facilities and accommodations which are otherwise open to the general public"—had "no place" in this country, the country "of the melting pot, of equal rights, of one nation and one people." S. Rep. No. 872, at 8–9 (quoting President Kennedy, June 19, 1963). It therefore passed Title II of the Civil Rights Act of 1964, which declares: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination . . . on the ground of race, color, religion, or national origin." 42 U. S. C. §2000a. In enacting this landmark civil rights statute, Congress invoked the holding-out rationale from antebellum common law: "one who employed his private property for purposes of commercial gain by offering goods or services to the public must stick to his bargain." S. Rep. No. 872, at

12          303 CREATIVE LLC *v.* ELENIS

SOTOMAYOR, J., dissenting

22; see also *id.*, at 9–10 (endorsing Lord Holt's view in *Lane* v. *Cotton*).

This bargain, America would soon realize, had long excluded half of society. Women, though having won the right to vote half a century earlier, were not equal in public. Instead, a "separate-spheres ideology" had "assigned women to the home and men to the market." E. Sepper & D. Dinner, Sex in Public, 129 Yale L. J. 78, 83, 88–90 (2019) (Sepper & Dinner). Women were excluded from restaurants, bars, civic and professional organizations, financial institutions, and sports. "Just as it did for the civil rights struggle, public accommodations served as kindling for feminist mobilization." *Id.*, at 83, 97–104; cf. S. Mayeri, Reasoning From Race: Feminism, Law, and the Civil Rights Revolution 9–40 (2011). In response to a movement for women's liberation, numerous States banned discrimination in public accommodations on the basis of "sex." See Sepper & Dinner 104, nn. 145–147 (collecting statutes). Colorado was the first State to do so. See 1969 Colo. Sess. Laws ch. 74, p. 200.

In the decades that followed, the Nation opened its eyes to another injustice. People with disabilities, though inherently full and equal members of the public, had been excluded from many areas of public life. This exclusion worked harms not only to disabled people's standards of living, but to their dignity too. So Congress, responding once again to a social movement, this time against the subordination of people with disabilities, banned discrimination on that basis and secured by law disabled people's equal access to public spaces. See S. Bagenstos, Law and the Contradictions of the Disability Rights Movement 13–20 (2009); R. Colker, The Disability Pendulum 22–68 (2005). The centerpiece of this political and social action was the Americans with Disabilities Act of 1990 (ADA). Title III of the ADA provides that "[n]o individual shall be discriminated

SOTOMAYOR, J., dissenting

against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U. S. C. §12182(a).

Not only have public accommodations laws expanded to recognize more forms of unjust discrimination, such as discrimination based on race, sex, and disability, such laws have also expanded to include more goods and services as "public accommodations."  What began with common inns, carriers, and smiths has grown to include restaurants, bars, movie theaters, sports arenas, retail stores, salons, gyms, hospitals, funeral homes, and transportation networks.  See nn. 1–2, *supra*; L. Lerman & A. Sanderson, Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws, 7 N. Y. U. Rev. L. & Soc. Change 215, 217 (1978) ("'Public accommodations' is a term of art which was developed by the drafters of discrimination laws to refer to [public] places other than schools, work places, and homes").  Today, laws like Colorado's cover "any place of business engaged in any sales to the public and any place offering services . . . to the public."  Colo. Rev. Stat. §24–34–601(1); see also, *e.g.*, Ohio Rev. Code Ann. §4112.01(9).  Numerous other States extend such protections to businesses offering goods or services to "the general public."  Ariz. Rev. Stat. Ann. §41–1441(2); see also, *e.g.*, Mass. Gen. Laws, ch. 272, §92A.

This broader scope, though more inclusive than earlier state public accommodations laws, is in keeping with the fundamental principle—rooted in the common law, but alive and blossoming in statutory law—that the duty to serve without unjust discrimination is owed to everyone, and it extends to any business that holds itself out as ready to serve the public.  If you have ever taken advantage of a public business without being denied service because of who you are, then you have come to enjoy the dignity and freedom that this principle protects.

SOTOMAYOR, J., dissenting

3

Lesbian, gay, bisexual, and transgender (LGBT) people, no less than anyone else, deserve that dignity and freedom. The movement for LGBT rights, and the resulting expansion of state and local laws to secure gender and sexual minorities' full and equal enjoyment of publicly available goods and services, is the latest chapter of this great American story.

LGBT people have existed for all of human history. And as sure as they have existed, others have sought to deny their existence, and to exclude them from public life. Those who would subordinate LGBT people have often done so with the backing of law. For most of American history, there were laws criminalizing same-sex intimacy. *Obergefell* v. *Hodges*, 576 U. S. 644, 660–661 (2015). "Gays and lesbians were [also] prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate." *Id.*, at 661. "These policies worked to create and reinforce the belief that gay men and lesbians" constituted "an inferior class." Brief for Organization of American Historians as *Amicus Curiae* in *Obergefell* v. *Hodges*, O. T. 2014, No. 14–556, p. 3.

State-sponsored discrimination was compounded by discrimination in public accommodations, though the two often went hand in hand. The police raided bars looking for gays and lesbians so often that some bars put up signs saying, "'We Do Not Serve Homosexuals.'" *Id.*, at 13 (quoting G. Chauncey, Why Marriage 8 (2004)). LGBT discrimination in public accommodations has continued well into the 21st century. See UCLA School of Law Williams Institute, C. Mallory & B. Sears, Evidence of Discrimination in Public Accommodations Based on Sexual Orientation and Gender Identity (2016).

A social system of discrimination created an environment in which LGBT people were unsafe. Who could forget the

SOTOMAYOR, J., dissenting

brutal murder of Matthew Shepard? Matthew was targeted by two men, tortured, tied to a buck fence, and left to die for who he was. See K. Drake, Gay Man Beaten, Burned and Left Tied to Fence, Casper Star-Tribune, Oct. 10, 1998, p. A1. Or the Pulse nightclub massacre, the second-deadliest mass shooting in U. S. history? See S. Stolberg, For Gays Across America, a Massacre Punctuates Fitful Gains, N. Y. Times, June 13, 2016, p. A1. Rates of violent victimization are still significantly higher for LGBT people, with transgender persons particularly vulnerable to attack. See Dept. of Justice, J. Truman & R. Morgan, Violent Victimization by Sexual Orientation and Gender Identity, 2017–2020 (2022).

Determined not to live as "social outcasts," *Masterpiece Cakeshop*, 584 U. S., at ___ (slip op., at 9), LGBT people have risen up. The social movement for LGBT rights has been long and complex. See L. Faderman, The Gay Revolution (2015) (Faderman). But if there ever was an "earthquake," it occurred in the final days of June in 1969 at the Stonewall Inn in Greenwich Village. *Id.*, at 169. The Stonewall Inn was a gay bar with a "varied and lively clientele." *Id.*, at 171. Its "'unruly' element" made it "an especially inviting target" for police raids. J. D'Emilio, Sexual Politics, Sexual Communities 231 (1983) (D'Emilio). "Patrons of the Stonewall tended to be young and nonwhite. Many were drag queens. . . . " *Ibid.* Just before midnight on June 27, the New York police's Public Morals Squad showed up to the bar and started making arrests. Drag queens, for example, were arrested for offenses like being "disguised" in "unnatural attire." N. Y. Penal Law Ann. §240.35(4) (West 1967).

What started out as a fairly routine police raid, however, became anything but. Outside the Stonewall Inn, patrons who had been thrown out started to form a crowd. "Jeers and catcalls arose from the onlookers when a paddy wagon departed with the bartender, the Stonewall's bouncer, and

SOTOMAYOR, J., dissenting

three drag queens." D'Emilio 231. "A few minutes later, an officer attempted to steer the last of the patrons, a lesbian, through the bystanders to a nearby patrol car." *Id.*, at 231–232. When she started to struggle, protests erupted. They lasted into the night and continued into the next. News of the Stonewall protests "spread rapidly," and "within a year gay liberation groups had sprung into existence on college campuses and in cities around the nation." *Id.*, at 233. From there, the path to LGBT rights has not been quick or easy. Nor is it over. Still, change has come: change in social attitudes, in representation, and in legal institutions. Faderman 535–629.

One significant change has been the addition of sexual orientation and gender identity to public accommodations laws. State and local legislatures took note of the failure of such laws to protect LGBT people and, in response, acted to guarantee them "all the privileges . . . of any other member of society." Hearings on S. B. 200 before the House Judiciary Committee, 66th Gen. Assem., 2d Reg. Sess., 4, 11–12 (Colo. 2008) (remarks of Sen. Judd). Colorado thus amended its antidiscrimination law in 2008 to prohibit the denial of publicly available goods or services on the basis of "sexual orientation." 2008 Colo. Sess. Laws. ch. 341, pp. 1596–1597. About half of the States now provide such protections.[8] It is "'unexceptional'" that they may do so. *Ante*, at 13 (quoting *Masterpiece Cakeshop*, 584 U. S., at ___ (slip op., at 10)). "These are protections taken for granted by

---

[8] See Cal. Civ. Code Ann. §51; Colo. Rev. Stat. §24–34–601; Conn. Gen. Stat. §46a–81d; Del. Code Ann., Tit. 6, §4504; Haw. Rev. Stat. §489–3; Ill. Comp. Stat., ch. 775, §5/1–102; Iowa Code §216.7; Me. Rev. Stat. Ann., Tit. 5, §4591; Md. State Govt. Code Ann. §20–304; Mass. Gen. Laws, ch. 272, §98; Mich. Comp. Laws §37.2302, as amended; Minn. Stat. §363A.11; Nev. Rev. Stat. §651.070; N. H. Rev. Stat. Ann. §354–A:17; N. J. Stat. Ann. §10:5–12; N. M. Stat. Ann. §28–1–7; N. Y. Civ. Rights Law Ann. §40; Ore. Rev. Stat. §659A.403; R. I. Gen. Laws §11–24–2; Vt. Stat. Ann., Tit. 9, §4502; Va. Code Ann. §2.2–3904; Wash. Rev. Code §49.60.215; Wis. Stat. §106.52.

SOTOMAYOR, J., dissenting

most people either because they already have them or do not need them; these are protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." *Romer* v. *Evans*, 517 U. S. 620, 631 (1996). LGBT people do not seek any special treatment. All they seek is to exist in public. To inhabit public spaces on the same terms and conditions as everyone else.

## C

Yet for as long as public accommodations laws have been around, businesses have sought exemptions from them. The civil rights and women's liberation eras are prominent examples of this. Backlashes to race and sex equality gave rise to legal claims of rights to discriminate, including claims based on First Amendment freedoms of expression and association. This Court was unwavering in its rejection of those claims, as invidious discrimination "has never been accorded affirmative constitutional protections." *Norwood* v. *Harrison*, 413 U. S. 455, 470 (1973). In particular, the refusal to deal with or to serve a class of people is not an expressive interest protected by the First Amendment.

### 1

Opponents of the Civil Rights Act of 1964 objected that the law would force business owners to defy their beliefs. Cf. *ante*, at 3. They argued that the Act would deny them "any freedom to speak or to act on the basis of their religious convictions or their deep-rooted preferences for associating or not associating with certain classifications of people." 110 Cong. Rec. 7778 (1964) (remarks of Sen. Tower). Congress rejected those arguments. Title II of the Act, in particular, did not invade "rights of privacy [or] of free association," Congress concluded, because the establishments covered by the law were "those regularly held open to the

public in general." H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 9 (1963); see also S. Rep. No. 872, at 92.

Having failed to persuade Congress, opponents of Title II turned to the federal courts. In *Heart of Atlanta Motel*, one of several arguments made by the plaintiff motel owner was that Title II violated his Fifth Amendment due process rights by "tak[ing] away the personal liberty of an individual to run his business as he sees fit with respect to the selection and service of his customers." Brief for Appellant, O. T. 1964, No. 515, p. 32. This Court disagreed, based on "a long line of cases" holding that "prohibition of racial discrimination in public accommodations" did not "interfer[e] with personal liberty." 379 U. S., at 260.

In *Katzenbach* v. *McClung*, 379 U. S. 294 (1964), the owner of Ollie's Barbecue (Ollie McClung) likewise argued that Title II's application to his business violated the "personal rights of persons in their personal convictions" to deny services to Black people. Brief for Appellees, O. T. 1964, No. 543, p. 33 (citing, *inter alia, West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943)). Note that McClung did not refuse to *transact* with Black people. Oh, no. He was willing to offer them take-out service at a separate counter. See Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* in *Katzenbach* v. *McClung*, p. 4, n. 5. Only integrated table service, you see, violated McClung's core beliefs. So he claimed a constitutional right to offer Black people a limited menu of his services. This Court rejected that claim, citing its decision in *Heart of Atlanta Motel.* See 379 U. S., at 298, n. 1.

Next is *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400 (1968) (*per curiam*), in which the owner of a chain of drive-in establishments asserted that requiring him to "contribut[e]" to racial integration in any way violated the First Amendment by interfering with his religious liberty. App. to Pet. for Cert., O. T. 1967, No. 339, p. 21a. Title II could not be applied to his business, he argued, because that

SOTOMAYOR, J., dissenting

would "'controven[e] the will of God.'"  390 U. S., at 402–
403, n. 5.  The Court found this argument "patently frivo-
lous."  *Ibid.*

Last but not least is *Runyon* v. *McCrary*, 427 U. S. 160
(1976), a case the majority studiously avoids.  In *Runyon*,
the Court confronted the question whether "commercially
operated" schools had a First Amendment right to exclude
Black children, notwithstanding a federal law against ra-
cial discrimination in contracting.  *Id.*, at 168; see 42
U. S. C. §1981.  The schools in question offered "educational
services" for sale to "the general public."  427 U. S., at 172.
They argued that the law, as applied to them, violated their
First Amendment rights of "freedom of speech, and associ-
ation."  Pet. for Cert., O. T. 1976, No. 75–62, p. 6; see also
Brief for Petitioners, O. T. 1976, No. 75–62, p. 12 ("Freedom
to teach, to express ideas").  The Court, however, reasoned
that the schools' "*practice*" of denying educational services
to racial minorities was not shielded by the First Amend-
ment, for two reasons: First, "the Constitution places no
value on discrimination."  427 U. S., at 176 (alterations and
internal quotations marks omitted).  Second, the govern-
ment's regulation of conduct did not "inhibit" the schools'
ability to teach its preferred "ideas or dogma."  *Ibid.* (inter-
nal quotation marks omitted).  Requiring the schools to
abide by an antidiscrimination law was not the same thing
as compelling the schools to express teachings contrary to
their sincerely held "belief that racial segregation is desira-
ble."  *Ibid*.

2

First Amendment rights of expression and association
were also raised to challenge laws against sex discrimina-
tion.  In *Roberts* v. *United States Jaycees*, the United States
Jaycees sought an exemption from a Minnesota law that
forbids discrimination on the basis of sex in public accom-
modations.  The U. S. Jaycees was a civic organization,

SOTOMAYOR, J., dissenting

which until then had denied admission to women. The organization alleged that applying the law to require it to include women would violate its "members' constitutional rights of free speech and association." 468 U. S., at 615. "The power of the state to change the membership of an organization is inevitably the power to *change the way in which it speaks*," the Jaycees argued. Brief for Appellee, O. T. 1983, No. 83–724, p. 19 (emphasis added). Thus, "the right of the Jaycees to decide its own membership" was "inseparable," in its view, "from its ability to freely express itself." *Ibid.*

This Court took a different view. The Court held that the "application of the Minnesota statute to compel the Jaycees to accept women" did not infringe the organization's First Amendment "freedom of expressive association." *Roberts*, 468 U. S., at 622. That was so because the State's public accommodations law did "not aim at the suppression of speech" and did "not distinguish between prohibited and permitted activity on the basis of viewpoint." *Id.*, at 623–624. If the State had applied the law "for the *purpose* of hampering the organization's ability to express its views," that would be a different matter. *Id.*, at 624 (emphasis added). "Instead," the law's purpose was "eliminating discrimination and assuring [the State's] citizens equal access to publicly available goods and services." *Ibid.* "That goal," the Court reasoned, "was unrelated to the suppression of expression" and "plainly serves compelling state interests of the highest order." *Ibid.*

Justice O'Connor concurred in part and concurred in the judgment. See *id.*, at 631. She stressed that the U. S. Jaycees was a predominantly commercial entity open to the public. And she took the view that there was a First Amendment "dichotomy" between rights of commercial and expressive association. *Id.*, at 634. The State, for example, was "free to impose any rational regulation" on commercial transactions themselves. "A shopkeeper," Justice O'Connor

explained, "has no constitutional right to deal only with persons of one sex." *Ibid.*

To wit, the Court had just decided in *Hishon* v. *King & Spalding*, 467 U. S. 69, 78 (1984), that a law partnership had no constitutional right to discriminate on the basis of sex in violation of Title VII. The law partnership was an act of association. Its services (legal advocacy) were expressive; indeed, they consisted of speech. So the law firm argued that requiring it to consider a woman for the partnership violated its First Amendment rights "of free expression" and "of commercial association." Brief for Respondent, O. T. 1983, No. 82–940, pp. 14–18. This Court rejected that argument. The application of Title VII did not "infringe constitutional rights of expression or association," the Court held, because compliance with Title VII did not "inhibi[t]" the partnership's ability to advocate for certain "ideas and beliefs." 467 U. S., at 78 (internal quotation marks omitted); see also *supra*, at 19 (discussing *Runyon*, 427 U. S., at 176). The Court reiterated: "'[I]nvidious private discrimination . . . has never been accorded affirmative constitutional protections.'" 467 U. S., at 78 (quoting *Norwood*, 413 U. S., at 470).

## II

Battling discrimination is like "battling the Hydra." *Shelby County* v. *Holder*, 570 U. S. 529, 560 (2013) (Ginsburg, J., dissenting). Whenever you defeat "one form of . . . discrimination," another "spr[ings] up in its place." *Ibid.* Time and again, businesses and other commercial entities have claimed constitutional rights to discriminate. And time and again, this Court has courageously stood up to those claims—until today. Today, the Court shrinks. A business claims that it would like to sell wedding websites to the general public, yet deny those same websites to gay and lesbian couples. Under state law, the business is free to include, or not to include, any lawful message it wants in

SOTOMAYOR, J., dissenting

its wedding websites. The only thing the business may not do is deny whatever websites it offers on the basis of sexual orientation. This Court, however, grants the business a broad exemption from state law and allows the business to post a notice that says: Wedding websites will be refused to gays and lesbians. The Court's decision, which conflates denial of service and protected expression, is a grave error.

A

303 Creative LLC is a limited liability company that sells graphic and website designs for profit. Lorie Smith is the company's founder and sole member-owner. Smith believes same-sex marriages are "false," because "'God's true story of marriage'" is a story of a "'union between one man and one woman.'" Brief for Petitioners 4, 6–7 (quoting App. to Pet. for Cert. 188a, 189a); Tr. of Oral Arg. 36, 40–41. Same-sex marriage, according to her, "violates God's will" and "harms society and children." App. to Pet. for Cert. 186a.

303 Creative has never sold wedding websites. Smith now believes, however, that "God is calling her 'to explain His true story about marriage.'" Brief for Petitioners 7 (quoting App. to Pet. for Cert. 188a). For that reason, she says, she wants her for-profit company to enter the wedding website business. There is only one thing: Smith would like her company to sell wedding websites "to the public," App. to Pet. for Cert. 189a; Colo. Rev. Stat. §24–34–601(1), but not to same-sex couples. She also wants to post a notice on the company's website announcing this intent to discriminate. App. to Pet. for Cert. 188a–189a. In Smith's view, "it would violate [her] sincerely held religious beliefs to create a wedding website for a same-sex wedding because, by doing so, [she] would be expressing a message celebrating and promoting a conception of marriage that [she] believe[s] is contrary to God's design." *Id.*, at 189a.

Again, Smith's company has never sold a wedding website to any customer. Colorado, therefore, has never had to

SOTOMAYOR, J., dissenting

enforce its antidiscrimination laws against the company. As the majority puts it, however, Smith "worries that, if she enters the wedding website business, the State will force her to convey messages inconsistent with her belief that marriage should be reserved to unions between one man and one woman." *Ante*, at 2. So Smith and her company, the petitioners here, sued the State in federal court. They sought a court decree giving them a special exemption from CADA's Accommodation Clause (which, remember, makes it unlawful for a business to hold itself out to the public yet deny to any individual, because of sexual orientation, the full and equal enjoyment of the business's goods or services, see *supra*, at 3–4) and CADA's Communication Clause (which makes it unlawful to advertise that goods or services will be denied because of sexual orientation, see *supra*, at 4). App. 303–304.

The breadth of petitioners' pre-enforcement challenge is astounding. According to Smith, the Free Speech Clause of the First Amendment entitles her company to refuse to sell *any* "websites for same-sex weddings," even though the company plans to offer wedding websites to the general public. *Ibid.*; see also Brief for Petitioners 22–23, and n. 2; Tr. of Oral Arg. 37–38. In other words, the company claims a categorical exemption from a public accommodations law simply because the company sells expressive services. The sweeping nature of this claim should have led this Court to reject it.

B

The First Amendment does not entitle petitioners to a special exemption from a state law that simply requires them to serve all members of the public on equal terms. Such a law does not directly regulate petitioners' speech at all, and petitioners may not escape the law by claiming an expressive interest in discrimination. The First Amendment likewise does not exempt petitioners from the law's

prohibition on posting a notice that they will deny goods or services based on sexual orientation.

### 1

This Court has long held that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 567 (2011). "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 62 (2006) (*FAIR*). This principle explains "why an ordinance against outdoor fires might forbid burning a flag and why antitrust laws can prohibit agreements in restraint of trade." *Sorrell*, 564 U. S., at 567 (citation and internal quotation marks omitted).

Consider *United States* v. *O'Brien*, 391 U. S. 367 (1968). In that case, the Court upheld the application of a law against the destruction of draft cards to a defendant who had burned his draft card to protest the Vietnam War. The protester's conduct was indisputably expressive. Indeed, it was political expression, which lies at the heart of the First Amendment. *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring). Yet the *O'Brien* Court focused on whether the Government's interest in regulating the conduct was to burden expression. Because it was not, the regulation was subject to lesser constitutional scrutiny. 391 U. S., at 376–377, 381–382; *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 294, 299 (1984). The *O'Brien* standard is satisfied if a regulation is unrelated to the suppression of expression and "'promotes a substantial government interest that would be achieved less effectively

absent the regulation.'"  *FAIR*, 547 U. S., at 67 (quoting *United States* v. *Albertini*, 472 U. S. 675, 689 (1985)).[9]

*FAIR* confronted the interaction between this principle and an equal-access law.  The law at issue was the Solomon Amendment, which prohibits an institution of higher education in receipt of federal funding from denying a military recruiter "the same access to its campus and students that it provides to the nonmilitary recruiter receiving the most favorable access."  547 U. S., at 55; see 10 U. S. C. §983(b).  A group of law schools challenged the Solomon Amendment based on their sincere objection to the military's "Don't Ask, Don't Tell" policy.  For those who are too young to know, "Don't Ask, Don't Tell" was a homophobic policy that barred openly LGBT people from serving in the military.  LGBT people could serve only if they kept their identities secret.  The idea was that their open existence was a threat to the military.

The law schools in *FAIR* claimed that the Solomon Amendment infringed the schools' First Amendment freedom of speech.  The schools provided recruiting assistance in the form of emails, notices on bulletin boards, and flyers.  547 U. S., at 60–61.  As the Court acknowledged, those services "clearly involve speech."  *Id.*, at 60.  And the Solomon Amendment required "schools offering such services to other recruiters" to provide them equally "on behalf of the military," even if the school deeply objected to creating such speech.  *Id.*, at 61.  But that did not transform the equal provision of services into "compelled speech" of the kind barred by the First Amendment, because the school's speech was "only 'compelled' if, and to the extent, the school provides such speech for other recruiters."  *Id.*, at 62.  Thus,

───────────

[9]The majority commits a fundamental error in suggesting that a law does not regulate conduct if it ever applies to expressive activities.  See *ante*, at 19, 22.  This would come as a great surprise to the *O'Brien* Court.

26              303 CREATIVE LLC *v.* ELENIS

SOTOMAYOR, J., dissenting

any speech compulsion was "plainly incidental to the Solomon Amendment's regulation of conduct." *Ibid.*

2

The same principle resolves this case. The majority tries to sweep under the rug petitioners' challenge to CADA's Communication Clause, so I will start with it. Recall that Smith wants to post a notice on her company's homepage that the company will refuse to sell any website for a same-sex couple's wedding. This Court, however, has already said that "a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." *Sorrell*, 564 U. S., at 567 (quoting *FAIR*, 547 U. S., at 62; some internal quotation marks omitted); see *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 389 (1973). So petitioners concede that they are not entitled to an exemption from the Communication Clause unless they are also entitled to an exemption from the Accommodation Clause. Brief for Petitioners 34–35. That concession is all but fatal to their argument, because it shows that even "pure speech" may be burdened incident to a valid regulation of conduct.[10]

CADA's Accommodation Clause and its application here are valid regulations of conduct. It is well settled that a public accommodations law like the Accommodation Clause does not "target speech or discriminate on the basis of its content." *Hurley*, 515 U. S., at 572. Rather, "the focal point of its prohibition" is "on the *act* of discriminating against

_____

[10]The majority appears to find this discussion of the Communication Clause upsetting. See *ante*, at 20–21, and n. 5. It is easy to understand why: The Court's prior First Amendment cases clearly explain that a ban on discrimination may require a business to take down a sign that expresses the business owner's intent to discriminate. See, *e.g.*, *FAIR*, 547 U. S., at 62. This principle is deeply inconsistent with the majority's position. Thus, a "straight couples only" notice, like the one the Court today allows, see App. to Pet. for Cert. 188a–189a, is itself a devastating indictment of the majority's logic.

individuals in the provision of publicly available goods, privileges, and services." *Ibid.* (emphasis added). The State confirms this reading of CADA. The law applies only to status-based refusals to provide the full and equal enjoyment of whatever services petitioners choose to sell to the public. See Brief for Respondents 15–18.

Crucially, the law "does not dictate the content of speech at all, which is only 'compelled' if, and to the extent," the company offers "such speech" to other customers. *FAIR*, 547 U. S., at 62. Colorado does not require the company to "speak [the State's] preferred message." *Ante*, at 19. Nor does it prohibit the company from speaking the company's preferred message. The company could, for example, offer only wedding websites with biblical quotations describing marriage as between one man and one woman. Brief for Respondents 15. (Just as it could offer only t-shirts with such quotations.) The company could also refuse to include the words "Love is Love" if it would not provide those words to any customer. All the company has to do is offer its services without regard to customers' protected characteristics. *Id.*, at 15–16. Any effect on the company's speech is therefore "incidental" to the State's content-neutral regulation of conduct. *FAIR*, 547 U. S., at 62; see *Hurley*, 515 U. S., at 572–573.

Once these features of the law are understood, it becomes clear that petitioners' freedom of speech is not abridged in any meaningful sense, factual or legal. Petitioners remain free to advocate the idea that same-sex marriage betrays God's laws. *FAIR*, 547 U. S., at 60; *Hishon*, 467 U. S., at 78; *Runyon*, 427 U. S., at 176. Even if Smith believes God is calling her to do so through her for-profit company, the company need not hold out its goods or services to the public at large. Many filmmakers, visual artists, and writers never do. (That is why the law does not require Steven Spielberg or Banksy to make films or art for anyone who asks. But cf. *ante*, at 12, 23–24.) Finally, and most importantly, even

SOTOMAYOR, J., dissenting

if the company offers its goods or services to the public, it remains free under state law to decide what messages to include or not to include. To repeat (because it escapes the majority): The company can put whatever "harmful" or "low-value" speech it wants on its websites. It can "tell people what they do not want to hear." *Ante*, at 25 (internal quotation marks and brackets omitted). All the company may not do is offer wedding websites to the public yet refuse those same websites to gay and lesbian couples. See *Runyon*, 427 U. S., at 176 (distinguishing between schools' ability to express their bigoted view "that racial segregation is desirable" and the schools' proscribable "*practice* of excluding racial minorities").

Another example might help to illustrate the point. A professional photographer is generally free to choose her subjects. She can make a living taking photos of flowers or celebrities. The State does not regulate that choice. If the photographer opens a portrait photography business to the public, however, the business may not deny to any person, because of race, sex, national origin, or other protected characteristic, the full and equal enjoyment of whatever services the business chooses to offer. That is so even though portrait photography services are customized and expressive. If the business offers school photos, it may not deny those services to multiracial children because the owner does not want to create any speech indicating that interracial couples are acceptable. If the business offers corporate headshots, it may not deny those services to women because the owner believes a woman's place is in the home. And if the business offers passport photos, it may not deny those services to Mexican Americans because the owner opposes immigration from Mexico.

The same is true for sexual-orientation discrimination. If a photographer opens a photo booth outside of city hall and offers to sell newlywed photos captioned with the words "Just Married," she may not refuse to sell that service to a

newlywed gay or lesbian couple, even if she believes the couple is not, in fact, just married because in her view their marriage is "false." Tr. of Oral Arg. 36, 40–41.

### 3

Because any burden on petitioners' speech is incidental to CADA's neutral regulation of commercial conduct, the regulation is subject to the standard set forth in *O'Brien*. That standard is easily satisfied here because the law's application "promotes a substantial government interest that would be achieved less effectively absent the regulation." *FAIR*, 547 U. S., at 67 (internal quotation marks omitted). Indeed, this Court has already held that the State's goal of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services" is "unrelated to the suppression of expression" and "plainly serves compelling state interests of the highest order." *Roberts*, 468 U. S., at 624. The Court has also held that by prohibiting only "*acts* of invidious discrimination in the distribution of *publicly available* goods, services, and other advantages," the law "responds precisely to the substantive problem which legitimately concerns the State and abridges no more speech . . . than is necessary to accomplish that purpose." *Id.*, at 628–629 (emphasis added; internal quotation marks omitted); see *supra*, at 4–7.

### C

The Court reaches the wrong answer in this case because it asks the wrong questions. The question is not whether the company's products include "elements of speech." *FAIR*, 547 U. S., at 61. (They do.) The question is not even whether CADA would require the company to create and sell speech, notwithstanding the owner's sincere objection to doing so, if the company chooses to offer "such speech" to the public. *Id.*, at 62. (It would.) These questions do not resolve the First Amendment inquiry any more than they

did in *FAIR*. Instead, the proper focus is on the character of state action and its relationship to expression. Because Colorado seeks to apply CADA only to the refusal to provide same-sex couples the full and equal enjoyment of the company's publicly available services, so that the company's speech "is only 'compelled' if, and to the extent," the company chooses to offer "such speech" to the public, any burden on speech is "plainly incidental" to a content-neutral regulation of conduct. *Ibid.*

The majority attempts to distinguish this clear holding of *FAIR* by suggesting that the compelled speech in *FAIR* was "incidental" because it was "logistical" (*e.g.,* "The U. S. Army recruiter will meet interested students in Room 123 at 11 a.m."). *Ante,* at 18 (internal quotation marks omitted). This attempt fails twice over. First, the law schools in *FAIR* alleged that the Solomon Amendment required them to create and disseminate speech propagating the military's message, which they deeply objected to, and to include military speakers in on- and off-campus forums (if the schools provided equally favorable services to other recruiters). 547 U. S., at 60–61; App. 27 and Brief for Respondents 5–8 in *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.,* O. T. 2005, No. 04–1152. The majority simply skips over the Court's key reasoning for why any speech compulsion was nevertheless "incidental" to the Amendment's regulation of conduct: It would occur only "if, and to the extent," the regulated entity provided "such speech" to others. *FAIR,* 547 U. S., at 62. Likewise in *O'Brien,* the reason the burden on O'Brien's expression was incidental was not because his message was factual or uncontroversial. But cf. *ante,* at 19. O'Brien burned his draft card to send a political message, and the burden on his expression was substantial. Still, the burden was "incidental" because it was ancillary to a regulation that did not aim at expression. 391 U. S., at 377.

SOTOMAYOR, J., dissenting

Second, the majority completely ignores the categorical nature of the exemption claimed by petitioners. Petitioners maintain, as they have throughout this litigation, that they will refuse to create *any* wedding website for a same-sex couple. Even an announcement of the time and place of a wedding (similar to the majority's example from *FAIR*) abridges petitioners' freedom of speech, they claim, because "the announcement of the wedding itself is a concept that [Smith] believes to be false." Tr. of Oral Arg. 41. Indeed, petitioners here concede that if a same-sex couple came across an opposite-sex wedding website created by the company and requested an identical website, with only the names and date of the wedding changed, petitioners would refuse. *Id.*, at 37–38.[11] That is status-based discrimination, plain and simple.

Oblivious to this fact, the majority insists that petitioners discriminate based on message, not status. The company, says the majority, will not sell same-sex wedding websites to anyone. *Ante*, at 17. It will sell only opposite-sex wedding websites; that is its service. Petitioners, however, "cannot define their service as 'opposite-sex wedding [websites]' any more than a hotel can recast its services as 'whites-only lodgings.'" *Telescope Media Group* v. *Lucero*,

───────────

[11] Because petitioners have never sold a wedding website to anyone, the record contains only a mockup website. The mockup confirms what you would expect: The website provides details of the event, a form to RSVP, a gift registry, etc. See App. 51–72. The customization of these elements pursuant to a content-neutral regulation of conduct does not unconstitutionally intrude upon any protected expression of the website designer. Yet Smith claims a First Amendment right to refuse to provide *any* wedding website for a same-sex couple. Her claim therefore rests on the idea that her act of service is itself a form of protected expression. In granting Smith's claim, the majority collapses the distinction between status-based and message-based refusals of service. The history shows just how profoundly wrong that is. See *Runyon* v. *McCrary*, 427 U. S. 160, 176 (1976); *Hishon* v. *King & Spalding*, 467 U. S. 69, 78 (1984); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622–629 (1984).

SOTOMAYOR, J., dissenting

936 F. 3d 740, 769 (CA8 2019) (Kelly, J., concurring in part and dissenting in part).  To allow a business open to the public to define the expressive quality of its goods or services to exclude a protected group would nullify public accommodations laws.  It would mean that a large retail store could sell "passport photos for white people."

The majority protests that Smith will gladly sell her goods and services to anyone, including same-sex *couples*. *Ante*, at 2, 17.  She just will not sell websites for same-sex *weddings*.  Apparently, a gay or lesbian couple might buy a wedding website for their straight friends.  This logic would be amusing if it were not so embarrassing.[12]  I suppose the Heart of Atlanta Motel could have argued that Black people may still rent rooms for their white friends.  Smith answers that she will sell other websites for gay or lesbian clients.  But then she, like Ollie McClung, who would serve Black people take-out but not table service, discriminates against LGBT people by offering them a limited menu.[13]  This is plain to see, for all who do not look the other way.

The majority, however, analogizes this case to *Hurley* and *Boy Scouts of America* v. *Dale*, 530 U. S. 640 (2000).  The law schools in *FAIR* likewise relied on *Hurley* and *Dale* to argue that the Solomon Amendment violated their free-speech rights.  *FAIR* confirmed, however, that a neutral regulation of conduct imposes an incidental burden on speech when the regulation grants a right of equal access

––––––––––

[12]The majority tacitly acknowledges the absurdity.  At the start of its opinion, it explains that Smith "decided to expand her offerings to include services for couples seeking websites for *their* weddings." *Ante*, at 1 (emphasis added).

[13]What is "'embarrassing'" about this reasoning is not, as the Court claims, the "distinction between status and message." *Ante*, at 18, n. 3.  It is petitioners' contrivance, embraced by the Court, that a prohibition on status-based discrimination can be avoided by asserting that a group can always buy services on behalf of others, or else that the group can access a "separate but equal" subset of the services made available to everyone else.

SOTOMAYOR, J., dissenting

that requires the regulated party to provide speech only if, and to the extent, it provides such speech for others. *Supra*, at 25–26, 29–30.

*Hurley* and *Dale*, by contrast, involved "peculiar" applications of public accommodations laws, not to "the act of discriminating . . . in the provision of publicly available goods" by "clearly commercial entities," but rather to private, nonprofit expressive associations in ways that directly burdened speech. *Hurley*, 515 U. S., at 572 (private parade); *Dale*, 530 U. S., at 657 (Boy Scouts). The Court in *Hurley* and *Dale* stressed that the speech burdens in those cases were not incidental to prohibitions on status-based discrimination because the associations did not assert that "mere acceptance of a member from a particular group would impair [the association's] message." *Dale*, 530 U. S., at 653; see also *ibid.* (reasoning that Dale was excluded for being a gay rights activist, not for being gay); *ibid.* (explaining that in *Hurley*, "the parade organizers did not wish to exclude the GLIB [Irish-American gay, lesbian, and bisexual group] members because of their sexual orientations, but because they wanted to march behind a GLIB banner"); *Hurley*, 515 U. S., at 572–573.

Here, the opposite is true. 303 Creative LLC is a "clearly commercial entit[y]." *Dale*, 530 U. S., at 657. The company comes under the regulation of CADA only if it sells services to the public, and only if it denies the equal enjoyment of such services because of sexual orientation. The State confirms that the company is free to include or not to include any message in whatever services it chooses to offer. *Supra*, at 26–28. And the company confirms that it plans to engage in status-based discrimination. *Supra*, at 22–23, 31–32. Therefore, any burden on the company's expression is incidental to the State's content-neutral regulation of commercial conduct.

Frustrated by this inescapable logic, the majority dials up the rhetoric, asserting that "Colorado seeks to compel [the

company's] speech in order to excise certain ideas or view-points from the public dialogue." The State's "very purpose in seeking to apply its law," in the majority's view, is "the coercive elimination of dissenting ideas about marriage." *Ante*, at 10–11 (internal quotation marks and brackets omitted).[14] That is an astonishing view of the law. It is contrary to the fact that a law requiring public-facing businesses to accept all comers "is textbook viewpoint neutral," *Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law* v. *Martinez*, 561 U. S. 661, 695 (2010); contrary to the fact that the Accommodation Clause and the State's application of it here allows Smith to include in her company's goods and services whatever "dissenting views about marriage" she wants; and contrary to this Court's clear holdings that the purpose of a public accommodations law, as applied to the commercial act of discrimination in the sale of publicly available goods and services, is to ensure equal access to and equal dignity in the public marketplace, *supra*, at 4–6.

So it is dispiriting to read the majority suggest that this case resembles *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943). A content-neutral equal-access policy is "a far cry" from a mandate to "endorse" a pledge chosen by the Government. *FAIR*, 547 U. S., at 62. This Court has said "it trivializes the freedom protected in *Barnette*" to equate the two. *Ibid.* Requiring Smith's company to abide by a law against invidious discrimination in commercial sales to the public does not conscript her into espousing the government's message. It does not "invad[e]" her "sphere of intellect" or violate her constitutional "right to differ." *Ante*, at 2, 7 (internal quotation marks omitted). All it does is

_____

[14] The majority's repeated invocation of this Orwellian thought policing is revealing of just how much it misunderstands this case. See *ante*, at 10–12, 19–20, 24–25 (claiming that the State seeks to "eliminate ideas" and that it will punish Smith unless she "conforms her views to the State's").

SOTOMAYOR, J., dissenting

require her to stick to her bargain: "The owner who hangs a shingle and offers her services to the public cannot retreat from the promise of open service; to do so is to offer the public marked money. It is to convey the promise of a free and open society and then take the prize away from the despised few." J. Singer, We Don't Serve Your Kind Here: Public Accommodations and the Mark of Sodom, 95 B. U. L. Rev. 929, 949 (2015).

### III

Today is a sad day in American constitutional law and in the lives of LGBT people. The Supreme Court of the United States declares that a particular kind of business, though open to the public, has a constitutional right to refuse to serve members of a protected class. The Court does so for the first time in its history. By issuing this new license to discriminate in a case brought by a company that seeks to deny same-sex couples the full and equal enjoyment of its services, the immediate, symbolic effect of the decision is to mark gays and lesbians for second-class status. In this way, the decision itself inflicts a kind of stigmatic harm, on top of any harm caused by denials of service. The opinion of the Court is, quite literally, a notice that reads: "Some services may be denied to same-sex couples."

"The truth is," these "affronts and denials" "are intensely human and personal." S. Rep. No. 872, at 15 (internal quotation marks omitted). Sometimes they may "harm the physical body, but always they strike at the root of the human spirit, at the very core of human dignity." *Ibid.* To see how, imagine a same-sex couple browses the public market with their child. The market could be online or in a shopping mall. Some stores sell products that are customized and expressive. The family sees a notice announcing that services will be refused for same-sex weddings. What message does that send? It sends the message that we live in a society with social castes. It says to the child of the same-

SOTOMAYOR, J., dissenting

sex couple that their parents' relationship is not equal to others'.  And it reminds LGBT people of a painful feeling that they know all too well: There are some public places where they can be themselves, and some where they cannot. K. Yoshino, Covering 61–66 (2006).  Ask any LGBT person, and you will learn just how often they are forced to navigate life in this way.  They must ask themselves: If I reveal my identity to this co-worker, or to this shopkeeper, will they treat me the same way?  If I hold the hand of my partner in this setting, will someone stare at me, harass me, or even hurt me?  It is an awful way to live.  Freedom from this way of life is the very object of a law that declares: All members of the public are entitled to inhabit public spaces on equal terms.

This case cannot be understood outside of the context in which it arises.  In that context, the outcome is even more distressing.  The LGBT rights movement has made historic strides, and I am proud of the role this Court recently played in that history.  Today, however, we are taking steps backward.  A slew of anti-LGBT laws have been passed in some parts of the country,[15] raising the specter of a "bare . . . desire to harm a politically unpopular group." *Romer*, 517 U. S., at 634 (internal quotation marks omitted).  This is especially unnerving when "for centuries there have been powerful voices to condemn" this small minority. *Lawrence* v. *Texas*, 539 U. S. 558, 571 (2003).  In this pivotal moment, the Court had an opportunity to reaffirm its commitment to equality on behalf of all members of society, including LGBT people.  It does not do so.

Although the consequences of today's decision might be most pressing for the LGBT community, the decision's logic

───────────

[15]These laws variously censor discussion of sexual orientation and gender identity in schools, see, *e.g.*, 2023 Ky. Acts pp. 775–779, and ban drag shows in public, see 2023 Tenn. Pub. Acts ch. 2.  Yet we are told that the real threat to free speech is that a commercial business open to the public might have to serve all members of the public.

cannot be limited to discrimination on the basis of sexual orientation or gender identity. The decision threatens to balkanize the market and to allow the exclusion of other groups from many services. A website designer could equally refuse to create a wedding website for an interracial couple, for example. How quickly we forget that opposition to interracial marriage was often because "'Almighty God . . . did not intend for the races to mix.'" *Loving* v. *Virginia*, 388 U. S. 1, 3 (1967). Yet the reason for discrimination need not even be religious, as this case arises under the Free Speech Clause. A stationer could refuse to sell a birth announcement for a disabled couple because she opposes their having a child. A large retail store could reserve its family portrait services for "traditional" families. And so on.[16]

Wedding websites, birth announcements, family portraits, epitaphs. These are not just words and images. They are the most profound moments in a human's life. They are the moments that give that life personal and cultural meaning. You already heard the story of Bob and Jack, the elderly gay couple forced to find a funeral home more than an hour away. *Supra*, at 5–6, and n. 4. Now hear the story of Cynthia and Sherry, a lesbian couple of 13 years until Cynthia died from cancer at age 35. When Cynthia was diagnosed, she drew up a will, which authorized Sherry to make burial arrangements. Cynthia had asked Sherry to include an inscription on her headstone, listing the relationships that were important to her, for example, "daughter, granddaughter, sister, and aunt." After Cynthia

_____

[16]The potential implications of the Court's logic are deeply troubling. Would *Runyon* v. *McCrary* have come out differently if the schools had argued that accepting Black children would have required them to create original speech, like lessons, report cards, or diplomas, that they deeply objected to? What if the law firm in *Hishon* v. *King & Spalding* had argued that promoting a woman to the partnership would have required it to alter its speech, like letterhead or court filings, in ways that it would rather not? Once you look closely, "compelled speech" (in the majority's facile understanding of that concept) is everywhere.

died, the cemetery was willing to include those words, but
not the words that described Cynthia's relationship to
Sherry: "'beloved life partner.'"  N. Knauer, Gay and Les-
bian Elders 102 (2011).  There are many such stories, too
many to tell here.  And after today, too many to come.

I fear that the symbolic damage of the Court's opinion is
done.  But that does not mean that we are powerless in the
face of the decision.  The meaning of our Constitution is
found not in any law volume, but in the spirit of the people
who live under it.  Every business owner in America has a
choice whether to live out the values in the Constitution.
Make no mistake: Invidious discrimination is not one of
them.  "[D]iscrimination in any form and in any degree has
no justifiable part whatever in our democratic way of life."
*Korematsu* v. *United States*, 323 U. S. 214, 242 (1944) (Mur-
phy, J., dissenting).  "It is unattractive in any setting but it
is utterly revolting among a free people who have embraced
the principles set forth in the Constitution of the United
States." *Ibid.*

The unattractive lesson of the majority opinion is this:
What's mine is mine, and what's yours is yours.  The lesson
of the history of public accommodations laws is altogether
different.  It is that in a free and democratic society, there
can be no social castes.  And for that to be true, it must be
true in the public market.  For the "promise of freedom" is
an empty one if the Government is "powerless to assure
that a dollar in the hands of [one person] will purchase the
same thing as a dollar in the hands of a[nother]." *Jones* v.
*Alfred H. Mayer Co.*, 392 U. S. 409, 443 (1968).  Because the
Court today retreats from that promise, I dissent.