UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**Richard Lowery**, on behalf of himself and others similarly situated,

        Plaintiff,

v.

**Texas A&M University**; **M. Katherine Banks**, in her official capacity as president of Texas A&M University; **Alan Sams**, in his official capacity as interim provost and vice president for academic affairs for Texas A&M University; **Annie S. McGowan**, in her official capacity as Vice President and Associate Provost for Diversity at Texas A&M University; **N.K. Anand**, in his official capacity as Vice President for Faculty Affairs at Texas A&M University,

        Defendants.

Case No. 4:22-cv-3091

## SECOND AMENDED CLASS-ACTION COMPLAINT

Federal law prohibits universities that accept federal funds from discriminating on account of race or sex. *See* 42 U.S.C. § 2000d (Title VI); 20 U.S.C. § 1681 (Title IX). Texas A&M University is flouting these requirements by using race and sex preferences in faculty hiring and compensation—a practice that violates the clear and unequivocal text of Title VI and Title IX, as well as the Equal Protection Clause of the Fourteenth Amendment. The plaintiff brings suit to enjoin these discriminatory practices, and to ensure that all components of Texas A&M University comply with their obligations under federal anti-discrimination law.

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3. Plaintiff Richard Lowery is a resident of Texas and an associate professor of finance at the University of Texas at Austin.

4. Defendant Texas A&M University is located in College Station, Texas. It can be served at its Office of the General Counsel, located at 301 Tarrow Street, College Station, Texas 77840-7896.

5. Defendant M. Katherine Banks is president of Texas A&M University. She is sued in her official capacity.

6. Defendant Alan Sams is interim provost and vice president for academic affairs at Texas A&M University. He is sued in his official capacity.

7. Defendant Annie S. McGowan is Vice President and Associate Provost for Diversity at Texas A&M University. She is sued in her official capacity.

8. Defendant N.K. Anand is Vice President for Faculty Affairs at Texas A&M University. He is sued in his official capacity.

## STATEMENT OF FACTS

9. Texas A&M University, along with nearly every university in the United States, discriminates on account of race and sex when hiring its faculty, by giving discriminatory preferences to females and non-Asian racial minorities at the expense of white and Asian men. This practice, popularly known as "affirmative action," has led universities to hire and promote inferior faculty candidates over individuals with better scholarship, better credentials, and better teaching ability.

10. These race and sex preferences are patently illegal under Title VI and Title IX, which prohibit all forms of race and sex discrimination at universities that receive federal funds. But university faculty and administrators think they can flout these federal statutes with impunity because no one ever sues them over their discriminatory hiring practices and the Department of Education looks the other way.

11. These discriminatory, illegal, and anti-meritocratic practices have been egged on by woke ideologues who populate the so-called diversity, equity, and inclusion offices at public and private universities throughout the United States. The existence of these offices is subverting meritocracy and encouraging wholesale violations of civil-rights laws throughout our nation's university system.

12. M. Katherine Banks, the current president of Texas A&M University, is a particularly aggressive and enthusiastic proponent of illegal race and sex preferences in faculty hiring. Banks is using her powers at the university to ensure that women and non-Asian racial minorities receive hiring preferences at the expense of white and Asian men, while demanding that her subordinates comply with her discriminatory and unlawful hiring edicts.

13. Before Banks became president of Texas A&M University on June 1, 2021, she served as dean of Texas A&M's college of engineering. During the spring of 2021, while serving as dean, Banks told faculty senators from the engineering caucus that, until further notice, all new tenure-track hires in the college must be "underrepresented minorities." In addition, Banks would regularly give departments new faculty openings that could be filled by only "underrepresented minorities" or women.

14. Banks is continuing to promote and impose these discriminatory practices as university president, and she is overseeing and actively supporting explicit and compulsory hiring preferences for women and non-Asian racial minorities.

15. On July 8, 2022, a memo was sent from the Texas A&M "office for diversity," to all deans at the university. The memo was signed by Annie McGowan, the

vice president and associate provost for diversity, and N.K. Anand, the vice president for faculty affairs. The memo says:

> Effective July 1, 2021, Texas A&M was officially recognized as a Hispanic Serving Institution (HSI) by the United States Department of Education. As an HSI, Texas A&M is charged with expanding the capacity of low-income, first-generation Hispanic students, and other underserved students and their communities. Increasing opportunities for underserved students to interact and engage with faculty that share their ethnic, life, and cultural experiences are essential to achieving this goal. The presence of faculty of color is also integral to the University's mission to provide the highest quality of undergraduate and graduate education and develop new understandings through research and creativity.
>
> ACES Plus was created to ensure promising faculty to come to Texas A&M. For the FY 23 and FY 24, the VP for Faculty Affairs will allocate a sum of $2 million for the ACES Plus Program. The funds will be used to provide 50% matching base salary and benefits, up to a maximum contribution of $100,000 (salary and fringe) for new mid-career and senior tenure-track hires **from underrepresented minority groups, that contribute to moving the structural composition of our faculty towards parity with that of the State of Texas**. Consistent with our land-grant mission, and as defined NIH policy, Texas A&M defines URMs as African Americans, Hispanic/Latino Americans, Native Americans, Alaskan Natives, and Native Hawaiians.

*See* Exhibit 1 (emphasis added).

16. N.K. Anand discussed these racial set-asides in the ACES Plus program with President Banks, who is cc'd on the memo of July 8, 2022. President Banks was aware of and approved the ACES Plus program and its racially discriminatory set-asides.

17. Timothy Scott, the then-interim provost of Texas A&M University, is also cc'd on the memo of July 8, 2022.

18. Texas A&M's decision to set aside funds to supplement the salaries of faculty members from "underrepresented minority groups" is a flagrant violation of Title VI.

19. Texas A&M's proclaimed goal of establishing a faculty whose racial composition attains "parity with that of the state of Texas" seeks to achieve racial balancing,

which is flatly illegal under Title VI and the binding precedent of the Supreme Court. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("[O]utright racial balancing . . . is patently unconstitutional.").

20. Texas A&M University is also establishing faculty-hiring lines that are reserved exclusively for members of "underrepresented" (read: non-Asian) racial minorities. On August 26, 2022, a faculty member at Texas A&M's business school e-mailed Shane A. Johnson, the head of the recruiting committee for the department of finance for 2022–23 academic year, after hearing that one of the faculty-hiring lines in the department of finance was being set aside for an "underrepresented" racial minority. *See* Exhibit 2 ("I heard from someone that one of our lines is reserved for an 'underrepresented minority.' Is that correct?").

21. Later that day, Professor Johnson e-mailed back confirming that this was indeed the case:

> The underrepresented line would potentially be a third position, so yes reserved, but not one of our "regular" positions.

Exhibit 2.

22. The memo of July 8, 2022, from the office for diversity, and the Johnson e-mail of August 26, 2022, are merely two of the most recent examples of the pervasive race and sex preferences that infect every aspect of faculty hiring at Texas A&M University. The university has been systematically discriminating and continues to systematically discriminate in favor of women and non-Asian racial minorities, and against white and Asian men, when recruiting and hiring faculty, in an effort to bend the demographic makeup of its faculty to more closely resemble "parity" with "the state of Texas," and the university will continue doing so unless and until this Court puts a stop to it.

23. The use of discriminatory race and sex preferences in faculty hiring has been enthusiastically embraced by the Texas A&M faculty senate. On October 17, 2022,

the Texas A&M faculty senate overwhelmingly adopted a resolution announcing that, among other things, that "the university still has significant work ahead to help other underrepresented groups make progress to more adequately reflect Texas of the 21st century." *See* https://youtu.be/NJ2UdG2C2_g?t=6175. The resolution stated:

> Be it resolved: The faculty senate of Texas A&M university reconfirms its commitment to diversity, equity, and inclusion efforts and, be it further resolved, that the faculty senate supports the goals of programs, such as ACES and ACES Plus, that aim to diversify the ranks of faculty to better represent our state and our student body.

*Id*.

24. During the faculty senate meeting, Professor Adam Kolasinski spoke against the resolution. *See* https://youtu.be/NJ2UdG2C2_g?t=6465 (last visited on July 12, 2023). He cautioned that voting on the resolution was "extremely unwise because one of the programs it endorses is subject to litigation." *See id.*; *see also id*. ("Weighing in on a program that is subject to litigation whose outcome is highly uncertain is an extremely bad idea as we are not a court and we are not lawyers.").

25. Professor Kolasinski also criticized the stated goal in the ACES Plus program to "move the structural composition of our faculty toward parity with that of the state of Texas." *See* https://youtu.be/NJ2UdG2C2_g?t=6687. He pointed out that Asians currently constitute 20% of the Texas A&M faculty but only 5% of the Texas population. *See* https://youtu.be/NJ2UdG2C2_g?t=6732. So the implication of the stated goal in the ACES Plus program would be to require "the replacement of 2/3 to 3/4 of our Asian faculty solely because of their race." *Id*. He then said:

> If you are serious this resolution, I ask you, which 3/4 of your Asian colleagues do you want to get rid of? Or do you instead support making most new faculty positions one to which Asians need not apply, for the next decade? By the way, that's what the ACES Plus program does. It creates new faculty positions for which no Asians need apply.

*See* https://youtu.be/NJ2UdG2C2_g?t=6787.

26. After Professor Kolasinski finished his remarks, Professor Angie Hill Price said: "I am almost speechless. I think that was extraordinarily offensive." *See* https://youtu.be/NJ2UdG2C2_g?t=6933. She also said: "I hope that we can help support our DEI initiatives and intent from our university and support the coordinating board initiatives to be able to better represent the people of the state of Texas who are paying for our services and paying taxes to support us." *Id.*

27. No other faculty senator commented on Professor Kolasinski's remarks. The faculty senate then voted 54-12 to endorse the resolution despite Professor Kolasinski's objections. *See* https://youtu.be/NJ2UdG2C2_g?t=7140.

28. The lopsided vote in the Texas A&M faculty senate in favor of the discriminatory ACES Plus program demonstrates the overwhelming support for race and sex preferences among the faculty who vote on hiring and tenure decisions, as well as the faculty's determination and zeal to continue discriminating in favor of female and non-Asian minorities candidates when making faculty appointments. Dissenting perspectives such as Professor Kolasinksi's are dismissed as "offensive" and overwhelmingly voted down.

29. Professor Hill Price's remarks indicate that there are other "DEI initiatives" and other "coordinating board initiatives," in addition to the ACES Plus program, that are designed to make the demographic makeup of Texas A&M less white and less Asian—or (in the euphemistic words of Professor Hill Price) "to better represent the people of the state of Texas who are paying for our services and paying taxes to support us." And it is evident that the 54 faculty members who voted to endorse the resolution intend to pursue these goals regardless of whether they are dictated or decreed from on high.

30. Finally, Texas A&M University deploys race and sex preferences in its faculty hiring even when it does not put its discriminatory intentions in writing. Under

the original ACES program, which did not contain the explicit discriminatory language that appears in the ACES Plus memo of July 8, 2022, the university would nonetheless reserve hiring spots for underrepresented-minority candidates. The use of race and sex preferences—as well as outright set-asides—is pervasive throughout the university's faculty hiring, and the problem extends far beyond the ACES Plus program and the other discrete episodes mentioned in this complaint.

31. Defendants Banks, Sams, McGowan, and Anand all have some connection to the enforcement of Texas A&M University's discriminatory faculty-hiring practices, and are therefore proper defendants under *Ex parte Young*, 209 U.S. 123, 157 (1908). President Banks has aggressively pushed for Texas A&M University to discriminate in favor of women and non-Asian faculty candidates, and against white and Asian men, both in her role as dean of the college of engineering and as president of the university, where she approved the discriminatory set-asides in the ACES Plus program. The president and provost of Texas A&M University must approve faculty appointments that give tenure on arrival, so President Banks and interim provost Sams have additional connections to the discriminatory faculty-hiring practices that pervade Texas A&M University. And defendants McGowan and Anand authored and circulated the memo establishing the racial set-asides in the ACES Plus program. Each of the defendants therefore has some connection to these pervasive and ongoing violations of federal law.

32. Defendant McGowan also oversees Texas A&M University's Office for Diversity, which is charged with implementing Texas A&M University's "diversity plan." *See* https://diversity.tamu.edu/About-the-Office ("The mission of the Office for Diversity is to implement and coordinate Texas A&M University's Diversity Plan"). One of the stated goals is this "diversity plan" is to "[a]chieve and evidence progress in the ranks of our faculty, students, staff, and administrators to demonstrate that we are a national leader in diversity." *See* https://bit.ly/3PUdaNM (page 2). Defendant

McGowan therefore has some connection to the pervasive and ongoing discriminatory preferences given to female and non-Asian faculty candidates at Texas A&M University.

## FACTS RELATED TO STANDING

33. Professor Richard Lowery is an associate professor of finance at the University of Texas at Austin.

34. Professor Lowery stands "able and ready" to apply for a faculty appointment at Texas A&M University. *See Carney v. Adams*, 141 S. Ct. 493, 499–500 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

35. Professor Lowery is actively looking for employment opportunities outside the University of Texas at Austin because he is unhappy with the current administration and has been treated poorly by his colleagues and superiors at the university, despite his status as a tenured professor. He has faced retaliation at the university for his criticism of the administration, especially over its resistance to the proposed Liberty Institute at UT-Austin. He sharply criticized the university president in a recent podcast,[1] which triggered an investigation from the university's legal department.

36. Professor Lowery has also been banned from participating in recruiting for the finance department at UT-Austin because he refuses to attend the "diversity training sessions" that the provost's office requires for university faculty. One of his colleagues has gone so far as to insist that those who, like Professor Lowery, refuse to attend the required diversity training should not be allowed to express any opinion on any faculty candidate.

---

1. For example, he made the statement that "the sole qualification for being president of a university in a red state is being good at lying to Republicans." *See* https://podcasts.apple.com/us/podcast/lessons-from-the-frontlines-of-the-university/id1548137490?i=1000570292359

37. Professor Lowery is also disillusioned with his current job because of the rising crime rates in Austin caused by the city's failure to address the homelessness situation, and would like to find an appointment in a location that does not put his family's safety at risk. Encounters with hostile homeless individuals now occur both around the University of Texas campus and in Professor Lowery's own neighborhood, and Professor Lowery has experienced a burglary of his garage while home with his family, with significant loss of goods.

38. Professor Lowery has already applied for a faculty appointment at the University of Florida, where he has been intrigued by the recently approved Hamilton Center for Classical and Civic Education, which is similar to the Liberty Institute that was proposed but ultimately nixed at UT-Austin, and where the university system appears more serious about improving leadership, as demonstrated by the recent hiring of Senator Ben Sasse as President.

39. Professor Lowery is especially interested in applying for a faculty appointment at Texas A&M, because he prefers to remain in Texas due to the favorable income-tax environment but would like to move away from major metropolitan areas. He also has good relationships with a number of faculty in the finance department at the Mays School of Business and believes that he could integrate quickly into that department. Texas A&M is also one of the few universities in the United States where some departments might consider hiring an outspoken conservative at Professor Lowery's career stage, and as such is one of his best options for alternative employment.

40. Professor Lowery prefers to seek employment at universities in Texas and Florida because he sees some hope that these states may have the political will to restore unfettered academic inquiry as the goal of the university, reversing the movement toward "social justice" activism.

41. Professor Lowery, though he stands "able and ready" to apply for a faculty appointment at Texas A&M University, will not do so until he can compete on an

even playing field with female faculty candidates and faculty candidates of other races. Professor Lowery would have already applied for a faculty position at Texas A&M University were the university not using these discriminatory hiring practices.

42. Indeed, Professor Lowery is actively assisting efforts at Texas A&M University to establish something akin to the Liberty Institute that failed to win approval at UT-Austin. So he has a keen interest in the mission of Texas A&M University and would be honored to apply for a faculty position once they scrap their illegal and discriminatory hiring preferences.

43. In April of this year, Professor Lowery gave an informal lunch talk to the finance department at Texas A&M University's Mays Business School in the hopes of generating interest from the department in a possible future appointment.

44. Professor Lowery would be an exceptionally strong candidate for a faculty appointment at Texas A&M University given his status as an already-tenured professor UT-Austin, and given the demonstrated interest that the finance department at Texas A&M has shown in his research by inviting him to present the brown-bag lunch talk in April of this year.

45. The pervasive and ongoing use of race and sex preferences and set-asides at Texas A&M University prevents Professor Lowery from competing with other applicants for these faculty positions on an equal basis. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666.

46. This injury is caused by Texas A&M University's pervasive and ongoing use of race and sex preferences and set-asides in faculty hiring, and it will be redressed by a declaratory judgment and injunction that bars the university from considering race or sex when appointing or compensating its faculty.

47. Professor Lowery sues on behalf of a class of all white and Asian men who stand "able and ready" to apply for faculty appointments at Texas A&M.

### FACTS REGARDING THE CONTINUE EXISTENCE OF AN ARTICLE III CASE OR CONTROVERSY

48. After Professor Lowery initiated this lawsuit on September 10, 2022, the Texas legislature enacted Senate Bill 17 (or SB 17), which is scheduled to take effect on January 1, 2024. SB 17, when it takes effect, will add section 51.3525 to the Education Code, and section 51.3525(b)(1)(D) will say that the "governing board" of Texas A&M must ensure that each unit of Texas A&M "does not, except as required by federal law, give preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution."

49. On June 29, 2023, the Supreme Court announced its ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199 (2023), which largely prohibits universities that receive federal funds from using discriminatory racial preferences in student admissions.

50. Neither the enactment of SB 17 nor the Supreme Court's ruling in *Students for Fair Admissions* moots Professor Lowery's claims against the defendants.

51. SB 17 has not yet taken effect, and the governing board of Texas A&M has not taken steps to ensure that the defendants stop discriminating on account of race or sex in faculty hiring and compensation. More importantly, the defendants were already under pre-existing legal obligations to avoid race and sex preferences in faculty hiring and compensation, even before the enactment of SB 17 and the announcement of *Students for Fair Admissions*, as Title VI and Title IX explicitly outlaw *all* forms of race and sex discrimination at universities that receive federal funds and have done so for more than 50 years. *See* 42 U.S.C. § 2000d (Title VI) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 20 U.S.C. § 1681 (Title

IX) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ."). The defendants have been flouting these federal anti-discrimination laws for decades, and the enactment of a redundant state anti-discrimination measure and the issuance of a Supreme Court ruling will not induce them to comply.

52. Indeed, the defendants intend to continue using race and sex preferences in faculty hiring despite the enactment of SB 17 and the announcement of the Supreme Court's ruling in *Students for Fair Admissions*, and they will continue doing so unless and until they are enjoined by the Court.

53. Even after the enactment of SB 17 and the announcement of *Students for Fair Admissions*, Texas A&M *still* boasts on its website that intends to consider race and sex in faculty hiring, as provided in Texas A&M's 2020–2025 Strategic Plan. Its website states that the university will:

- In new hires, increase by 100% the diversity of our faculty to better reflect the diversity of our student body.

- Increase by 50% the retention of women faculty on the tenure track to better reflect the diversity of our student body.

https://diversity.tamu.edu/Home/Strategic-Planning (last visited on June 30, 2023); *see also* Exhibit 3. This remains on the university's website even after Governor Abbott signed SB 17 into law.

54. In addition, when Governor Abbott issued a directive in February of 2023 that prohibited universities from requiring "diversity statements" from faculty candidates, defendant Annie McGowan announced at a faculty senate meeting on February 14, 2023, that the university would circumvent the governor's directive by asking faculty candidates to address diversity in their "teaching and research statements" instead:

> We're looking for actual evidence, it's an evidence-based approach to the work that the person has done. Therefore, it is not necessary that we have a diversity statement per se to do the work, if we ask for the candidate to reflect on that work in their teaching and research statement.

https://mediasite.tamu.edu/Mediasite/Play/5ca182bfdcf648c4af46eb37a2afc8be1d (McGowan's statement begins at 30:33 of the video).

55. When Chancellor Sharp issued an order in February of 2023, banning the use of DEI statements in faculty hiring in response to the governor's directive, the university continued to encourage the use of DEI statements in faculty statements but hid its evasion of the governor's directive by deleting incriminating materials from its website and moving them to a password-protected training manual available only to Texas A&M employees. *See* Scott Yenor, *DEI by Any Other Name Still Stinks: Administrators at Texas A&M try to bury their woke hiring agenda*, The American Mind (February 22, 2023), available at https://americanmind.org/salvo/dei-by-any-other-name-still-stinks (last visited on July 12, 2023) (attached as Exhibit 4).

56. In June of 2023, the university hired Kathleen McElroy, an exceedingly pro-DEI individual who used to work at the New York Times, to direct its new journalism program. *See* Valerie Muñoz, *Aggies Hire NY Times 'Diversity' Advocate To Head Journalism Program*, Texas Scorecard (June 15, 2023), available at https://texasscorecard.com/state/aggies-hire-ny-times-diversity-advocate-to-head-journalism-program (last visted on July 12, 2023) (attached as Exhibit 5). On July 11, 2023, McElroy changed her mind and decided to return to UT-Austin rather than work at Texas A&M.

57. A recent dean-search committee at the Mays Business School was pressured by the university administration to interview underqualified female and minority candidates, despite the fact that these discriminatory preferences were flatly prohibited by Title VI and Title IX. *See* Kolasinski Decl. ¶¶ 4–19 (attached as Exhibit 6). Faculty

who resist these unlawful and discriminatory practices face retaliation from higher-ranking university officials. *See id*. at ¶¶ 14–19.

58. The named defendants have no intention of complying with SB 17 or *Students for Fair Admissions*. They will continue to defy the law—just as they have defied Title VI and Title IX—and they will continue pressuring faculty appointment and search committees to discriminate in favor of unqualified or underqualified female or minority candidates until they are enjoined by a court and subjected to judicial oversight.

## COUNT 1—VIOLATIONS OF TITLE VI AND TITLE IX

59. Texas A&M University and its officers are violating Title VI and Title IX by discriminating in favor of female and "underrepresented" minority faculty candidates and against white and Asian men.

60. Texas A&M University is a "program or activity" that "receives Federal financial assistance" within the meaning of Title VI and Title IX.

61. Professor Lowery therefore seeks declaratory and injunctive relief that prohibits Texas A&M University and its officers from discriminating on account of race and sex in the appointment, promotion, and compensation of their faculty, and that compels the university and its officers to appoint, promote, and compensate their faculty in a color-blind and sex-neutral manner.

62. Professor Lowery seeks this relief under Title VI, Title IX, 42 U.S.C. § 1983, and any other law that might supply a cause of action for the requested relief.

63. Professor Lowery seeks this relief against each of the named defendants, including Texas A&M University.

## COUNT 2—VIOLATIONS OF 42 U.S.C. § 1981

64. 42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. *See* 42 U.S.C. § 1981(a) ("All persons within

the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens").

65. 42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

66. Texas A&M University and its officers are violating 42 U.S.C. § 1981(a) by discriminating in favor of "underrepresented" minorities in its faculty hiring, and against whites and Asians. Whites and Asians therefore do not enjoy the "same right . . . to make and enforce contracts" that so-called underrepresented minorities enjoy at Texas A&M University.

67. Professor Lowery therefore seeks declaratory and injunctive relief that prohibits Texas A&M University and its officers from discriminating on account of race in the appointment, promotion, and compensation of faculty, and that compels the university and its officers to appoint, promote, and compensate faculty in a color-blind manner.

68. Professor Lowery seeks this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60 (1975).

69. Professor Lowery seeks this relief only against the individual defendants, and not against Texas A&M University as an institution, as 42 U.S.C. § 1981 neither abrogates nor waives a state institution's sovereign immunity from suit. *See Sessions v. Rusk State Hospital,* 648 F.2d 1066 (5th Cir. 1981) ("Section 1981 contains no congressional waiver of the state's eleventh amendment immunity.").

## COUNT 3—EQUAL PROTECTION CLAUSE

70. As a public university, Texas A&M is subject to the commands of the Equal Protection Clause, which prohibits state universities from denying to any person the equal protection of the laws.

71. The Supreme Court has held that the Equal Protection Clause prohibits race and sex discrimination by state universities in all but the most compelling situations. *See Grutter v. Bollinger*, 539 U.S. 306 (2003); *United States v. Virginia*, 518 U.S. 515 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

72. The holdings of *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), which purport to permit racial preferences in the context of public-university student admissions, are inapplicable to faculty-hiring decisions.

73. In all events, Texas A&M's fixed set-asides for non-Asian racial minorities is a constitutionally forbidden quota that fails even if one were to assume that *Grutter* and *Fisher* govern a public university's faculty-hiring decisions. *See Grutter*, 539 U.S. at 328 ("[A] race-conscious admissions program cannot use a quota system").

74. Professor Lowery therefore seeks declaratory and injunctive relief that prohibits Texas A&M University and its officers from discriminating on account of race and sex in any manner outside the narrow context of student admissions.

75. Professor Lowery seeks this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief.

76. Professor Lowery seeks this relief only against the individual defendants, and not against Texas A&M University as an institution, as 42 U.S.C. § 1983 authorizes lawsuits only against "persons" and not states or state institutions. *See Will v. Michigan Dep't of Police*, 491 U.S. 58 (1989) (a state is not a "person" under 42 U.S.C. § 1983).

**DEMAND FOR RELIEF**

77. Professor Lowery respectfully requests that the court:

    a. certify the class described in paragraph 47;

    b. declare that each of the defendants is violating Title VI and Title IX by discriminating in favor of women and non-Asian racial minorities in the appointment, promotion, and compensation its faculty;

    c. declare that the individual defendants (but not Texas A&M University) are violating 42 U.S.C. § 1981(a) and the Equal Protection Clause by discriminating in favor of women and non-Asian racial minorities in the appointment, promotion, and compensation its faculty;

    d. permanently enjoin the defendants from considering race or sex in the appointment, promotion, or compensation of its faculty;

    e. appoint a court monitor to oversee all decisions relating to the appointment, promotion, and compensation of faculty at Texas A&M University to ensure that these decisions are free from race and sex discrimination of any sort, and require that all decisions relating to the appointment, promotion, and compensation of faculty at Texas A&M University be pre-cleared by this Court;

    f. appoint a court monitor to oversee the "diversity office" at Texas A&M University to ensure that it does not aid or abet violations of the nation's civil-rights laws;

    g. award costs and attorneys' fees;

    h. grant all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

|  |  |
|---|---|
| GENE P. HAMILTON* | /s/ Jonathan F. Mitchell |
| Virginia Bar No. 80434 | JONATHAN F. MITCHELL |
| Vice-President and General Counsel | *Attorney in Charge* |
| America First Legal Foundation | Texas Bar No. 24075463 |
| 300 Independence Avenue SE | S.D. Tex. Bar No. 1133287 |
| Washington, DC 20003 | Mitchell Law PLLC |
| (202) 964-3721 | 111 Congress Avenue, Suite 400 |
| gene.hamilton@aflegal.org | Austin, Texas 78701 |
|  | (512) 686-3940 (phone) |
| * admitted pro hac vice | (512) 686-3941 (fax) |
|  | jonathan@mitchell.law |
| Dated: July 12, 2023 | *Counsel for Plaintiff and Proposed Class* |

# CERTIFICATE OF SERVICE

I certify that on July 12, 2023, I served this document through CM/ECF upon:

M. CARTER CROW
LAYNE E. KRUSE
PAUL TRAHAN
RYAN MELTZER
JESIKA SILVA BLANCO
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
(713) 651-5151 (phone)
(713) 651-5246 (fax)
carter.crow@nortonrosefulbright.com
layne.kruse@nortonrosefulbright.com
paul.trahan@nortonrosefulbright.com
ryan.meltzer@nortonrosefulbright.com
jesika.blanco@nortonrosefulbright.com

*Counsel for Defendants*

    /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff and Proposed Class*