1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4    LOWERY                          §     CASE NO.  4:22-cv-3091
                                     §     HOUSTON, TX
5    VERSUS                          §     WEDNESDAY,
                                     §     MAY 31, 2023
6    TEXAS A&M UNIVERSITY            §     10:50 AM TO 11:51 AM

7                            MOTION HEARING

8                BEFORE THE HONORABLE CHARLES ESKRIDGE
                      UNITED STATES MAGISTRATE JUDGE
9
                              APPEARANCES:
10

11        FOR THE PARTIES:            SEE NEXT PAGE

12        COURT REPORTER:             BRANDIS ISOM

13        COURT CLERK:                JENNELLE GONZALEZ

14

15

16

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21                   Veritext Legal Solutions
                  330 Old Country Road, Suite 300
22                       Mineola, NY 11501
                Tel: 800-727-6396 ▼ www.veritext.com
23
       Proceedings recorded by electronic sound recording; transcript
24                 produced by transcription service.

25

```
 1                              APPEARANCES:

 2

 3   FOR THE PLAINTIFF:           MITCHELL LAW PLLC
                                  Jonathan Franklin Mitchell
 4                                111 Congress Avenue
                                  Suite 400
 5                                Austin, TX 78701
                                  512.686.3940
 6

 7   FOR THE DEFENDANTS:          NORTON ROSE FULBRIGHT US LLP
                                  Michael Carter Crow
 8                                Layne Edwin Kruse
                                  1301 McKinney Street
 9                                Suite 5100
                                  Houston, TX 77010
10                                713.651.5194

11
                              (APPEARING TELEPHONICALLY)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>     HOUSTON, TEXAS; WEDNESDAY, MAY 31, 2023; 10:50 AM</u>

1

2          DEPUTY:  All rise.  The United States District Court

3    for the Southern District of Texas is now in session.  The

4    Honorable Charles Eskridge presiding.  God save these United

5    States and this honorable court.

6          THE COURT:  Thank you, everyone.  Please be seated.

7    All right, I call Case Number 22-3091, Richard Lowry versus

8    Texas University System and others.  Can I get appearance of

9    counsel, please?

10          MR. MITCHELL:  Good morning, Your Honor, Jonathan

11    Mitchell, for the plaintiff.

12          THE COURT:  Welcome, Mr. Mitchell.  And for the for

13    the defendants.

14          MR. KRUSE:  Good morning, Your Honor.  Layne Kruse

15    for the defendants.

16          THE COURT:  Thank you.

17          MR. KRUSE:  Well, and Carter Crow.

18          THE COURT:  I was going to say we can't short change

19    Mr. Crow either.  Welcome to you both.  It's good to see you.

20    And who do you have a table with you?

21          MR. TRAHAN:  Paul Trahan and Ryan Melzer also with

22    Norton Rose Fulbright, representing the defendants, Your Honor.

23          THE COURT:  All right, great.  Thank you all.  All

24    right.  Well, we're loaded for bear with good counsel on both

25    sides.  Let me ask first, for purposes of this hearing, I'm

1   more interested -- just so you know -- in the standing and

2   ripeness issues on the 12(b)(6) claims we've got pending at the

3   Supreme Court, Students For Fair Admissions versus President

4   and Fellows of Harvard College.  I think that whatever the

5   court has to say there is at least going to be informative on

6   what I would think about the 12(b)(6) issues going forward.  Is

7   there anything anybody would like to address on that or

8   disabuse me of the idea that somehow what the Supreme Court is

9   about to say on that case could matter here?  Any disagreement

10  with that?

11          MR. MITCHELL:  No, Your Honor.  We don't disagree.  I

12  think there likely will be relevant discussion.

13          THE COURT:  Okay.

14          MR. KRUSE:  I don't think that that's going to

15  directly impact the arguments on 12(b)(6) as well as our

16  arguments on standing, but I understand the Court's focus on

17  standing because we do think that's the most important issue

18  that the Court should think about today, as well as ripeness.

19          THE COURT:  Okay.

20          MR. KRUSE:  But I think we can certainly defer, you

21  know, to our 12(b)(6) arguments that are in the brief.

22          THE COURT:  Because I look at it that I've got these

23  threshold issues to deal with first.  And to the extent I would

24  get then to the issues in the motion to dismiss on 12(b)(6), I

25  probably would do to have some additional briefing on that at

1   the time.  It just seems to make sense.  I had a case -- well,

2   I still have pending a case from last term when Dobbs was

3   pending.  It was an action before me brought by the Satanic

4   Temple on abortion restrictions here, which I held off until

5   Dobbs came down.  And that clarified a lot of the issues of

6   going forward there.  So I just think that that has the

7   potential here as well.

8          All right.  So let's start with standing.  I'm going

9   to have most questions for Mr. Mitchell.  I've got the point of

10  your argument.  I'm going to let you all start with what you

11  want to emphasize for me there.  And it'll probably, as we go

12  through it, give Mr. Mitchell a heads up of questions that I'm

13  going to have for him.  But Mr. Kruse, always happy to hear you

14  argue on summary judgment or motion to dismiss.  Go ahead.

15         MR. KRUSE:  Your Honor.  I'm prepared to argue a

16  motion to dismiss on standing and ripeness here.  And as this

17  Court is well aware, this is a what we call a hypothetical

18  employment discrimination case for injunctive relief brought

19  by, you know, Professor Lowery, who is a tenured professor at

20  the University of Texas who says he wants to teach at A&M.  His

21  brief says the Finance Department in the College of Business.

22         Now as a preliminary matter on standing, this Court

23  we should be well aware that Professor Lowery has not applied

24  to work at Texas A&M.  He's never applied to work at A&M as far

25  as I know.  And his only excuse is that he fears that Texas A&M

```
1   will discriminate against white men and Asian men.  And that's
2   why he fears for not, you know, for not applying.  But he is
3   also -- what I think is important to realize -- he's never
4   identified -- it's not in his complaint -- he's never
5   identified anybody else, any white male or Asian male who is
6   discriminated against by Texas A&M.
7          He's also claiming that he wants to move to College
8   Station.  But as we know, he also has this other lawsuit where
9   he's telling another federal judge in Austin that don't fire me
10  at UT because I'm an outspoken critic of diversity initiatives,
11  don't fire me, don't cut my pay.  So he has that lawsuit going
12  on in Austin right now where he is telling this other federal
13  judge that basically he wants to keep his job at the University
14  of Texas.  And at the same time, he's --
15         THE COURT:  Does that, does that necessarily conflict
16  that he wants -- he doesn't want to get fired from UT, but that
17  would -- the fact that he might be getting fired from UT is a
18  reason that he might want to be looking around for other
19  employment.  I'm not sure that I necessarily see those at
20  complete loggerheads.
21         MR. KRUSE:  Well, I think what we've, what you -- the
22  standard on imminent, imminent harm, you know, the Supreme
23  Court in many cases talk about -- use that phrase "imminent
24  harm," -- actual or imminent harm at the hands of Texas A&M.  I
25  don't think that gets you there on imminent harm.  And that's
```

```
 1    why we've emphasized that as he really focused on that.  I mean

 2    the Supreme Court, for example, in that Carney case, and I

 3    would really direct your attention to that.  I know you've read

 4    that, but --

 5              THE COURT:  I do have questions about the Carney

 6    case.  I have one other -- I didn't look at it before I got up

 7    on the bench -- I had a standing decision where I read and

 8    applied Carney.  I think it was a Fair Debt Collection

 9    Practices Act, but I may be misremembering.  But no, I mean,

10    I'm familiar with the Carney case.

11              MR. KRUSE:  Well, let me, let me emphasize two things

12    about Carney -- and I know Mr. Mitchell says it helps him, not

13    us -- but let me, you know, the court, of course, denied

14    standing.

15              THE COURT:  There is the averment of being able and

16    ready, but that alone is not enough.  It's sort of like, okay,

17    that's like --

18              MR. KRUSE:  That's right.

19              THE COURT:  -- what's behind the supposition that

20    you're able and ready that you've actually done to show that

21    you still sustained a concrete and particularized injury.  Go

22    ahead.

23              THE COURT:  Yes, sir.  Well, let me emphasize two

24    facts that the Supreme Court pointed out.  And what is

25    interesting in Carney, of course, is that the District Court,
```

```
 1    the Third Circuit both said he had standing.  And when he got

 2    to the Supreme Court, they just rewrote it all and said he had

 3    no standing.  But what, a couple --

 4              THE COURT:  Am I remembering Carney right?  It's a

 5    pretty short opinion, right?  Am I remembering it correctly?

 6              MR. KRUSE:  Well, Justice Breyer wrote it and he

 7    doesn't write short opinions.

 8              THE COURT:  Justic Breyer?  Okay.

 9              MR. KRUSE:  Justic Breyer wrote it and --

10              THE COURT:  Well that would weight against it being

11    short.

12              MR. KRUSE:  Well, that's what I recall.  But what --

13    they reviewed the evidence, they reviewed the facts.  And so

14    definitely it was a factual analysis of standing.  But let me

15    just highlight two of the facts here because it bears in our

16    case.  It says they highlighted the fact that he had not

17    applied before to be a judge.  That's like Professor Lowery.

18    He's, we have no -- he's never applied to be a professor at

19    Texas A&M.  The other issue is that they point --

20              THE COURT:  Are there any cases that say -- because

21    I, I mean, I would assume if it was to be articulated about why

22    I haven't applied, it would injure me if I think that I don't

23    have a fair chance at it.  And so why should I subject myself

24    to the humiliation of an application process that's not fair?

25    And so, and I'm sort of the view is like, do we require our
```

1    plaintiffs to be made of sterner stuff than that?  Do we

2    require them to -- it's not a cost-free process to apply but

3    not hard to apply.  And so do we -- do the cases sort that out

4    clearly?

5           MR. KRUSE:  Well, obviously the case has come up with

6    the language "concrete harm" actually.  So how do you get to

7    concrete harm?  And when you say is it, is it -- and, and we

8    say, if all --

9           THE COURT:  That's sort of my question.  Is it

10   concrete harm to say, well, I'm going to apply and get denied

11   and that's humiliating and I don't want to subject myself to

12   that.

13          MR. KRUSE:  Well, let's look at the, the two cases

14   where that comes from.  Or one case where that comes from is

15   the Teamster's case.

16          THE COURT:  Okay.

17          MR. KRUSE:  About 1977 US Supreme Court case on US

18   Teamsters where -- which was actually a settlement of a Title

19   VII case or dispute on discrimination.  And one of the issues

20   was whether or not the black truck drivers could apply for

21   seniority retroactively when they had frankly knew that they

22   would be discriminated against?  Your Honor, I -- this case is

23   so far removed from that situation.

24          THE COURT:  And that's on track record where you

25   could then say, and here's the -- not just I'm looking at

1    policies that suggest there might be discrimination, just

2    looking at it as here's a record of discrimination in the past.

3              MR. KRUSE:  Well, let me, let me --

4              THE COURT:  That's a particular employment decision.

5              MR. KRUSE:  And what I -- the language used, "known

6    and consistently enforced policy of discrimination," that's the

7    language that the Fifth Circuit used in the Shackelford case,

8    "known and consistently enforced policy of discrimination."

9    There is no evidence that that's what exists at Texas A&M.

10   We've been all over that.  And so to say that he can just get

11   out of applying for a job at A&M because he says "I fear

12   discrimination," that's the problem, Your Honor.  And I don't

13   think -- and I do think we're, we're really looking at a

14   significant -- if you make the burden light, you know, I'm as a

15   trial lawyer --

16             THE COURT:  In standing you mean?

17             MR. KRUSE:  I'm sorry?

18             THE COURT:  The burden as to showing standing?

19             MR. KRUSE:  Yes.  Yes.

20             THE COURT:  All right.  Go ahead.

21             MR. KRUSE:  Lighter on the plaintiff because all he's

22   got to say is that, well, I fear that discrimination.  I think

23   there is a practical problem about opening the door to types of

24   lawsuits.  So that is a major issue.

25             THE COURT:  Okay.

```
1          MR. KRUSE:  So I think he doesn't meet what happened
2     in Teamsters and he doesn't meet even that language that the
3     Fifth Circuit is used in Shackelford trying to analyze
4     Teamsters too about known and consistently enforced policy of
5     discrimination.  So I think that's one of the major problems
6     that he's got.  But let me focus on -- and since you've read
7     Carney, I will pick up on that language of "someday" -- we
8     think he's a someday plaintiff.  Now he may want to apply to
9     A&M at some day.
10         THE COURT:  Well, it's like he's a no day plaintiff.
11    He's not even intending to.
12         MR. KRUSE:  Someday, yeah, someday.  Well you don't
13    even have to go that far.  But someday, he's going to get
14    around to it and applying to A&M.  He's working at UT.  He's
15    applied to University of Florida, and someday he may want to
16    come to A&M.  I understand that, but that doesn't get you in
17    the door.
18         THE COURT:  The policies in Florida, am I -- whatever
19    DEI plan or whatever is on their web page, is it still there?
20    Have there been statutory changes in Florida?  And does that
21    even matter because I take it that when he applied, the point
22    is there was a DEI policy stated on its web page. I'm just
23    wondering, sort of like, well, I was thinking that that might
24    change, and I don't know, has it changed in Florida?  Or do you
25    even know?
```

1            MR. KRUSE:  I believe the law has passed in Florida

2     because Texas passed the law very similar over the weekend.

3     And that's what we pointed out in our filing that we made

4     yesterday, that Texas passed a similar law.

5            THE COURT:  And we should be talking about that's

6     moot at this point?

7            MR. KRUSE:  Yes, sir.  Because we raised that in our

8     supplemental filing that we filed yesterday.

9            THE COURT:  Oh, I haven't seen that filing.

10            MR. KRUSE:  Well, I'm, I'm sorry.

11            THE COURT:  Is it based on this -- a new house action

12     or new law?

13            MR. KRUSE:  Yes.  Yes, sir.

14            THE COURT:  What did that do?

15            MR. KRUSE:  And I will -- may I hand you, I can hand

16     you a copy of that that I have an extra copy of that.

17            THE COURT:  Sure.  Mr. Mitchell, you've seen it and I

18     take it that --

19            MR. KRUSE:  It's Housefield --

20            THE COURT:  You won't be tied and flatfooted.  You'll

21     always be able to respond to it in writing.  Don't worry.

22            MR. MITCHELL:  We, we did file a written response

23     about this.  I'm sorry.  Go ahead.

24            THE COURT:  And do you have a copy or my case manager

25     can print one for me?

```
 1              MR. MITCHELL:  We filed it about three hours ago.

 2              THE COURT:  Okay.

 3              MR. MITCHELL:  I'm sorry.  I was so close to the

 4    hearing.  They filed yesterday, so.

 5              THE COURT:  Well, this one was filed yesterday.  So I

 6    think that that's okay.

 7              MR. KRUSE:  Here.  Do you have a copy?

 8              MR. MITCHELL:  I have a copy.

 9              MR. KRUSE:  Okay.

10              MR. MITCHELL:  And, counsel, we did file a response.

11    I don't know if you saw that.

12              MR. KRUSE:  I've got that response too.

13              MR. MITCHELL:  Okay.  It was, yeah.

14              MR. KRUSE:  I appreciate that.

15              THE COURT:  If you'll just print that for me when you

16    can.  Thank you, Mr. Mitchell.

17              MR. KRUSE:  Well, let me --

18              THE COURT:  Just briefly, what was it?  And have you

19    all had a chance to confer as to whether this really does start

20    to address the concerns that Mr. Mitchell's client is at least

21    raising whether as a concrete matter or whether as a matter of

22    policy?

23              MR. KRUSE:  Well, Mr. Mitchell has filed his

24    response.  He says it does not.

25              THE COURT:  Okay.
```

1          MR. KRUSE:  So it is what it is.  But since the Court

2     asked, let me just spend a couple of minutes on that.  But

3     Senate Bill 17 was passed on Sunday.  And we expect the

4     governor to sign the bill.  It's listed already as one of his

5     major achievements, you know, for the legislative session.  He

6     signed the bill and what we have pointed out in our

7     supplemental authority, two arguments here.  Because in this

8     supplemental authority, Your Honor, or in the bill, what it

9     does, it prohibits, you know, state public universities from

10    having diversity offices, from having, you know, diversity

11    statements required of applicants.  It prohibits preferences on

12    race or gender.  Those are all the issues that I believe had

13    been raised by Professor Lowery when he was saying that's what

14    Florida was on the way to doing with their legislation.

15          So Texas now has either copied Florida or gotten

16    ahead of Florida on its legislation.  But this is what is in

17    effect.  And we think it has two very strong reasons as to why

18    this case should be dismissed.  One, Your Honor --

19          THE COURT:  As to standing or as to mootness?

20          MR. KRUSE:  Standing and mootness.

21          THE COURT:  All right.

22          MR. KRUSE:  We think standing goes to the fact that

23    if you've got to show as we -- as certainly impending threat of

24    future harm to justify his wholesale injunctive relief, which

25    he's asking, that does not -- we can raise that right now.  And

 1   that goes to standing because not only do we have the

 2   established policies we've argued of Texas A&M, but now we've

 3   got the state law on top of it.  We don't believe that there is

 4   a certainly impending -- and that's the language of the Supreme

 5   Court -- threat of future harm to the plaintiff.

 6           We also want to point out, Judge, that it goes to

 7   ripeness.  There is no hardship.

 8           THE COURT:  I do see -- I'm looking at Mr. Mitchell's

 9   response right now that standing, standing is determined as of

10   the date of filing, which I agree with.  But so what I think

11   you're saying though is mootness.

12           MR. KRUSE:  Well let me, let me -- and I hesitate to

13   take issue with Mr. Mitchell here.  His first point is that

14   standing is unaffected by post-filing events.  Your Honor, I

15   agree that standing is determined on the date the lawsuit is

16   filed.  But, and if I may quote the, well, I guess the Carney

17   opinion, Carney v. Adams, standing as of the time he brought

18   this lawsuit and maintaining it thereafter.  Standing can be --

19   come into play any time during the case.  If you lose standing,

20   you're out of court right.

21           THE COURT:  Right.  You hear the argument -- and

22   you've also raised ripeness.  And so, I mean, reading the cases

23   in the briefing on that, I mean, really the ripeness argument

24   that you're raising kind of overlaps with whatever conclusion I

25   would reach on standing.  And I sort of think as a, as a

1   conceptual matter, mootness is distinct.  I hear what you're

2   saying that it's like, oh, this happened and so now he no

3   longer has standing, I would tend to let -- I'm not saying that

4   you can't raise the argument.  I'm just sort of saying I put it

5   in the box of "I might find it to be moot."

6          MR. KRUSE:  Well, I want to cover both boxes here,

7   you know.  I guess if -- I can argue for both areas.  I do

8   think it covers both areas.

9          THE COURT:  You're paid to argue all the boxes.

10          MR. KRUSE:  Well, and I do believe there's an

11   overlap, you know, on the issues here.

12          THE COURT:  Okay.

13          MR. KRUSE:  You can't just put them in a separate

14   box, but it goes to standing because he says, I mean, Mr.

15   Mitchell says that we haven't, it doesn't go to mootness.  And

16   I understand their arguments, but what we cite in our case,

17   what we think is the latest Fifth Circuit opinion, is that

18   Freedom From Religion versus Abbott, and that's where they

19   changed the rules on what could be displayed in the state

20   capitol.  They changed the rules.  And then the Fifth Circuit

21   said, well, they changed the rules and there was mootness there

22   and we, and we're dismissing the case.  What we quote in -- you

23   know there's an argument that, oh, this is, this is a voluntary

24   secession.  What we're saying about the statute, it's a state

25   statute.  You know, of course, we believe at Texas A&M, we're

```
 1    not, we're not violating any discrimination laws to begin with.

 2    But now we've got this state law on top of it that forbids the

 3    diversity offices and diversity statements.

 4            THE COURT:  Well, in terms of that, I guess I would

 5    ask this.  Based on the law that has just been passed, does

 6    Texas A&M have to do a review of all its policies and make

 7    changes to what it's doing or at least potentially consider

 8    that it has to make changes?

 9            MR. KRUSE:  Well, I'm not, I think we're probably we

10    are complying with the law, but there may be areas that we're

11    going to have to take a closer look at because, because we're

12    going to comply with this law.

13            THE COURT:  Right.

14            MR. KRUSE:  And what, what I would like to point out

15    though in terms --

16            THE COURT:  That's a different -- you have policies

17    that are in place and, of course, they're internally vetted at

18    the university.  And so there's obviously a belief that what's

19    imposed currently meets prior statutory and constitutional

20    constraints.  Now you have a state law overlay and I'm, it's a

21    friendly question, I would just assume that the university is

22    like, well, in light of a new law, we're really going to have

23    to do a top-to-bottom review of our policies and make sure that

24    we're complying with this law.

25            MR. KRUSE:  Yes.
```

1       THE COURT:  Make any, if there are changes that need
2   to be made.  I mean, there's a -- from what you're quoting --
3   the bill amends the Texas Education Code to bar the
4   establishment or maintenance of a "diversity, equity and
5   inclusion office at any state institution of higher education."
6   My recollection from the complaint is that in the call for
7   relief, Paragraph 66, it's more directly (f) Appoint a court
8   monitor to oversee the Diversity Office at Texas A&M University
9   to ensure there's no aiding or abetting of violations of civil
10  rights laws.  And so there's those overlap.  Right?
11      MR. KRUSE:  Right, right.
12      THE COURT:  So is there a DEI office at Texas A&M
13  right now?
14      MR. KRUSE:  Well, there's an Office of Diversity.
15      THE COURT:  Okay.
16      MR. KRUSE:  And that will be, that will be reviewed
17  and evaluated in light of the statue.
18      THE COURT:  And it might go away.
19      MR. KRUSE:  Correct.
20      THE COURT:  But it might not.
21      MR. KRUSE:  Correct.
22      THE COURT:  But that's going to be reviewed?
23      MR. KRUSE:  That will be reviewed.  That will be
24  reviewed.  And in our response, which is, which is really
25  quoting some of the language of the prayer where they

 1    specifically says they want, you know, to enjoin the use of

 2    those preferences --

 3              THE COURT:  Again, I'm not expressing a view on what

 4    Texas A&M must or should do or that if it's got an office,

 5    that's a good thing or a bad thing presently or how it

 6    interacts with the law.  I'm just saying a law was just passed.

 7    It's about to be signed.  It seems to overlap with some of the

 8    contentions in this case.  So I would assume that A&M is going

 9    to be reviewing and then we'll have sort of a new state of

10    affairs.

11              MR. KRUSE:  That's correct, Your Honor.

12              THE COURT:  Okay, all right.  Okay.  Go ahead.

13              MR. KRUSE:  You know that goes directly, I think, to

14    that Greenstein case on ripeness where the Fifth Circuit said,

15    wait a minute, you know, you have this, antiabortion, or this

16    abortion law in the State of Louisiana.  And they rushed in to

17    try to challenge that law and the Fifth Circuit took a look at

18    it and said, wait a minute.  You know the statute's not, hasn't

19    been enforced.  It was newly filed.  Why don't we wait and why

20    don't we dismiss on the grounds of ripeness?  And I think

21    that's appropriate here.  That's appropriate with this

22    particular new statute coming in.  Let's see how it goes.  And

23    they could come, you know, file another lawsuit if they think

24    there's a problem on that.  But I think it fits in directly

25    with what the Fifth Circuit decided to do in that Greenstein

1    case related to the abortion statute in Louisiana.

2              THE COURT:  Okay.

3              MR. KRUSE:  And that's what we're asking for on the,

4    you know, on the -- now, I will say Your Honor on the standing

5    issues here and we have -- just to be clear -- you know we have

6    made a factual challenge and a 12(b)(1) --

7              THE COURT:  And you're entitled to do that under

8    12(b)(1).

9              MR. KRUSE:  Yes, sir.  And it puts the burden on the

10   plaintiff.  The burden on the plaintiff is the plaintiff has to

11   come forward with the evidence.  You know we've come forward

12   with evidence too, which we're entitled to do.

13             THE COURT:  Right.

14             MR. KRUSE:  The plaintiff has filed a declaration.

15   Well, let me tell you, the plaintiff has filed a five-page

16   declaration and that's, that's basically all.  And let me tell

17   you, you know, it's mainly about his criticism of the

18   University of Texas, rightly so.

19             THE COURT:  Mr. Mitchell, there's a lot of people in

20   the audience.  Is your client here today?

21             MR. MITCHELL:  He is, Your Honor.

22             THE COURT:  He is?  I suspected that he might be.  So

23   if you want to introduce him, just so --

24             MR. MITCHELL:  That's my client, Professor Lowery.

25             THE COURT:  All right, welcome, Mr. Lowery.  There's

 1   more people in the courtroom than usual, but I was thinking

 2   that he might be with you.  You could have had him at table

 3   with you, if you'd like.

 4           MR. MITCHELL:  I didn't know that was allowed.

 5           THE COURT:  Yeah, that would is your client.  Mr.

 6   Lowery, you're certainly welcome at table with your counsel if

 7   you'd like to be in front of the bar, that's fine with me.

 8           MR. LOWERY:  Thank you.

 9           THE COURT:  He is a client.  He is a party to this

10   case.  So it's fine to have him at the table with you.

11           MR. MITCHELL:  All right, thank you.

12           THE COURT:  Okay.  Go ahead, Mr. Kruse.

13           MR. KRUSE:  Well, what I was saying is that, you

14   first --

15           THE COURT:  Anybody from A&M here that you would like

16   to have?  You're also welcome.

17           MR. KRUSE:  They're good to sit back there.

18           MS. VOGEL:  Thank you so much.

19           THE COURT:  Welcome to Texas A&M University as well.

20           MS. VOGEL:  Thank you.

21           THE COURT:  Thank you.  You are?

22           MS. VOGEL:  Carla Vogel, Assistant General Counsel.

23           THE COURT:  Okay.

24           MS. VOGEL:  And Kathleen Colt, Assistant General

25   Counsel.

```
 1            THE COURT:  All right.  Thank you both very much for
 2   being here.  Go ahead, Mr. Kruse.
 3            MR. KRUSE:  Okay.  We were talking about what did --
 4   the plaintiff has the burden, what did the plaintiff file to
 5   get the evidence in front of the Court?  You have a five-page
 6   affidavit.  It's mainly about the University of Texas.  You
 7   know, it says in there -- it doesn't say he's quitting his job
 8   at the UT.  But he says, you know, I think there's a phrase in
 9   there that would indicate that he doesn't intend to stay at UT
10   forever.  Well, okay, so he may stay there a while, I would say
11   where you interpret that.  But what's not in that complaint or
12   in that declaration is it, what's he looking for?  You know,
13   the Supreme Court in Carney got upset with the plaintiff
14   because they were --
15            THE COURT:  It's looking for what he articulates as a
16   level playing field and pointing to policies that he has
17   concerns about.  So, I mean, I at least understand that.  I
18   don't know if it's enough, but I at least understand that.  He
19   has articulated some changes that he wants.
20            MR. KRUSE:  Well, he's --
21            THE COURT:  The question is whether he gets to be the
22   one to say, in this action and these ways, I can force these
23   changes.
24            MR. KRUSE:  He can act as a policymaker and make an
25   advocate for changes in Texas A&M and he's been an advocate in
```

1    the legislature and done a good job with that.  But to get

2    standing, the concrete harm, the injury to that individual,

3    that doesn't get you there.  And why, Your Honor?  You know,

4    it's the same thing in Carney where he had all the good heart

5    to try to change the law, this lawyer -- and I think they say

6    he's qualified to be a judge.  I shouldn't say it doesn't take

7    much to be a judge -- but it does bring the Supreme Court

8    opinion.  I got that feeling.

9            THE COURT:  Well you're talking about state court

10   judge.

11           MR. KRUSE:  Exactly, Your Honor.

12           THE COURT:  Exactly.

13           MR. KRUSE:  Exactly, Your Honor.

14           THE COURT:  All right.  Our Texas judges are great.

15   Go ahead.

16           MR. KRUSE:  I understand.  I agree.  I agree.  He

17   couldn't articulate what judicial position he was really going

18   for.  And in his affidavit or declaration to this Court, it's

19   the same problem.  There's nothing in there about, oh, I want

20   to go for this open position at Texas A&M.  This is what I

21   want.  This is what I've articulated to identify and he hasn't

22   done that.  He's in the same boat as Mr. Adams was in the

23   Carney decision because he's not articulated anything about his

24   job that he really wants other than, you know, other than make

25   some general statement that he's not applying because he fears

1    discriminatory practices period.  That's it.  You know, you

2    would think that if you really want a job at A&M in the College

3    of Business or in the business school, you would articulate

4    what you wanted and he doesn't do that.  And that, I think, I

5    think that, that alone, frankly, Your Honor, I believe is fatal

6    to his standing arguments that he's making in this case.

7            THE COURT:  The position that he's potentially

8    interested in.  I don't know if everybody's on the same page,

9    but is it in the finance department at the Mays School of

10   Business?  Is that what it is?

11           MR. KRUSE:  Well, yes, sir.  I would think that

12   that's generally what it, what it falls under.  Okay?  You

13   know, he's a tenured professor --

14           THE COURT:  From the briefing, it indicates that a

15   lot of the policies -- that's the question that I have, that

16   the policies -- is that the ACE Plus and ACE Fellows Program

17   isn't involved at the Mays Business School?

18           MR. KRUSE:  Yes, sir.  Yes, sir.  Each one of the

19   schools has the option to participate in this program or not.

20   The business school has never participated in the program.  So

21   that doesn't come into play.  And that's what -- one of the big

22   points that we make is that he -- I think when he brought this

23   lawsuit, even though it's, I think, evident from our website,

24   he was focused on that memo that he found or got a copy of.

25   And then he realized that practice didn't apply to the College

1    of Business where he wants to get a job.  And so that, I think,

2    again, is fatal to his standing argument because it doesn't

3    match up.  I will say this too and point out that this memo on

4    the ACE program did come out in July last summer and frankly,

5    no one's ever hired, been hired under it.  And we issued -- and

6    Texas A&M issued a clarifying memo in December.  We sent it to

7    the plaintiff in this case and said, look, this is the

8    operative memo on the program.  It clearly says you comply with

9    equal opportunity laws.  There's no, you know, preference, you

10   know, for underrepresented minorities.  You know, we wanted to

11   make it absolutely clear that we're not giving preferences to,

12   for racial minorities.  And that's what we did in that memo.

13   And that, of course, was never used in the amended complaint or

14   even talked about in a response to the motion to dismiss.

15   That's important.

16          And then if the other exhibit and I -- and let me say

17   this, Your Honor, since this Court is very familiar with all

18   the whole Twombly Iqbal issue.

19          THE COURT:  Yeah.

20          MR. KRUSE:  When you read the complaint, it is filled

21   with conclusory allegations and they, you know, it doesn't meet

22   Twombly Iqbal, but then they try to, you know how you try to

23   backfill it by saying I'll attach two exhibits to try to give

24   little facts here?

25          THE COURT:  Yeah.

1          MR. KRUSE:  And the two exhibits, they don't get them

2     there.  That's what we said.

3          THE COURT:  But that's moving to 12(b)(6), Iqbal

4     Twombly, which I'm not really doing here today.

5          MR. KRUSE:  Well, it's only relevance here is for

6     standing, I would argue, just to make my observation here.

7          THE COURT:  I see what argument you're making about

8     the standing part of it.  And it still can't be conclusory.  It

9     still can't be speculative.

10          MR. KRUSE:  And no harm, no actual imminent harm.  If

11    there's no actual or imminent harm from a, from a, from a

12    program that would cause him to say, I don't, I can't even

13    afford to apply or can't even risk applying here.  That's the

14    problem.  We wanted to point out for standing purposes that he

15    has no risk.  And he has -- he should have applied in order to

16    get him in the door and start the process with respect to

17    standing in this particular case.

18          THE COURT:  All right.

19          MR. KRUSE:  Now, I would point out --

20          THE COURT:  I'll give you a couple more minutes to

21    sort of wrap up on the standing, ripeness, mootness things.

22    But then I want to start talking with Mr. Mitchell about it.

23          MR. KRUSE:  Okay.  Okay.  You know, the chief case is

24    that he's -- even that Northeastern Florida case versus

25    Jacksonville, Your Honor, the court used the phrase, you know,

1    that's regularly bid.  You know, they were saying, oh, we just

2    want to get our foot in the door.  We just want to have a level

3    playing field to be considered.  The Supreme Court went through

4    the analysis and said, well, these plaintiffs, these

5    contractors regularly bid and that's language that's been

6    picked up by the courts too, regularly bid.  They regularly bid

7    on contracts and they would bid on this one except for that

8    ordinance that the city had passed.  And they, and the court

9    said that's good enough for standing because they were, they

10   were really in the game here of a municipal contractor.

11           And he cites Gratz v. Bollinger.  You know that was a

12   student admission case out of Michigan where it was clear that

13   the plaintiffs there did actually apply to Michigan and were

14   rejected.  So there's no question about a lack of evidence with

15   respect to applications there.

16           We've talked about the Teamsters case and we talked

17   about their case on Carney v. Adams, which I do not think helps

18   them at all in light of the facts on that particular case

19   where, where the record is clear that he has a problem on

20   applying, he has a problem on telling the court exactly what he

21   was applying, applying for.

22           You know, this is standing argument, Your Honor, and

23   I'll wrap it up here since I've already talked about, about

24   ripeness here.  There's a practical trial lawyer problem on

25   this standing argument.  You know, one is that we've mentioned

1    before that if you lower the standards here, you got a lot of

2    Title VII people or a lot of, you know, discrimination people

3    say, Well, great, I can get into court now with a lower

4    standard here because I don't really have to apply.  That's a

5    problem.  But secondly, Your Honor -- and I think the Court has

6    looked at the prayer in this particular case, he at best -- and

7    I don't think he does -- has standing on applying for a job in

8    the College of Business.  And yet his demand for injunctive

9    relief in this case goes to the fact that he's asking this

10   Court to be, in essence the HR Czar for Texas A&M and approve

11   all appointments and preclear appointments, preclear

12   compensation.

13              THE COURT:  I'm aware of that request.

14              MR. KRUSE:  That, to me, is a standing issue and yet

15   we're allowing, that's why we cannot allow, you know, and

16   someone in Mr. Lowery's situation -- and I do, you know, I have

17   no doubt about his sincerity and about his sincerity with

18   respect to what he is advocating for here, but that doesn't get

19   you in the door.

20              It's better, I think, to be concerned about what

21   Justice Alito said in the Clapper opinion where they denied

22   standing about -- you're talking about separation of powers.

23   You're talking about a political system that judges are not

24   supposed to give advisory opinions.  Judges are not supposed to

25   just allow, you know, political decisions or policy decisions

1  to be made in their court.  And the reason how we rein them in

2  is standing.  You've got to have standing to get into court.

3  Thank you.

4          THE COURT:  Thank you.  I also take that last

5  argument as you're not submitting your application to be

6  considered as court monitor if it gets to that point.

7          MR. KRUSE:  That's right.  That's right.

8          THE COURT:  All right.  Thank you.  All right.  Mr.

9  Mitchell.

10         MR. MITCHELL:  Thank you, Your Honor.  May it please

11 the Court, there are three crucially important issues that

12 should be clarified with respect to the defendant's motion.

13 The first is one Your Honor has already discussed with Mr.

14 Kruse, which is the distinction between standing and mootness.

15 The post-fling events that the defendants rely on, not only the

16 recent passage of Senate Bill 17, but also their decision to

17 walk back in part the ACE's Plus memo of July 8th of last year

18 go to the question of mootness because all of those events

19 postdate the filing of this complaint.

20         The reason this is important is because of the burden

21 of proof.  With respect to Article III standing, the burden is

22 on us to allege the elements in our complaint and ultimately to

23 prove each of those elements by a preponderance of evidence

24 after discovery and after fact development.

25         With mootness, the burden is on the defendants.  They

1    have to prove mootness factually.  And also if it's an act of

2    voluntary cessation, they need to prove that it is absolutely

3    clear the expected conduct would not be expected to reoccur.

4              THE COURT:  Have you considered in light of, I guess,

5    the amendment to the memo that you referred to and the new

6    statute that's just been, I guess, it's about to be signed?

7    Have you considered declaring victory and saying that action

8    like this is forced change and your watchful eye will be on A&M

9    and you'll bring another action if, if need be?  But I'm sort

10   of, I'm looking at just briefly what I see as the thrust of the

11   law that's just passed.  It seems to get a long way to where

12   you're arguing as a policy matter on what education policy

13   ought to be in the state.

14             MR. MITCHELL:  Yeah, you're right, Your Honor.  It

15   does touch on that.  I mean it certainly does with respect to

16   faculty hiring.  It specifically says in the bill that there's

17   to be no consideration of race or sex, which is exactly what

18   we're suing over.

19             THE COURT:  Right.

20             MR. MITCHELL:  The reason we're not ready to declare

21   victory yet is because it is a factual question whether and to

22   what extent A&M will comply with this.  I can tell Your Honor

23   from my own personal experience, I have served on university

24   faculties where they have written explicit policies that say

25   there is no consideration of race in faculty hiring and they

1    disregard those policies all the time and use race regardless.

2    We could submit declarations from people who still sit on those

3    faculties saying that very thing.

4           There is, in our view, a factual question on which

5    A&M bears the burden of proof, not us, where A&M would need to

6    show that number one, they are complying with the law as

7    written.  But number two, provide some assurance that can prove

8    to the Court -- because again, the burden of proof is on them -

9    - that they are indeed complying and that it's not going to be

10   a situation where the university is saying one thing and doing

11   another.

12          THE COURT:  Let me ask this to both of you, also to

13   Mr. Kruse on behalf of the university.  I've got the notice,

14   notice of supplemental authority and I've got your response.

15   Is that adequate briefing on a potential mootness issue or

16   should I just get, you know, a further affirmative motion or

17   explanation in that regard and you have the chance to respond

18   to it.  Mr. Kruse.  I mean, I can read it myself and I do have

19   your notice, but as a notice you did it write, it's less

20   argumentative as opposed to simply saying, hey, here's this

21   other thing that you need to read.

22          MR. KRUSE:  Your Honor, since I guess I normally

23   would have a reply right to what Mr. Mitchell has filed, but,

24   you know, if -- you know, I'd be more than happy to file a --

25   you know, next week we could file something with the Court on

1    if you want on mootness specifically.

2            THE COURT:  Well, let me ask then, Mr. Mitchell, is

3    your response, is it enough?  Well, I just want to do --  do I

4    have your views on mootness in writing?

5            MR. MITCHELL:  It's somewhat skeletal.  I think I

6    could develop the arguments a little more if I had had a little

7    more time to respond.  We were, we were rushed to get that in.

8            THE COURT:  From yesterday to today.

9            MR. MITCHELL:  I think the only thing I would add to

10   elaborate on the points that we made is -- and we gestured

11   toward this in the written submission -- there is a need, in

12   our view, for factual development because mootness is a

13   question on which they bear the burden of proof.  And in our

14   view, simply citing the existence of Senate Bill 17 is not

15   enough to prove factually by a preponderance of the evidence

16   that they're going to comply.  So we would like to take

17   discovery on the mootness questions.

18           THE COURT:  I'll come back around to further, whether

19   there's going to be further writing on mootness later in the

20   hearing.

21           MR. MITCHELL:  All right.  The second distinction,

22   Your Honor, I mentioned three at the outset.  First is this

23   distinction between standing and mootness.  The second though

24   is the fact that we are at the motion to dismiss stage of the

25   litigation and we're not at final judgment or summary judgment

```
 1    yet.  And this is where Carney against Adams comes in.  Carney
 2    was a case where the Supreme Court was reviewing an appeal from
 3    a final judgment of the District Court where the plaintiff in
 4    Carney needed to prove by a preponderance of the evidence that
 5    he stood able and ready to apply.  We're not anywhere near that
 6    stage of litigation yet.  We're at the complaint stage, the
 7    motion to dismiss stage, where we need only to allege that Mr.
 8    Lowery stands able and ready to apply.  Now, we've done more
 9    than that by attaching a declaration, a sworn declaration which
10    we don't think we needed to do.  We did that out of an
11    abundance of caution.  But in doing that, I don't want to in
12    any way concede that it's our obligation at this point of a
13    litigation to prove standing.
14               THE COURT:  Okay.
15               MR. MITCHELL:  We need only to allege it.  And all
16    the points that Mr. Cruz is making about Carney have to be
17    understood in the context of a case where the plaintiff had to
18    prove the elements of standing, not simply allege them.  We
19    eventually will have to prove standing.  I'm not denying that
20    we'll have to do it.  We just don't have to do it now.  That
21    will come later after discovery.  And after fact development.
22               THE COURT:  And what's the third point?
23               MR. MITCHELL:  The third point, which is closely
24    related to the second, is the distinction between a facial and
25    factual 12(b)(1) motion.  And the defendants -- I'm not in any
```

1  way suggesting bad faith on their part -- but they haven't been

2  entirely clear the extent to which their 12(b)(1) motion is

3  facial and the extent to which it is factual.  So in a, in a

4  facial 12(b)(1), they are challenging the adequacy of, of our

5  allegations of standing.  In a factual 12(b)(1), they would be

6  challenging the truth of our allegations.

7         If Your Honor looks at Pages 6 through 8 of their

8  original motion --

9         THE COURT:  I mean, they're definitely bringing a

10  factual standing challenge at this point.

11        MR. MITCHELL:  With respect to Mr. Lowery's

12  intentions of applying.

13        THE COURT:  Right.

14        MR. MITCHELL:  So the way I construe their motion --

15  and Mr. Kruse should correct me if I'm wrong -- I think they

16  are bringing a partial factual challenge, but only with respect

17  to Mr. Lowery's intent and state of mind and whether he's able

18  and ready to apply.

19        If you look at the rest of their motion, they're

20  challenging the adequacy of our allegations with respect to the

21  alleged discriminatory practices.  They haven't said, at least

22  the way I interpret their motion, they're not denying factually

23  that there is race and sex preferences going on.

24        THE COURT:  So in that context, a facial standing

25  challenge would be really no one would be able to have standing

1    based on our policies as construed?

2              MR. MITCHELL:  Or they would -- I'm sorry.

3              THE COURT:  And then factual challenges, okay, even

4    if somebody has the ability to do it.  Mr. Lowery, factually,

5    can't do it because is able and ready is not able and ready

6    enough.  Is that the distinction that you're saying?

7              MR. MITCHELL:  Basically right.  The only thing I

8    would add, Your Honor, is I think you could also make a facial

9    challenge by just saying we didn't plead enough detail under

10   Twombly or Iqbal.  That's another way, I think, of bringing a

11   facial 12(b)(1) in the context of Article III standing.

12             So we've tried to respond to this, what we view as

13   almost a hybrid motion, where we put in that declaration for

14   Mr. Lowery to try to produce some evidence that Mr. Lowery is

15   telling the truth in the allegations of his complaint.  At the

16   same time, we don't need to prove all the elements of Article

17   III standing.  We don't need to show, for example, that it's

18   factually true that the university is discriminating because we

19   haven't had a chance to take discovery yet.  It's not

20   reasonable to put us to that burden at this point in the

21   litigation.

22             So there's some statements in the reply brief from

23   the defendants that say we need to prove everything about

24   standing by a preponderance of the evidence now because they've

25   thrown down the gauntlet with a factual 12(b)(1) motion.  We

1   respectfully disagree.  We can't, at this point, prove all the

2   elements of standing before we've had a chance to take

3   discovery.  We could, I think, prove Mr. Lowery's intentions

4   because Mr. Lowry has that information himself and he's

5   produced that in the declaration.  But when we haven't yet had

6   a chance for discovery, it's not reasonable for the defendants

7   to say that we need to go all the way and prove right now at

8   the outset of the proceedings in this case, prove by a

9   preponderance of the evidence, all the elements of Article III

10  standing.  That has to wait for discovery so we can find out

11  exactly what's going on at A&M before we can prove that part of

12  the standing inquiry.

13          So I hope that makes sense, Your Honor.

14          THE COURT:  It does, it does.

15          MR. MITCHELL:  Yeah, that's, that's how we're

16  approaching their motion.

17          THE COURT:  Okay.

18          MR. MITCHELL:  And again, Mr. Kruse should, should

19  correct me if I'm mischaracterizing their argument in any way.

20  So I'm happy to answer any other questions Your Honor may have.

21  I think the only other point I would emphasize is that it's

22  very clear to us from the case law that Mr. Lowery does not

23  need to formally apply.  That is clear from Carney, all you

24  need is --

25          THE COURT:  It's clear from the case law what?

```
 1              MR. MITCHELL:  That Mr. Lowery does not need to

 2    formally apply to A&M before he can have standing because

 3    Carney against Adams says you only need to stand able and ready

 4    to apply.  Gratz against Bollinger is really helpful to us

 5    where Patrick Hamacher, who was given standing to sue Michigan

 6    as a transfer student, never applied as a transfer student.

 7    And the Supreme Court said that's okay.  He only needs to be

 8    able and ready to apply.  Now, Hamacher did apply to Michigan

 9    initially as an undergrad, but that didn't go to whether he had

10    prospective relief to sue Michigan over its transfer admissions

11    policies.

12              And then there's a really helpful quote from City of

13    Jacksonville, this case a Northeast Florida Chapter, where the

14    court says -- this is on a 508 US at Page 666 -- "To establish

15    standing, a party challenging a set-aside program like

16    Jacksonville's, need only demonstrate that it is able and ready

17    to bid on contracts and that a discriminatory policy prevents

18    it from doing so on an equal basis."  And that's exactly what

19    we're alleging here.  We allege Mr. Lowery is able and ready to

20    apply even though he hasn't applied yet.  But there's a

21    discriminatory policy that prevents him from seeking employment

22    on an equal basis with others.  And that's all we need, again,

23    at this point of litigation.

24              THE COURT:  Let me ask a couple of questions.  There

25    was an assertion and I just like your thought on, Has the
```

1    plaintiff, can the plaintiff identify any actual victim of the

2    discriminatory policy that you're asserting?  Is there anybody

3    that you could point to that that's the person who didn't get

4    hired that should have?

5            MR. MITCHELL:  No.  And the reason for that, Your

6    Honor, is we're not necessarily seeking prospective relief --

7    I'm sorry, retrospective relief on behalf of any other non-

8    party to this case.  So Mr. Lowery is suing on behalf of

9    himself and a class of others who will apply in the future.

10           THE COURT:  Right.

11           MR. MITCHELL:  So it's forward looking.  We're not

12   trying to seek damages on a class-wide basis.  We might try to

13   get nominal damages perhaps for Mr. Lowery.  But we're not --

14           THE COURT:  I terms of showing that there's a problem

15   here or that there's a well-founded fear or whatever, I just

16   want to be clear that there's not anybody -- I'm not aware of

17   any, I'm not aware -- there's not anybody that you're pointing

18   to that it was X, Y, or Z person got turned down and has been

19   complaining that they got turned down because of affirmative

20   action programs.

21           MR. MITCHELL:  We haven't alleged that yet.

22           THE COURT:  Okay.

23           MR. MITCHELL:  Perhaps after we take discovery, we

24   will find such a person.

25           THE COURT:  All right.

```
 1              MR. MITCHELL:  What we have alleged is that there's a

 2    pervasive practice at A&M of race and sex preferences and

 3    faculty hiring of which the ACE's Plus program is simply one

 4    manifestation.  But we will need to obviously do more than just

 5    have bare allegations to survive a motion for summary judgment.

 6    And if discovery turns out that there hasn't been anyone who's

 7    been denied employment, that will make it much harder for us to

 8    prevail on a motion for summary judgment.  But that's all going

 9    to come later in our view.  Discovery has to happen first

10    before we can be expected to produce that type of evidence.

11              THE COURT:  All right.  And then on, was it the

12    University of Florida where he has or did apply?

13              MR. MITCHELL:  Yes.

14              THE COURT:  University of Florida.  When he applied,

15    was there on their website policies that said, Hey, we have a

16    DEI program that's in place?  Was that known at the time that

17    he applied?

18              MR. MITCHELL:  There were things on websites about

19    DEI.  There was nothing, I think, that explicitly said we give

20    discriminatory racial preferences or sex preferences in our

21    faculty hiring.  Maybe you can imply that from having a DEI

22    page, perhaps.  But generally, these types of websites use

23    bromides and platitudes to describe what they're actually

24    doing?

25              THE COURT:  Yes.  Okay.  All right.  And let's look
```

```
 1   at Carney.  The court goes into -- and is it a Justice Breyer

 2   opinion?  Is that right?

 3              MR. MITCHELL:  It is, yes.

 4              THE COURT:  How long is it?  Maybe I'm remembering

 5   the wrong case?

 6              MR. MITCHELL:  It's not that long.  I mean for

 7   Justice Breyer opinion --

 8              THE COURT:  It's four or five pages?

 9              MR. MITCHELL:  Yeah.

10              THE COURT:  I mean, it's pretty short, right?

11              MR. MITCHELL:  I think it might have been ten or so.

12              MR. KRUSE:  I withdraw my criticism of --

13              THE COURT:  No, no, no.  I generally agree with that.

14   I think everybody would generally agree with observation.  It's

15   2020 decision.

16              MR. MITCHELL:  Yeah.

17              THE COURT:  Okay.

18              MR. MITCHELL:  And it is short, partly, because they

19   didn't get past Article III standing.  So they didn't have to

20   go into the merits, which is what they granted certiorari on.

21              THE COURT:  All right.  And so there's sort of a

22   block quote where it's not set out as a Breyer multifactorial

23   test, although he often does.  But his words, I would apply

24   standalone without any actual past injury, without reference to

25   an anticipated time frame, without prior judgeship applications
```

1   without prior relevant conversations, without efforts to

2   determine likely openings, without other preparations or

3   investigations, and without any other supporting evidence.  And

4   we could go through each one of those.  I mean I see some of

5   the things that you're submitting that having read that and

6   trying to tailor into what's being said there, is that right?

7           MR. MITCHELL:  Right.

8           THE COURT:  Like what you've submitted is what you've

9   got that responds to those concerns in that case?

10          MR. MITCHELL:  Yes, partly.  Now, again, this was on

11   review of final judgment.

12          THE COURT:  I got that.

13          MR. MITCHELL:  So that's the key point I want to

14   make.  We will eventually have to prove those sorts of things.

15   We just don't have to do it now.

16          THE COURT:  Okay.

17          MR. MITCHELL:  But Your Honor is correct.  That is

18   one factor to consider.  Now, there's also Justice Breyer says

19   -- and I'm looking at this passage right now -- three

20   considerations taken together convince us.  So it is one of

21   these, that's one factor of a three-factor test.  So we'll

22   probably have additional briefing on just exactly how all these

23   factors work together.  But we definitely acknowledge, Your

24   Honor, that it is our burden to prove this factually.  And we

25   will eventually have to prove something along the lines of what

1    Justice Breyer is describing.  But at this stage of the

2    litigation, it's enough for us to allege.  And that's what

3    we've done.  And that's enough to defeat at least a facial

4    motion to dismiss.

5            And factually, we still should have the chance to get

6    to discovery if they do want to contest the truth of our

7    allegations.  That should happen after discovery and fact

8    development before this Court decides definitively whether

9    we've done enough to show factually whether we have proven our

10   case.

11           THE COURT:  This isn't casting an aspersion on your

12   case.  This is a policy-directed case.  I get that.  And if you

13   have standing to do it, then you get to do it.  But is there,

14   with what's going on in the statute and with everything that's

15   going on, has there been discussions, is there anything that

16   you all want to talk about about whether something potentially

17   satisfactory might occur based on the statute that's just come

18   out that, I mean, as the federal judge, I'll rule on what I

19   need to and I'm always content to not rule if I don't need to.

20           So, is there any, I mean do you just want a ruling on

21   this because that's what you want or is there a context within

22   which you all could talk and maybe it alleviates the dispute.

23   I would never terminate the dispute because you'd always be

24   able to bring a later one.  But we have the statute, how it

25   might be applied.  Have you given thought to that?

```
 1              MR. MITCHELL:  I haven't given thought to it yet just
 2     because SB 17 is such a recent development.  But I think
 3     there's certainly potential for us to discuss whether SB 17, if
 4     there is going to be compliance with the statute in a way that
 5     could satisfy us, could obviate the need for the Court's
 6     intervention.  Courts exist to resolve cases or controversies.
 7              THE COURT:  Exactly.
 8              MR. MITCHELL:  And if there's no more case or
 9     controversy because the university is doing what we want,
10     there's no need for the Court to be involved.  We acknowledge
11     that and we have no desire to waste the Court's time or seek an
12     advisory opinion or misuse the --
13              THE COURT:  Right.  And it's not wasting my time.
14     I'm just sort of like -- I always give parties a chance to talk
15     it.  You heard my initial conferences on a slip and fall case.
16     It's like, Hey, when are you all going to go talk about this
17     because maybe it will go away?  And I'm happy for that to
18     happen.  But this is a different type of case, obviously.
19              MR. MITCHELL:  Right.  And SB 17 certainly changes
20     the playing field.  We acknowledge that.
21              THE COURT:  All right.  Would you all -- I would ask,
22     is there anything else you wanted to address with me?
23              MR. MITCHELL:  Unless Your Honor has further
24     questions, no.
25              THE COURT:  Those cover the questions I had.  Mr.
```

 1    Kruse, I'll hear anything further that you want to say in

 2    response.  I would like 10 days to give me a status report on

 3    whether there's the potential for discussions on which I should

 4    then hold off on ruling here.

 5            And in that status report in 10 days, let me know if

 6    you want to brief anything further on the new law as to

 7    mootness or however it might impact what's already teed up in

 8    front of me because I don't want to go through sort of

 9    threshold issues on this and then have another threshold issue

10    more formally briefed as mootness.  I'd like to sort of look at

11    clearing out whether and what's going forward in this action

12    substantively, if there are other standing or Article III

13    variants, that sort of terminate what I would be doing at this

14    point.  Does that make sense?

15            MR. MITCHELL:  Yeah.

16            MR. KRUSE:  We'll report back in ten days, Your

17    Honor.

18            THE COURT:  All right.  Thanks.  Sort of the one

19    other non-12(b)(6) issue was the sovereign immunity.  I think

20    I've got it on the briefing from both parties, but I am looking

21    at that right now as well.  Do you want to give me, I'll let

22    Mr. Mitchell lead on that and then you can respond further on

23    that.  How about maybe like five minutes from each side on

24    sovereign immunity.

25            MR. MITCHELL:  We address that, I think, fairly

1    thoroughly in our brief and as did our opposing counsel.  And,

2    Your Honor, we just see all the time whenever a litigant sues

3    over a university policy, it seeks prospective relief, you sue

4    the university president.  That's just the normal ex parte

5    Young defendant.  This is not a situation where we're

6    challenging the enforceability of a statute.  So a lot of these

7    cases that the defendants are citing are brought up in that

8    context.  We're challenging an ongoing policy that we allege

9    is, is pervasive throughout the university.  And ultimately,

10   the president is responsible for it.  And if we're not going to

11   sue the president, who are we supposed to sue?  And that's the

12   rhetorical question that I would ask the defendants.

13             THE COURT:  Right.

14             MR. MITCHELL:  There's, there needs to be somebody.

15   This is not a Texas Heartbeat Act situation where it's designed

16   to have no ex parte Young defendant.

17             THE COURT:  Also in part, the argument is, okay, if

18   we haven't sued the right university official, just tell us who

19   it is and we'll sue that person.

20             MR. MITCHELL:  Right.  That's kind of what I would

21   ask.  I mean, obviously, it's our job to figure out who to sue

22   because we're the plaintiffs.  But this doesn't seem to me a

23   situation where it's been designed intentionally to have nobody

24   responsible for the ultimate policy at the university.

25             THE COURT:  Right.  Somebody has to be responsible.

```
 1                MR. MITCHELL:  Somebody has -- and when we talk about
 2     faculty hiring, the provost signs off on every decision, the
 3     president signs off on every decision, or at least on most of
 4     them.  And if it's not the president, it's one of the
 5     president's delegates who the president would be responsible
 6     for.
 7                THE COURT:  All right.  Okay.  Thank you very much.
 8                MR. MITCHELL:  Thank you.
 9                THE COURT:  Mr. Kruse.
10                MR. KRUSE:  I'll make a couple of comments on this
11     sovereign.  I'm trying to get an ex parte Young case.  I was
12     intrigued by there was no response to our latest cases.  You
13     know, last year, the Fifth Circuit in that Texas Alliance v.
14     Scott case, you know, held that the Secretary of State had no
15     ex parte Young, you know, argument and they dropped her or
16     dropped him out of the case and dropped the case.  And I would
17     direct the court's attention, frankly, I don't refer many times
18     to a dissent, but Judge Higginbotham had wrote a dissent in
19     that case giving the history of how ex parte Young has been
20     narrowed and continues to be narrow.  And that's what we're
21     talking about here because I don't think they've adequately
22     alleged those four particular people.  You know, you could say,
23     oh, yeah, it's the president, you know, a general duty to
24     enforce the rule.  It doesn't get you there under the cases
25     that we cite and I think the courts have been backing off on ex
```

```
 1    parte Young and that's the cases we'd like for this Court to
 2    read and, frankly, this diversity statute comes into play.  We
 3    now, you know, you're not going to just say, oh, we'll just
 4    name the heads of the diversity office.  Well, we don't have a
 5    diversity office.  So that's the type of easy, kind of, trial
 6    lawyers say we'll just name these people and we can get away
 7    with it.  But I think the courts are taking a closer look at
 8    it.
 9             THE COURT:  But for ex parte Young, is it narrowing
10    its availability or is it narrowing who can be sued under it?
11             MR. KRUSE:  Well, it's narrowing --
12             THE COURT:  What you're saying about Higginbotham's
13    opinion.
14             MR. KRUSE:  It's narrowing the availability of who
15    can be sued on it because there they said the Secretary of
16    State on voting laws in Texas was not going to be the proper ex
17    parte Young.  Now that was a --
18             THE COURT:  And did they determine who it was?
19             MR. KRUSE:  No.
20             THE COURT:  They just determined that they didn't get
21    this right.
22             MR. KRUSE:  That person had, that this person was
23    off.  You know, and that case was interesting again.  Now that
24    is the law.  They argued that this person, that Secretary of
25    State, didn't necessarily -- this was the challenge with
```

 1   respect to when Texas passed a law that said -- got rid of

 2   straight party ticket voting.

 3           THE COURT:  Okay.

 4           MR. MITCHELL:  Some people didn't like it, right?

 5   And so there's a lawsuit brought about who do you sue?  You

 6   know, you can't sue the state.  So they sued the Secretary of

 7   State who generally everybody concedes, and at least Judge

 8   Higginbotham thought, was the person that you would sue in the

 9   State of Texas who handles voting.  Court said, no.  The court

10   said there's a lot of local officials who are going to enforce

11   that law and; therefore, you know, they were, they were going

12   too high.  Let's put it that way.

13           THE COURT:  And so, okay.

14           MR. KRUSE:  And so, and so, it's similar to what you

15   get into this, this kind of a, what I call a kind of a knee

16   jerk reaction, oh, let's just sue the president.

17           THE COURT:  But I can sort of see that in terms of if

18   you're looking at sovereign entities that range from municipal

19   to state level as to who you're picking that are enforcing

20   these things.  I don't pretend to understand all the arcana of

21   Texas law and procedure.  But is that, does that overlay onto

22   like a university system the same way?  Because I mean, there

23   is only one person at the top of the chain there.  And from

24   what I hear you saying, the Secretary of State is not

25   necessarily the person that's on top of what's going to happen

1    in Harris County or Bear County or wherever.  There's an

2    election administrator for each of those counties.  What,

3    what's your thought?

4            MR. KRUSE:  Part of the problem with this case is

5    that, you know, how do you determine on a program they say

6    there is a -- you know, if they say there's a systematic

7    discriminatory policy at Texas A&M, people have denied that and

8    people will say there is none.  You know, we've made that

9    argument.  There is no policy here to discriminate and have

10   preferences for racial minorities.  And so the issue is no, you

11   know, there's somebody out there who we should target for an

12   injunction.  It's kind of hard to do, Your Honor, because the,

13   the president will say that's not -- you know, I don't have to

14   enforce the law generally.  That's what the case says, to

15   enforce the law generally is, you know, maybe the president's

16   duty, but that doesn't get you into ex parte Young.

17           THE COURT:  Okay.

18           MR. KRUSE:  And so that's the concern I've got here

19   and I would direct your attention to the cases that we cited in

20   that portion of the brief.

21           THE COURT:  All right.  Thank you.  All right.  Thank

22   you all very much.  If there's nothing else, that will conclude

23   us today.  For what it's worth, I will note that you all

24   brought out a lot of Fifth Circuit law clerks and other summer

25   interns who are here in the building.  So it was a good

1    argument.  Mr. Kruse, the last time we were in a courtroom

2    together was across the hall before Judge Lake if you remember.

3    I was a young partner supporting Steve Sussman.  I think you

4    all battled to a draw that day and it settled.  But I say that

5    in memory of Mr. Sussman.

6          MR. KRUSE:  Yes.  Thank you.  Thank you.  Steve is a

7    good man to remember.

8          THE COURT:  We are adjourned.

9       (Hearing adjourned at 11:51 a.m.)

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T I O N

 2

 3      I, Sonya Ledanski Hyde, certified that the foregoing

 4  transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8  Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20  Veritext Legal Solutions

21  330 Old Country Road

22  Suite 300

23  Mineola, NY 11501

24

25  Date:  November 21, 2023
```